```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   GEORGE CAVELLE,                    )
                                        )
 4              Plaintiff,              )
                                        )
 5     v.                               )  No. 17 C 5409
                                        )
 6   CHICAGO TRANSIT AUTHORITY,         )
     DORVAL R. CARTER, JR.,             )
 7   individually, JOHN DOE 1, and      )
     JOHN DOE 2,                        )  Chicago, Illinois
 8                                      )  March 21, 2019
                Defendants.             )  1:30 p.m.
 9
                             UNDER SEAL
10              TRANSCRIPT OF PROCEEDINGS - HEARING
        BEFORE THE HONORABLE MARY M. ROWLAND, MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:          SWEENEY & SCHARKEY, LLC
13                               BY:  MR. JOHN JOSEPH SCHARKEY
                                      MR. ROBERT D. SWEENEY
14                                    MS. JOANNE HANNAWAY SWEENEY
                                 111 West Washington Street
15                               Suite 1160
                                 Chicago, Illinois  60602
16                               (312) 384-0500

17   For the Defendants:         TAFT STETTINIUS & HOLLISTER LLP
                                 BY:  MS. ELIZABETH ERIN BABBITT
18                                    MR. JOHN FRANCIS KENNEDY
                                      MS. ALLISON EMMA CZERNIAK
19                                    MR. PAUL JOHN COOGAN
                                 111 East Wacker Drive
20                               Suite 2800
                                 Chicago, Illinois  60601
21                               (312) 527-4000

22

23

24

25
```

                    Nancy C. LaBella, CSR, RDR, CRR
                         Official Court Reporter
                  219 South Dearborn Street, Room 1222
                         Chicago, Illinois  60604
                              (312) 435-6890
                         NLaBella.ilnd@gmail.com

```
 1              THE CLERK:  17 C 5409, Cavelle v. Chicago Transit
 2   Authority.
 3              THE COURT:  Is plaintiff out front?
 4              MR. KENNEDY:  I'll go check, your Honor.
 5      (Brief pause.)
 6              MR. KENNEDY:  No, your Honor.  Plaintiffs nor his
 7   counsel are here, at least yet.
 8              THE COURT:  So the people outside are your
 9   witnesses -- are the witnesses?
10              MR. KENNEDY:  Yes.
11              THE COURT:  There's a witness room across the hall if
12   you want to use a room.
13              MR. KENNEDY:  I'll let them know.  Thank you, Judge.
14              MS. BABBITT:  Your Honor, would you want the
15   witnesses to be separated or --
16              THE COURT:  I have two rooms --
17              MS. BABBITT:  Okay.
18              THE COURT:  -- if that would be easier.
19      (Brief recess.)
20              THE CLERK:  17 C 5409, Cavelle v. Chicago Transit
21   Authority.
22              MR. SCHARKEY:  Good morning, your Honor -- afternoon
23   rather.  John Scharkey, S-c-h-a-r-k-e-y.  I represent the
24   plaintiff George Cavelle.
25              MR. KENNEDY:  Good morning, your Honor.  John Kennedy
```

1    and Elizabeth Babbitt here on behalf of the CTA.  Also present

2    from the CTA and in Ms. Seimetz's absence -- she was the

3    general counsel who was here before, your Honor -- is Jeffrey

4    Hulbert from the general counsel's office.

5            THE COURT REPORTER:  Can you spell the name, please?

6            MR. KENNEDY:  H-o-b-e-r-t.

7            MS. BABBITT:  H-u-l-b-e-r-t.

8            MR. KENNEDY:  Close.

9            THE COURT:  Okay.

10           MR. SWEENEY:  Robert Sweeney on behalf of

11   Mr. Cavelle.

12           MS. SWEENEY:  Joanne Sweeney on behalf of

13   Mr. Cavelle.

14           MR. SWEENEY:  And Mr. Cavelle is also present in

15   court.

16           THE COURT:  Okay.  Are we ready to proceed?

17           MR. SCHARKEY:  We are, your Honor.  We have a couple

18   of just preliminary issues.  We're --

19           THE COURT:  Sure.

20           MR. SCHARKEY:  -- in somewhat of an unorthodox

21   posture here in terms of the order of proof, who is carrying

22   the burden and how the Court wishes to receive the evidence.

23   We're prepared to put Mr. Cavelle on and direct his testimony

24   to get things going.  We're happy to do the examination.  We

25   assume that at some point, the Court may have questions.  We

1    don't know if the Court wishes to examine the witnesses or how

2    you anticipate this hearing playing out.

3         THE COURT:  So I've reviewed some of the case law on

4    witness tampering.  I assume everybody here has.  I don't have

5    any briefing on it from either of the parties in terms of how

6    it's been raised, first, with the district court judge and

7    then referred to me.

8         The party, as I understand it, making the accusation

9    and the party asking for a sanction would bear the burden,

10   right.  There hasn't been actually a motion.  I mean, I have a

11   motion for protective order is all that's pending really right

12   now.  So the way I anticipated doing it -- and we'll have to

13   see how it comes in today -- maybe we'll have briefing.  We'll

14   see how that comes in today.  I don't know if plaintiff would

15   end up filing some kind of motion for sanction or defendant

16   would end up filing some kind of motion for sanction.  Whoever

17   asked for the sanction, of course, bears the burden on the

18   sanction, right.

19        Because we're talking about witness tampering and

20   because it's really plaintiff who made that accusation, I

21   thought that for purposes of today, plaintiff would proceed

22   first, even though it's CTA's motion.  But that seemed to be

23   the most sensible to me.  I thought you would -- that

24   plaintiff would begin by presenting evidence, and they can go

25   in whatever order they want to go in.  I'll jump in if I feel

1    the need; but I have no doubt, between plaintiff's counsel and

2    defense counsel, everything will be covered.  I appreciate

3    that defense counsel has sent us some exhibits.  I assume

4    everybody has those.  So I think if we cover what I see in

5    there and what the witnesses have to say, everything will be

6    covered.  So if that's acceptable to all of you, that's how I

7    would proceed.

8            MR. SCHARKEY:  Okay.  And just so that we're all

9    oriented -- I think you've touched on some of it -- we have

10   not asked for this hearing.  We simply raised in a discovery

11   conference with our opponents that we understood that some

12   activity like this was afoot and we asked that it be

13   discontinued.  As a consequence, there were a number of

14   Rule 37 e-mails that went back and forth.  There was a

15   conference involved.  And the motion was strictly for

16   disclosure of the names, which your Honor ordered at the last

17   hearing date.

18           So in terms of, you know, pressing on with this,

19   Mr. Cavelle is here.  We're going to put him in that chair and

20   we're happy to direct his testimony.  He's going to tell the

21   Court exactly what he knows about this.  You'll hear it from

22   him.

23           But in terms of the extent of this hearing, when we

24   were here last time, it was our understanding there were going

25   to be three witnesses.  Counsel seemed somewhat surprised when

1   the names were given to the Court.  And what we learned from

2   the submissions last week is these names were very well known.

3   It appears some of these issues were discussed internally.

4   We've got e-mails that involve people that we've -- until the

5   disclosure of these exhibits, never knew -- never knew that

6   they were a part of this.  We never knew that they were

7   involved in -- in what appears to be a concern over payment

8   for wages while someone was going to testify.  That seems to

9   be pretty clear.

10          So, again, we're ready to go today; but we think in

11  terms of a complete hearing, if we're going to air this out

12  completely, we're going to need some additional evidence

13  because we're going to want to put some more in.  There may be

14  some depositions that we're going to ask to take of their

15  counsel, of their general counsel and of their deputy general

16  counsel.  And I don't want to get too far ahead.

17          THE COURT:  Oh, yeah, we're not getting that far

18  ahead.

19          Let me say this:  You can reserve your right to ask

20  for anything, okay --

21          MR. SCHARKEY:  Very good.

22          THE COURT:  -- after we do this.  But I'm not ruling

23  on that right now.  But when you say to me you didn't ask for

24  this hearing, would you prefer that the CTA take the lead and

25  begin by putting your client on the stand?  Because I can do

1    it that way.  I'm happy to do it that way.  I'm only giving

2    you the lead because if, at the end of the day, we decide

3    we're going to have some briefing -- which I haven't even made

4    that decision yet, depends how the evidence comes in -- if

5    there's going to be any briefing and if you were to ask for

6    sanctions because you believe, at the end of the day, you have

7    a basis to argue that there was any witness tampering, you

8    would bear that burden.  So I believe it would be appropriate

9    for you to go first and be able to control, to some extent,

10   the witnesses and the presentation of the evidence.

11            But you're right, you didn't ask for the hearing.

12   And so if you don't want to begin the evidence, I can happily

13   ask the CTA lawyers to begin.  They might begin with a

14   different witness.  I don't know what they would choose to do.

15   I don't really care.  I'm happy to go whichever way the

16   lawyers want to present it.  But I believe I kind of owe it to

17   you to give you the first shot and to control the witnesses in

18   terms of when they appear.  So I'm offering that to you.  But

19   you did not ask for a hearing and so if you don't want that

20   opportunity, I'm happy to pass the baton.

21            MR. SCHARKEY:  No, no.  We will gladly accept the

22   order.  We're not shying away from it.  We just -- you know,

23   when you sit down and you think about, well, what's the issue,

24   what's the burden, who raised this, who has got to carry the

25   proof, you start to get into these questions about who should

1  go, what's the burden, what's the totality of the record,

2  things of that nature.  So we're happy to proceed, your Honor.

3       THE COURT:  And I've been pondering all those things

4  too since we last met of course.  And I'm not oblivious to the

5  fact that, at the end of the day, lawyers for the other side

6  are going to say to me, Judge, we want sanctions because we've

7  spent time and money on this; and we don't believe --

8  depending on what happens -- we don't believe our time and

9  money was well spent.  So I understand there might be a

10  different burden going on because of a different motion that

11  might be filed, so I'm aware of that too.  But I feel that the

12  main issue here is tampering with a witness, and I know you

13  would have that burden.  So I feel what's fair is you should

14  get to have the first shot at the witnesses because I feel

15  like that's really what we're here about today.  So that's

16  what I think we should do.

17       Anything from CTA on that?

18       MR. KENNEDY:  Yes, Judge.  John Kennedy for the

19  record.

20       I appreciate your Honor thinking through the process.

21  We were going through the same concerns.  My concern from what

22  I just heard is this sort of mission creep that this was an

23  issue-spotting exercise.  But this didn't start as a

24  mission -- as an issue-spotting exercise.  This resulted from

25  a very clear accusation by plaintiff that the CTA was engaging

1    in what they called blatant witness tampering, not maybe

2    something is going on or, hey, can you take a look at this.

3    They made an accusation that they said was sanctionable and

4    actionable, and it was not in the form of a concern.

5         They also stated that they would seek even more

6    discovery.  What we now know -- and it took us several

7    efforts, until your Honor raised -- ripened the issue -- was

8    they claim one witness was tampered with and they attribute

9    certain words to a third party who has nothing to do with this

10   case as the tamperer.  That's what we know so far.  So there

11   is a clear accusation.  It was not an equivocal fact.  It was

12   a statement of asserted fact.

13        And with respect to the e-mail record, as your Honor

14   will see, all those concerns with respect to Mr. Mendenhall

15   being paid, he was timely paid in all circumstances.  So it's

16   a complete misrepresentation of those records to suggest that

17   there was a concern about payment arising from some sort of

18   tampering.  Mr. Mendenhall wanted to make sure he was paid

19   because the field officer needed to make sure that he was

20   getting paid and all the processes had to be checked.  You'll

21   see that when we go through those with the e-mails.

22        So this notion that there's going to be depositions

23   of the general counsel or deputy general counsel and the like,

24   we would certainly want to be heard in full on that if there's

25   any --

1          THE COURT:  I understand.

2          MR. KENNEDY:  -- inclination of bleeding that out to

3     that extent.

4          THE COURT:  We're not even anywhere near there.

5          MR. SWEENEY:  Yeah, I don't want to get into an

6     argument or rebuttal of those points.  We'll let the evidence

7     speak for itself and the record that is in front of you

8     already, which would contain the statements made by the

9     general counsel two weeks ago with respect to what the policy

10    was for reimbursing witnesses at the CTA.  And you'll see,

11    based on the evidence that's presented to you, whether that

12    policy was actually followed.

13         Putting that aside, it does touch on the issue of

14    these exhibits that they provided to you.  From what we can

15    tell, maybe in a few of them, they have a sponsoring witness

16    who we expect to testify today, ▉▉▉▉▉▉▉.  But --

17         THE COURT:  Who?

18         MR. SWEENEY:  ▉▉▉▉▉.

19         THE COURT:  ▉▉▉▉, yes, right.

20         MR. SWEENEY:  But with respect to the vast majority

21    of them, they don't have sponsoring witnesses, as far as I'm

22    aware, that they're going to call, such as Brad Jansen, other

23    individuals that would be sending these e-mails back and

24    forth.

25         So is the Court inclined to accept these documents or

1  are we going to have the same sort of rules that we would have

2  in a normal trial with --

3          THE COURT:  Well, I'm inclined to accept

4  correspondence between counsel.  At a hearing like this, I

5  don't even know if the Rules of Evidence would apply.  Let's

6  get going.

7          MR. SWEENEY:  I agree.

8          THE COURT:  I'm inclined to get going and see how the

9  evidence is coming in.  I'm happy to hear your objections as

10 we go.  But, I mean, I've flipped through these.  They look

11 like they are scheduling e-mails.  I mean, I must get 4,000 of

12 these a day myself.  So I'm not inclined to say we've got to

13 have somebody come over from CTA to tell me this is something

14 that he or she gets in the normal course of business.

15         MR. SWEENEY:  I just don't want to get in trouble to

16 the extent that we ask questions about them and --

17         THE COURT:  No.

18         MR. SWEENEY:  Okay.

19         THE COURT:  I'm not inclined to get anyone in trouble

20 for asking about an e-mail, as mundane as some of these are.

21         MR. KENNEDY:  Judge, there is one case management

22 matter I wanted to put on your radar screen.

23         THE COURT:  Yes.

24         MR. KENNEDY:  There's a pending motion to place these

25 proceedings and the transcript and the like under seal.

1          THE COURT:  Yes.

2          MR. KENNEDY:  There's been a response filed.

3          THE COURT:  Yes.

4          MR. KENNEDY:  Your Honor's last word was you were

5 going to take it under advisement.  And we have not filed a

6 reply because we thought that was -- you understand the

7 issues.

8          THE COURT:  Right.

9          MR. KENNEDY:  But at some point if there is going to

10 be an argument about that, we'd like to be heard.

11          THE COURT:  Yes.

12          MR. KENNEDY:  And, also, the supporting briefs that

13 were filed to change the hearing date and challenge the motion

14 to keep these things under seal were filed in the public

15 record.

16          THE COURT:  Yes.

17          MR. KENNEDY:  And I'd ask counsel not to do that, to

18 keep everything under seal until your Honor rules.

19          THE COURT:  Okay.

20          MR. KENNEDY:  That has not been abided by.

21          THE COURT:  So let me tell you about that.  I will

22 hear you.  You know, the Seventh Circuit is not friendly to

23 things being under seal.  I don't know if you have looked at

24 that law, but it's --

25          MR. KENNEDY:  Yes, I have, Judge.

1    THE COURT:  It's firm.  So I'm not seeing the basis

2  to put this stuff under seal.  I think that, probably, you

3  filed that motion and things were happening very quickly.  So

4  what I would say, I'd like to get to the merits of what's

5  happening.  So what I would -- I don't like to ask for

6  briefing unnecessarily because I don't like to waste people's

7  time.  But what I would say is why don't I get some briefing

8  from you on it because you didn't really give me any briefing

9  on the merits.  I mean, you kind of just talked about what was

10  happening, which I appreciate.  But I think it would be

11  smarter, if you want to be heard on it, for you to give me,

12  you know, a couple of pages.  I don't need 20 pages on it, but

13  just, you know, ten-page max on why you think it should be

14  under seal.  They've basically filed a brief on it.  Let you

15  respond to that.  I want to keep an open mind.

16    I know it's sensitive, but I don't think sensitive is

17  something that the Seventh Circuit says is okay to keep under

18  seal.  I've never seen a case like that.  So I understand

19  there's employees' names.  And there's a lot of cases that say

20  employees' names should be redacted, and I'm happy to do that,

21  and I would order that automatically.  But that's very

22  different than keeping an entire document under seal.  And I

23  do --

24    MR. SWEENEY:  Or proceedings.  I think they've

25  actually asked for this.

1           THE COURT:  Yes.  So feel free to look at the case

2    law and give me your take on it.  But I don't see that in the

3    case law.  There's a lot -- you don't even have to give me the

4    cases on redacting employees' names.  I know that case law.  I

5    will do that.  That's already ordered.  I'll order that today.

6    But in terms of keeping all this under seal or the filings

7    under seal, the judges up there in the Seventh Circuit have

8    spoken loud and clear about this.  The things that district

9    court judges consider have to be in the public docket so that

10    the public can look at what we're looking at to assess are we

11    doing our job.  That's just kind of taxpayers and open courts

12    and all those principles come into it.

13           MR. KENNEDY:  Can I propose a limiting order, Judge,

14    that -- codifying your statement about protecting employee

15    names --

16           THE COURT:  Sure.

17           MR. KENNEDY:  -- and that sort of thing and redacting

18    those, but -- and order to maintain these proceedings under

19    seal until you rule?

20           THE COURT:  Yes, that's fine.

21           MR. KENNEDY:  Okay.

22           THE COURT:  And that's --

23           MR. KENNEDY:  That's all we're asking.

24           THE COURT:  -- what I've done with your initial

25    motion and then everything else that has kind of come in

 1   afterwards.  So I'm happy to do that and then I'm happy to

 2   hear you on it.

 3            MR. KENNEDY:  Thank you.

 4            THE COURT:  All right.  So, plaintiff, you're going

 5   to call your first witness?

 6            MR. SCHARKEY:  We are, your Honor.  We'll call George

 7   Cavelle.

 8            THE COURT:  Mr. Cavelle, come on up here.

 9            Raise your right hand.

10      (Witness sworn.)

11            THE COURT:  Keep your voice up.

12            Okay.  And we're keeping the testimony to the matter

13   at hand --

14            MR. SCHARKEY:  Of course.

15            THE COURT:  -- everybody understands, even though

16   there's broader issues at issue.

17            MR. SCHARKEY:  And, your Honor, just -- just as a

18   matter of course, we were going to give you just a little -- a

19   little bit of background.

20            THE COURT:  Fine.  So when I --

21            MR. SCHARKEY:  We're not going into --

22            THE COURT:  -- make the determination --

23            MR. SCHARKEY:  -- the merits of the case.

24            THE COURT:  All right.

25            MR. SCHARKEY:  May we proceed?

Cavelle - direct

16

```
 1              THE COURT:  Yes.
 2            GEORGE CAVELLE, PLAINTIFF'S WITNESS, SWORN
 3                      DIRECT EXAMINATION
 4   BY MR. SCHARKEY:
 5   Q.  Mr. Cavelle, would you please introduce yourself to the
 6   Court, spelling your last name.
 7   A.  George Cavelle, C-a-v-e-l-l-e.
 8   Q.  Mr. Cavelle, where do you live?
 9   A.  Boynton Beach, Florida.
10   Q.  Is that home for you?
11   A.  Yes, it is.
12   Q.  Where did you grow up?
13   A.  Chicago, south side.
14   Q.  And how long did you live in Chicago?
15   A.  My whole life up to the time I moved to Florida, which has
16   been about three years, four years, right after I left CTA.
17   Q.  Okay.  How old are you?
18   A.  50.
19   Q.  So you've been in Chicago a long time?
20   A.  Yes, sir.
21   Q.  Okay.  Did you graduate high school?
22   A.  Yes.
23   Q.  Where did you go?
24   A.  Tinley Park High School.
25   Q.  Did you go to college?
```

Cavelle - direct

1    A.   Yes.  I attended a technical school, American Airlines

2    Maintenance Academy.

3    Q.   Just slow down a little bit --

4    A.   Okay.

5    Q.   -- so the court reporter can get everything we're saying.

6    Okay?

7                I asked you if you went to college?

8    A.   Yes.

9    Q.   Okay.  Where did you go?

10   A.   American Airlines Maintenance Academy in conjunction with

11   Daley College.

12   Q.   Did you take a degree?

13   A.   No.  I was two credits short.

14   Q.   How long were you at that school?

15   A.   I was there for two and a half years, I believe, two

16   years, just under.

17   Q.   Any other special training besides high school and the

18   time that you did at -- that you did after high school?

19   A.   Yeah.  I did receive an airframe and power plant diploma

20   from the airlines school.

21   Q.   What did that diploma entitle you to do?

22   A.   Repair airline -- airline craft, aircraft.

23   Q.   After you finished with your education, did you -- did you

24   actually go into the -- to the field?

25   A.   Actually, no.  They had just laid off a bunch of

Cavelle - direct

18

1   technicians, so that was either, asked to move to Texas or I'd

2   have to wait.

3   Q.  Okay.  I don't want to belabor this with a job-by-job blow

4   for the Court, but can you -- can you just briefly give us the

5   highlights of your career, the places that you've worked?

6   A.  Yes.  So I -- after I graduated from there, they had job

7   placement.  So I had an interview for Burlington Railroad, as

8   well as the Chicago Transit Authority.

9   Q.  How long did you work at the railroad?

10  A.  At -- I didn't -- I didn't take the job at Burlington.  I

11  elected to take the position at Chicago Transit Authority.

12  Q.  Okay.  So was the CTA your first job?

13  A.  I worked before that in management at my father's White

14  Hens and things like that.

15  Q.  Okay.  But in terms of outside of the family or what you

16  were doing with the family, this was your first kind of --

17  A.  Yes.

18  Q.  -- your own job?

19  A.  Yes.

20  Q.  Okay.  How long were you at the CTA?

21  A.  19 and a half years.

22  Q.  Now, you were sitting in the back.  You heard what the

23  Court said.  I don't want to go into the issues that are --

24  that are at play in the case, so I don't want to talk about

25  your departure or anything like that.  But can you just tell

Cavelle - direct

19

1   us how you evolved through your time at the CTA and what your

2   positions were?

3   A.  I started out as a technician on the railcar maintenance

4   side.  I then became a -- I worked a little bit with the

5   union.  And then I took a leader position, which is pretty

6   much like an acting foreman position.  I then became a manager

7   of rail maintenance.  And then I worked my way through the

8   ranks, going up to a senior manager of railcar appearance,

9   then becoming the general manager of maintenance, director of

10  bus maintenance, vice president of vehicle maintenance, vice

11  president of vehicle and facility maintenance, and then ending

12  as the COO.

13  Q.  Fair to say you grew up at the CTA?

14  A.  Yes.

15  Q.  Okay.  How many years was it in total?

16  A.  19 and a half.

17  Q.  During your 19 years at the CTA, Mr. Cavelle, did you --

18  did you forge any friendships with people?

19  A.  Yes.

20  Q.  Okay.  And since you've left the CTA, have you maintained

21  some of those friendships?

22  A.  Yes.

23  Q.  All right.  I want to direct your attention now to one of

24  those friends, okay.  Do you know George Mendenhall?

25  A.  Yes.

Cavelle - direct

1   Q.  How long have you known him?

2   A.  Over 15 years.

3   Q.  Okay.  And in what capacity did you meet him and in what

4   capacity do you know him now?

5   A.  We met -- actually he was doing -- he's the nephew of

6   someone I used to buy music equipment from.  And he used to do

7   electrical installs, and we just got to know each other, you

8   know, at different jobs he was doing.

9   Q.  Different jobs at the CTA?

10  A.  No, different jobs at -- doing nightclubs and things like

11  that.

12  Q.  Okay.  And did you ever work together at the CTA?

13  A.  Yes.

14  Q.  Okay.  And during the course of your work with him, you

15  became friends?

16  A.  Yes.

17  Q.  Okay.  And you've remained friends with him?

18  A.  Yes.

19  Q.  How often do you talk to him?

20  A.  I'd say maybe once a week, maybe once every couple of

21  weeks.

22  Q.  Okay.  Are you close with his family?

23  A.  Yes.

24  Q.  And when you say yes, what do you mean by that?

25  A.  I'm very close with his family.

Cavelle - direct

21

1    Q.  His children?

2    A.  Yes.

3    Q.  Which one?

4    A.  The one that's in ICU right now.

5    Q.  Have you ever -- Mr. Cavelle, have you ever talked to

6    Mr. Mendenhall about your case that -- your case against the

7    CTA?

8    A.  Yes.

9    Q.  What I'd like to do is I'd like to focus on that topic,

10   your conversations with Mr. Mendenhall.

11           You said you've had conversations with him about your

12   case.  Can you tell the Court how many of those you've had?

13   A.  Maybe four, five.

14   Q.  Okay.  Let's break those down.  When was the first time

15   you received a call or that you talked to Mr. Mendenhall about

16   your lawsuit against the CTA?

17   A.  Sometime last year.

18   Q.  Do you remember when?

19   A.  I don't know.  It was maybe February.

20   Q.  Okay.  Was that the -- the February call was the first

21   time you talked to him?

22   A.  Yes.

23   Q.  Okay.  Did you have an occasion to talk to him maybe back

24   in the summer around your deposition time?

25   A.  Yes.

Cavelle - direct

22

1   Q.   Okay.

2   A.   I may have talked to him several occasions on it.

3   Q.   Okay.  Let's go back to the first one.  We're here for a

4   reason.  We're going to talk about the February conversation,

5   but let's talk about the first time I think that you talked to

6   him.

7   A.   Oh, okay.

8   Q.   Okay?

9           Do you recall when that took place?

10  A.   No, I don't.  It was sometime last year in the summer,

11  something like that.  I -- May, April, something.

12  Q.   Okay.  And how did that conversation take place?  You said

13  you're now in Florida, and Mr. Mendenhall is here.  How did

14  the conversation take place?

15  A.   I think I either called him or he called me.  I don't

16  recall.  It was just during a conversation over the phone.

17  Q.   So it was a telephone call?

18  A.   That's correct.

19  Q.   Do you remember, was it during the week or was it during

20  the weekend?

21  A.   I don't recall.

22  Q.   Do you remember receiving the call or placing the call?

23  A.   I don't recall if I contacted him or he contacted me.

24  Q.   You just know it was a phone call?

25  A.   Yeah.

Cavelle - direct

23

1   Q.   And when you got on the phone, could you tell who was on

2   the other end of the line?

3   A.   Yes.

4   Q.   And who was it?

5   A.   George Mendenhall.

6   Q.   And how were you able to say that it was George

7   Mendenhall?

8   A.   Because I've known George for 15 -- over 15 years so --

9   Q.   You recognize his voice?

10  A.   Yes.

11  Q.   Okay.  How long did the conversation last?

12  A.   Five minutes, ten minutes.  I mean, it wasn't that long.

13  Q.   And everyone here appreciates you're not going to have an

14  exact recollection of what was said, the specific words; but

15  can you tell the Court, generally speaking, what

16  Mr. Mendenhall said to you and what you said to him?

17  A.   We were talking about other things, personal stuff.  I

18  don't recall what it was.  But then I mentioned to him that my

19  lawyers may be requesting him for a deposition based off of a

20  poster that was in one of the shops.

21  Q.   What did he say in response to that?

22  A.   He was, like, okay.

23  Q.   Any other discussion about the poster or your claims

24  against the CTA?

25  A.   No.  I mean, he knew general knowledge of the case.

Cavelle - direct

1   Q.  Okay.  And you said that call lasted a few minutes?

2   A.  Yeah.  When we were discussing that, yeah.

3   Q.  During that call, do you -- did you have any impression,

4   any sense, of whether Mr. Mendenhall was stressed or worried

5   about the fact that someone was going to be talking to him

6   about one of the issues in your case?

7   A.  No.

8   Q.  Okay.  When was the next time you recall talking to

9   Mr. Mendenhall about your case against the CTA?

10  A.  George had called me this year.  We -- I was in Seminole

11  County actually for a job site, and he gave me a call.

12  Q.  And for everyone's benefit here, where is Seminole County?

13  A.  It's in Florida.

14  Q.  All right.  Do you remember when that call took place?

15  A.  I think that was the January or February call; February,

16  somewhere around that time, I think.

17  Q.  Do you remember where you were when the call took place?

18  A.  Yeah.  As I stated, I was at work.  I was working at

19  Seminole County.  That's one of the projects that I'm in

20  charge of.

21  Q.  What time did it take place?

22  A.  It was during the day, so -- I don't recall the exact

23  time, but it was during the business hours and -- maybe

24  1:00 o'clock, 12:00 o'clock.

25  Q.  Do you remember if you called him or he called you?

Cavelle - direct

25

```
 1   A.   No, he called me.

 2   Q.   And why is it that you remember that?

 3   A.   I saw his name on the phone.

 4   Q.   You answered the call?

 5   A.   Yes.

 6   Q.   Did you recognize the voice on the other end of the phone?

 7   A.   Yes.

 8   Q.   Whose was it?

 9   A.   George Mendenhall's.

10   Q.   Was anybody else on that call?

11   A.   No.

12   Q.   And how do you know that?

13   A.   He didn't tell me there was anybody else on the call.

14   Q.   Okay.  And during that call, what did Mr. Mendenhall say

15   to you and what did you say to him?

16   A.   During that call, he -- he was -- I wouldn't say upset,

17   but he was -- he sounded stressed.  He said they just called

18   me and they told me that I have to report -- that the lawyers

19   are going to call me and I have to report to CTA and I may be

20   quarantined down there for a couple of days and I don't know

21   how I'm going to get paid for this.  And at that point, I was

22   like, what are you talking about; you should get paid.

23   Q.   Hold on one second.  We've got to line these conversations

24   up.

25   A.   All right.
```

Cavelle - direct

26

1   Q.  So he says to you he's going to be called down.  He's

2   concerned about some kind of quarantine.  He's worried about

3   pay.  You then interject into the conversation?

4   A.  That's correct.

5   Q.  What -- what did you interject into the call?

6   A.  I believe I said something like what are -- what are you

7   talking about; you'll get paid for this.

8   Q.  What did he say in response to that?

9   A.  He said, well, that's not what they're telling me.

10  They're telling me if it's for CTA, the lawyers will handle

11  it; but if it's not, I may have to make up the time.

12  Q.  Now, again, you've known him for a long time.  Did the

13  call that you had with him, whether it was late January or

14  early February, did he -- was your impression as a result of

15  that call that there was any concern on his behalf?

16  A.  Yes.  He seemed very concerned.

17  Q.  Did anything else -- did you guys talk about anything else

18  in that particular conversation?

19  A.  No.  I mean, it happened so fast.  And I told him, well,

20  you know, calm down; you know, let me call my counsel and I'll

21  call you back.

22  Q.  Okay.  You hung up?

23  A.  Hung up, yes.

24  Q.  Did you talk to Mr. Mendenhall again about the topic of

25  what the two of you had just talked about, the fact that he

Cavelle - direct

1   was concerned about pay, that he might be quarantined, et

2   cetera?  Did you talk again about that subject matter?

3   A.   Yes.

4   Q.   When?

5   A.   After discussing it with my counsel, I called George back.

6   Q.   Okay.  When did that call take place?

7   A.   It may have been a half hour.  I can't recall really, but

8   it was later.  It was after that call.

9   Q.   Same day?

10  A.   Same day, yes.

11  Q.   You called him?

12  A.   Yes, I called him.

13  Q.   Again, you recognized his voice on the end of the line?

14  A.   Yes.

15  Q.   Okay.  As far as you know, no one else was on that call?

16  A.   As far as I know, no.

17  Q.   Tell us what took place in that conversation.

18  A.   I simply told him, who called you from CTA, and he --

19  Q.   Okay.  You asked him?

20  A.   Yeah, I asked him specifically.

21  Q.   And when you asked him, you were referring to the

22  conversation he had relayed to you earlier; is that correct?

23  A.   That's correct.

24  Q.   And after you asked him who from CTA called him, did he

25  answer you?

Cavelle - direct

28

1   A.  Yes.

2   Q.  Who did he say called him?

3   A.  ███████.

4   Q.  Did you -- did you know who that was?

5   A.  I don't know ███████, but I know about who he is.

6   Q.  Okay.  So he just gave you a last name?

7   A.  That is correct.

8   Q.  Okay.  What else took place during that call?

9   A.  I said to him, well, just tell the truth; you know, you

10  don't have nothing to worry about; and if you need anything or

11  if anything happens, give me a call and let me know.

12  Q.  Okay.  And that was the end of that call?

13  A.  Yes.

14  Q.  So on that day, you had two calls.  One, you talk about

15  his concern.  The second is the -- the identifying the name of

16  the person who talked to him.  And for that day, that's the

17  end?

18  A.  Yes.

19  Q.  Okay.  After those two calls passed, did there come a time

20  later where you and Mr. Mendenhall revisited the issue of your

21  case against the CTA or the issues that you had talked about

22  during those calls?

23  A.  Yes.

24  Q.  Tell the Court when that took place.

25  A.  That may have been three weeks ago, four weeks ago.  I

                        Cavelle - direct
                                                                    29

 1   can't recall exactly, but it was -- I was in town for my
 2   father and grandfather's estate for a court hearing.
 3   Q.  So you were in Chicago?
 4   A.  That is correct.
 5   Q.  Okay.  And you had some kind of court date for a probate
 6   hearing?
 7   A.  Yes.
 8   Q.  How long were you in town?
 9   A.  The weekend.
10   Q.  Where did you stay?
11   A.  George Mendenhall's house.
12   Q.  Is that unusual or is that --
13   A.  Not at all.
14   Q.  Why not?
15   A.  I usually always stay at George's house if -- if his wife
16   lets us.
17   Q.  So at some point during your stay at his house, the topic
18   comes up again; is that right?
19   A.  Yes.
20   Q.  Okay.  And tell us where that took place.
21   A.  In his downstairs living room.
22   Q.  Was anyone else present?
23   A.  No.
24   Q.  Just the two of you?
25   A.  Yes.

Cavelle - direct

30

1    Q.   Okay.  And where are you in the basement?

2    A.   Just in the living room area.

3    Q.   How did it come up, the topic?

4    A.   He told me that they had called him down again, the CTA

5    lawyers.

6    Q.   Okay.

7    A.   And --

8    Q.   And what did he say happened?

9    A.   He said that they instructed him that they may need his

10   personal cell phone records; they may need his e-mails; they

11   may need his financial records; and, oh, you're married; we

12   may need your wife's financial records.  He was rambling very

13   quickly.  And he basically just said, you know, I don't need

14   this right now; I got a baby on the way; I don't need this

15   stress.

16   Q.   Did you -- did you know -- did you ask him what he was

17   talking about?  Did you -- what did you say to him in

18   response?

19   A.   I just said to him, I'm sorry.  I'm sorry you're going

20   through all this, man.  And, you know, if you need anything,

21   I -- you know, I'll do whatever I can do to help.  I don't

22   want nothing bad to happen to you.

23   Q.   So he expressed concern about his baby and whether he was

24   going to keep his job?

25   A.   Yeah.

Cavelle - direct

31

1   Q.   Okay.   This conversation was a little different, in that,

2   you're sitting in the same room with him.

3   A.   Yes.

4   Q.   You know, based on your 15-, 20-year friendship, what was

5   your impression about how he was dealing with these issues?

6   A.   He was concerned.

7   Q.   When I asked you what -- you know, what the two of you

8   talked about, I think you got -- you got kind of excited and

9   you wanted to get it out, but I want to make sure that we're

10   clear.

11          He told you that the CTA lawyers were asking him

12   again about these issues?

13   A.   Yes.   They were asking him again.   And he didn't really go

14   into detail what they specifically asked, other than he did

15   specifically mention that they may need his text messages, his

16   e-mail, his personal e-mails, his financial records, his

17   wife's financial records.

18   Q.   Did he tell you why they told him they might need that

19   stuff?

20   A.   No, he did not.

21   Q.   And I think you also said that they asked -- they told him

22   they may need his wife's e-mail or bank records?   I didn't

23   hear you.

24   A.   I believe he said financial records.

25   Q.   His wife's financial records?

Cavelle - direct

1   A.  Yes.

2   Q.  Did he tell you why they told him they may need those

3   records?

4   A.  No.  I mean, he was just venting this.  He didn't tell me

5   why though specifically.

6   Q.  Anything else take place during that conversation?

7   A.  I just apologized.  And, again, I told him I'm sorry.

8           MR. SCHARKEY:  Your Honor, can I have one minute,

9   maybe 30 seconds?

10          THE COURT:  Sure.

11     (Brief pause.)

12          MR. SCHARKEY:  I've got just a few more questions,

13  your Honor.

14  BY MR. SCHARKEY:

15  Q.  Mr. Cavelle, before I -- before we close off that

16  conversation -- and I want to be clear because you appreciate

17  that the subject matter of today's hearing is very serious?

18  A.  Yes.

19  Q.  There's no more a grave concern than the type of

20  allegation that's been made, right, the type of subject matter

21  that's been raised?  You understand it's very serious?

22  A.  Yes.

23  Q.  Okay.  When you were talking to Mr. Mendenhall in the

24  basement, I know you expressed that he was anxious; he's

25  worried about the kid.  Did he ever specifically say to you

Cavelle - cross

 1   that he was concerned about his job?

 2   A.  He just said I don't need this expletive right now.

 3   Q.  Okay.  And --

 4   A.  I've got a wife, I've got a kid I got to take care of; I

 5   don't need this.

 6   Q.  Okay.  And how did you interpret that?

 7   A.  He's scared for his job.

 8   Q.  Okay.  Mr. Cavelle, you took an oath when you took that

 9   stand.  Are you telling the truth today to the best of your

10   recollection?

11   A.  Yes.

12   Q.  Okay.  And do you have any reason to believe that George

13   Mendenhall will not tell the truth today?

14   A.  I hope he does.  I hope he does.

15   Q.  And you don't know of any reason why he wouldn't?

16   A.  Other than he has a kid in ICU right now to pay for.

17          MR. SCHARKEY:  We have nothing further, your Honor.

18          THE COURT:  Thank you.

19                     CROSS-EXAMINATION

20   BY MS. BABBITT:

21   Q.  Hello, Mr. Cavelle.

22   A.  How are you?

23   Q.  My name is Elizabeth Babbitt.  I'm an attorney for the CTA

24   and Dorval Carter.

25          Can you describe how you prepared for today's

Cavelle - cross

34

1   hearing?

2   A.   How I prepared?

3   Q.   Yes.

4   A.   I actually had another court date today down here.  So I

5   came to my lawyers' office and we came here.

6   Q.   Did you review any documents in advance of this hearing?

7   A.   No.

8   Q.   And who did you speak to about this hearing?

9   A.   My attorneys.

10  Q.   Did you speak to anyone else aside from your attorneys?

11  A.   Prior to today?

12  Q.   About this hearing, yes.

13  A.   I don't recall.

14  Q.   You don't recall if you spoke to anyone else about this

15  hearing?

16  A.   No.  My girlfriend, and I can't recall anybody else.

17  Q.   You spoke to your girlfriend about the hearing?

18  A.   Uh-huh.

19  Q.   Did you speak to anyone else besides your girlfriend?

20  A.   Not that I can recall.

21  Q.   And how long did you meet with your attorneys today before

22  you came here?

23  A.   Maybe 15, 25 minutes, half hour.  We had to run over here.

24  Q.   Did you discuss any of the exhibits that were submitted

25  with respect to this hearing with your attorneys?

Cavelle - cross

1   A.   No.

2   Q.   And you set out a set of conversations with your attorney,

3   and I want to get into sort of the timeline with that.

4            One more question with respect to the hearing.  Did

5   you speak to George Mendenhall about this hearing?

6   A.   Spoke to him about the hearing?  No.

7   Q.   When is the last time you spoke to George Mendenhall?

8   A.   Maybe a day before the -- when you guys were in court last

9   or two days before.  I don't know.

10  Q.   Okay.

11  A.   I don't know the exact time.

12  Q.   And I take it you're not staying with George Mendenhall --

13  A.   No.

14  Q.   -- on this visit?

15  A.   No, I'm not.

16  Q.   Okay.  So the first conversation that you detailed with

17  your attorney about talking to George Mendenhall about this

18  case, you indicated that it was sometime in 2018?

19  A.   That's correct.

20  Q.   And so you first thought it was February of 2018?

21  A.   No, no.  I meant -- I meant February of 2019.  I thought

22  he was asking me about the other conversation.  The very first

23  initial conversation that we talked about, once he clarified,

24  was in -- of '18, in the summer.

25  Q.   So the first time you had ever talked to George -- or

Cavelle - cross

36

1   George Mendenhall about the lawsuit you had against the CTA

2   was in May or April of 2018?

3   A.  Specifically about it, yeah; what his role would be.

4   Q.  Did you speak to him about it aside from his role at any

5   time before that?

6   A.  I mean, he -- we -- we mentioned it to him, about that it

7   was going on, but not the specifics or anything like that.

8   Q.  And so you spoke to him in May or April of 2018.  And who

9   contacted who during that call?

10  A.  I don't recall.  I don't know if I called him or he called

11  me.  But we got into a conversation and I -- I broached the

12  conversation about the lawsuit, stating that my lawyer may be

13  requesting him for a deposition.

14  Q.  Was that a phone call that took place via cell phone?

15  A.  I believe so.

16  Q.  Okay.  Do you typically contact Mr. Mendenhall on your

17  cell phone?

18  A.  Yes.

19  Q.  Okay.  I guess, do you ever call Mr. Mendenhall on a

20  landline or an office line?

21  A.  No.

22  Q.  Okay.  And when you spoke to Mr. Mendenhall that first

23  time that you talked to him about his role in the case,

24  Mr. Mendenhall never mentioned to you that he had already met

25  with CTA attorneys prior to that time?

1    A.  No.

2    Q.  Okay.  And Mr. Mendenhall didn't say anything at that time

3    that you spoke to him in May or April of 2018 that he had

4    spoken to CTA attorneys and he had been paid for his time?

5    A.  No, I don't recall any of that.

6    Q.  Mr. Mendenhall never expressed any concern in that first

7    call that his job was being threatened even though he had

8    already met with CTA attorneys about this lawsuit, correct?

9    A.  I didn't know he met with them, but he -- in that call, he

10   did not seem -- no, not at all.  He seemed fine.

11   Q.  He didn't express any concern in that first call?

12   A.  No.

13          THE COURT:  Can I ask a question.  It would be

14   helpful for me to know when the plaintiff was deposed because

15   I know I have part of plaintiff's deposition here, and I have

16   no idea what date that took place.

17          MS. BABBITT:  I believe it was June of 2018.  We can

18   get you the exact date, your Honor --

19          THE COURT:  That would be great.

20          MS. BABBITT:  -- in short order.

21          THE COURT:  Okay.

22          MR. SWEENEY:  I don't have the exact date, but I

23   believe it's May.

24          THE COURT:  May of 2018.  Okay.  Thanks so much.

25   BY MS. BABBITT:

Cavelle - cross

1   Q.  All right.  And then I want to move forward to that second

2   call that you discussed in your prior testimony, the second

3   call with Mr. Mendenhall.  And you said that took place in

4   January or February of this year?

5   A.  I believe that's what it was.

6   Q.  Okay.  And you said that Mr. Mendenhall called you in that

7   second call, right?

8   A.  That's correct.

9   Q.  And you said you were at work in Seminole County; is that

10  right?

11  A.  That's correct.

12  Q.  So you were on your cell phone?

13  A.  That's correct.

14  Q.  Do you know if Mr. Mendenhall was on his cell phone when

15  he called you?

16  A.  It was -- he was on his cell phone because it came up on

17  the caller ID.

18  Q.  And how long was that second phone call?

19  A.  I -- really, I can't remember.  It was maybe ten minutes.

20  I can't really remember.

21  Q.  It was ten minutes?

22  A.  I don't recall.

23  Q.  Was it more than 20 minutes?

24  A.  I don't believe it was more than 20 minutes, but I don't

25  recall the specifics.

Cavelle - cross

39

1   Q.  And you said that Mr. Mendenhall sounded stressed.  Can

2   you describe how you gleaned or determined that he sounded

3   stressed?

4   A.  Well, I've known George for over 15 years; and I can hear

5   his vocal tones.  And he was discussing his pay and discussing

6   that he was going to be quarantined, and he had a heightened

7   tone to his voice.

8   Q.  And you said that Mr. Mendenhall said they just called me,

9   right?

10  A.  Yes.

11  Q.  And did he tell you who "they" was when he said they just

12  called me?

13  A.  That came when I called back the second time.  I asked who

14  called him.

15  Q.  And so he said some individual called him at the CTA

16  during the second call, right?  An unidentified individual at

17  that point?

18  A.  At the second call, the first part of it?  Yes, he just

19  said they called me.

20  Q.  Okay.

21  A.  It was the second call that I called him back and asked

22  him who.

23  Q.  Okay.  And so I want to just deal with this second call.

24  So during the second call that you -- and we'll benchmark that

25  as the February 2019 call.

1   A.   Okay.

2   Q.   When you spoke to Mr. Mendenhall on that second call, he

3   said they just called me but he didn't identify who "they" was

4   to you?

5   A.   In that part of it, correct.

6   Q.   Did he at any point in that second phone call identify who

7   contacted him at the CTA?

8   A.   No.

9   Q.   And he said that he had to go to the CTA?

10  A.   He said that they would be -- that they would call him;

11  and when they tell him to report, he has to report to CTA

12  headquarters.

13  Q.   And, again, they didn't say -- or Mr. Mendenhall didn't

14  say who "they" was?

15  A.   No.

16  Q.   And then, according to you, Mr. Mendenhall said that he

17  may be quarantined?

18  A.   Yeah.

19  Q.   Is that specifically the word or is that how you're

20  characterizing it now that Mr. Mendenhall used?

21  A.   I'm pretty sure that's what he said, yes.

22  Q.   Did Mr. Mendenhall say that the individual or individuals

23  he spoke to at the CTA said they will quarantine him?

24  A.   He didn't say who they were, so I don't know who they were

25  at that time.

Cavelle - cross

1   Q.  And Mr. Mendenhall said, I don't know how I'm going to be

2   paid; is that right?

3   A.  That's correct.

4   Q.  Did Mr. Mendenhall say that the individuals from the CTA

5   said he would not be paid?

6   A.  No.  The whole conversation was, And I don't even know how

7   I'm going to get paid, which then I interjected.

8   Q.  And so Mr. Mendenhall never mentioned in that phone call

9   that anyone at the CTA told him he would not be paid?

10  A.  No.

11  Q.  And you said in the second phone call that Mr. Mendenhall

12  said that if he -- if it's for the CTA lawyers, they will

13  handle it?

14  A.  That's what he said.  If it's for CTA, the lawyers will

15  handle it.  If it's not, you'll have to make up the time.

16  That's exactly what was said.

17  Q.  And did Mr. Mendenhall -- was he told what he would need

18  to say so that it would be, quote, for the CTA?

19  A.  No.  None of that was discussed.

20  Q.  Mr. Cavelle, do you know what Mr. Mendenhall would need to

21  say to, quote, have it be for the CTA?

22  A.  I don't know.

23  Q.  That makes two of us.

24          Okay.  So you ended that call.  You said it was less

25  than 20 minutes, perhaps ten minutes, the second call, right?

Cavelle - cross

1   A.   Yeah.

2   Q.   You're on your cell phone?  You're at work?

3   A.   Correct.

4   Q.   And then as soon as you got off that call, what did you do

5   next?

6   A.   I called my lawyer.

7   Q.   How quickly after talking to George Mendenhall did you

8   call your lawyer?

9   A.   As soon as I hung up with him.

10  Q.   And which lawyer did you contact?

11  A.   My lawyer, Mr. Sweeney.

12  Q.   Mr. Sweeney?

13  A.   Uh-huh.

14  Q.   And did you call Mr. Sweeney's office?

15  A.   I believe I did, yes.

16  Q.   And did you speak to Mr. Sweeney when you called him at

17  that time?

18  A.   Yes.

19  Q.   So this would still have been in the afternoon on the --

20  that day in February of 2019?

21  A.   Yes, that's correct.

22  Q.   What did you tell Mr. Sweeney?

23  A.   I --

24        MR. SCHARKEY:  Your Honor, I'm going to object.  I

25  think we're getting into some privileged communications here.

Cavelle - cross

1          THE COURT:  I'm going to let you ask this question,

2    but be very careful.

3    BY MS. BABBITT:

4    Q.  What did you tell Mr. Sweeney?

5    A.  That George Mendenhall called me and he was very

6    concerned.

7    Q.  Did you tell Mr. Sweeney any other information about this

8    call?

9    A.  I told him what George had told me.

10   Q.  Did you tell Mr. Sweeney that -- that an individual from

11   the CTA was going to quarantine Mr. Mendenhall according to

12   him?

13   A.  Yes, I did.

14   Q.  And did Mr. Sweeney provide you with anything that you

15   should do in response to the call from Mr. Mendenhall?

16          THE COURT:  The objection is sustained.

17   BY MS. BABBITT:

18   Q.  Okay.  So how long was your call with Mr. Sweeney?

19   A.  Couple of minutes.

20   Q.  And, Mr. Cavelle, you're aware that your attorneys then

21   contacted us, the attorneys for the CTA, regarding this issue,

22   correct?

23   A.  Yes.

24   Q.  Okay.  And, Mr. Cavelle, you're aware that the -- your

25   counsel told the CTA that the CTA has threatened potential

Cavelle - cross

44

1   witnesses in this case with loss of pay and potentially more

2   serious repercussions if they do not testify on CTA's side?

3   You're aware of that?

4   A.   I don't know what the context of what they told you.

5   Q.   So you're not aware of what the CTA was told by your

6   counsel about --

7   A.   Not exactly, no.

8   Q.   -- the issue of witness tampering?

9        Mr. Cavelle, are you aware of other witnesses that

10  were allegedly tampered in this case?

11  A.   I have no knowledge of any.

12  Q.   And are you aware of any specific other serious

13  repercussions that Mr. Mendenhall was threatened with

14  according to you or Mr. Mendenhall?

15  A.   Not to my knowledge.

16  Q.   And did you tell Mr. Sweeney that there were other more

17  serious repercussions that could arise from Mr. Mendenhall

18  talking to the CTA?

19  A.   I -- no.  I just told Mr. Sweeney what exactly George told

20  me.

21  Q.   So after you spoke to Mr. Sweeney, you said on that same

22  day, you spoke to George Mendenhall again?

23  A.   Yes.

24  Q.   And how quickly in time after you spoke to Mr. Sweeney did

25  you contact Mr. Mendenhall again?

Cavelle - cross

1   A.   As soon as I got off the phone with Mr. Sweeney.

2   Q.   And this was, again, a cell phone call?

3   A.   Yes.

4   Q.   Did you exchange any text messages with Mr. Mendenhall

5   about this?

6   A.   I don't recall.

7   Q.   Did you exchange any e-mails with Mr. Mendenhall about

8   this?

9   A.   No, not that I know of.

10  Q.   Do you e-mail with Mr. Mendenhall?

11  A.   We've sent e-mails before, yes.

12  Q.   Do you text with Mr. Mendenhall?

13  A.   Yes, we've texted each other before.

14  Q.   But you haven't texted or e-mailed him about the issue

15  that we're here today?

16  A.   I don't recall if I sent him a text message about it.  I

17  just discussed it with -- I called him back and talked to him.

18  Q.   And you said you called Mr. Mendenhall back.  What was the

19  purpose of you calling him that second time on that day?

20  A.   I called him and asked him who called you from CTA.

21  Q.   Why did you want to know that?

22  A.   Because we didn't know who called him.

23  Q.   And was that the first thing that you asked Mr. Mendenhall

24  when you --

25  A.   Yes.

Cavelle - cross

1    Q.  -- spoke to him?

2            And Mr. Mendenhall said that ████████████ had

3    contacted him?

4    A.  Yes.

5    Q.  And did Mr. Mendenhall say that ████████████ was the one

6    who, quote, said he would be quarantined?

7    A.  No, he did not.

8    Q.  So Mr. Mendenhall didn't say that ████████████ said he

9    would be quarantined?

10   A.  He did not say that.  He -- I called and asked who called

11   you from CTA.  He said ████████.

12   Q.  Did Mr. Mendenhall say that ████████████ said that if he

13   didn't speak on behalf of the CTA, his pay would be withheld?

14   A.  Again, I called him, asked who called.  He said ████████.

15   That was it.

16   Q.  Did Mr. Mendenhall say if he had conversations with anyone

17   else besides ████████████?

18   A.  He did not say on that call to me, no.

19   Q.  And you didn't ask him?

20   A.  No.

21   Q.  You said you don't know ████████████, but you know about

22   who he is?

23   A.  Yes.

24   Q.  Did you ever work with ████████████?

25   A.  I don't recall if I -- I think he was in another

Cavelle - cross

1  department.

2  Q.  And you said you told Mr. Mendenhall just tell the truth,

3  right?

4  A.  Yeah.  I told him -- as a follow-up to that, I said, well,

5  you know, don't worry about anything and just tell the truth;

6  I mean, that's all you need to do.

7  Q.  Did you take any notes or records of any of these

8  conversations you had with Mr. Mendenhall as you were talking

9  to him?

10 A.  No.

11 Q.  And did you tell Mr. Mendenhall that he should contact his

12 union or file a grievance?

13 A.  No.  I think in that conversation -- it may have been that

14 conversation or a previous conversation, I can't remember --

15 but I said to him, if you feel you're getting pressure, then

16 you should reach out to the union; you're a union employee.

17 Q.  So you mentioned the union in a conversation with

18 Mr. Mendenhall?

19 A.  Yeah.  We may have talked about it, yeah, in the past.  I

20 don't know if it was specific on that call or not.  But I

21 remember recalling having that discussion.

22 Q.  So -- and now we've gone through four conversations -- or

23 we will have gone through four conversations that you had with

24 Mr. Mendenhall.  In one of those four conversations, your

25 testimony is that you suggested to him that he contact his

Cavelle - cross

1   union?

2   A.  Not contact them.  I just said, if you feel under

3   pressure, you're a union employee.

4   Q.  And did he respond with respect to that?

5   A.  No.

6   Q.  And did you suggest to Mr. Mendenhall that he contact CTA

7   legal about this issue?

8   A.  No.

9   Q.  Did you suggest to Mr. Mendenhall that he contact the CTA

10  EEO or HR offices?

11  A.  No, no.

12  Q.  Is the phone number that you called Mr. Mendenhall, is

13  that the same phone that you have today?

14  A.  Yes.

15  Q.  And then let's turn to that fourth in-person conversation

16  you had with Mr. Mendenhall.  You said that was about three or

17  four weeks ago?

18  A.  Yeah.  I don't recall the exact date, but I can get it.

19  Q.  And so that was -- if today is March 21st -- approximately

20  February 21st?

21  A.  It may have been.  I know -- but I have a court date for

22  it, so I don't know the exact date.

23  Q.  And you were staying at Mr. Mendenhall's house?

24  A.  That's correct.

25  Q.  Was his baby born at that point in time?

Cavelle - cross

 1  A.  No.

 2  Q.  And it was just you and Mr. Mendenhall in the living room

 3  of his -- downstairs of his home?

 4  A.  Yes.

 5  Q.  Is that in Chicago?

 6  A.  Suburb of Chicago.

 7  Q.  And you said that the issue arose again of Mr. Mendenhall

 8  and this lawsuit that you have against the CTA, correct?

 9  A.  That's correct.

10  Q.  Who raised that issue?

11  A.  I believe he did or I may have brought it up in

12  discussion.  We were talking about other things as well, but

13  it came up.  I don't remember for sure if it was me who

14  brought it up or if he brought it up.  But he did make the

15  statement that, I was down there and they were talking to me.

16  And then that's where all the stuff he let out about they were

17  going to -- you know, they may have to look at my personal

18  e-mail, my finances, my text messages, my cell records, and

19  you know, now because I'm married, they may have to look at my

20  wife's financial records.  So all of that was coming out.  It

21  was pretty quick the way he was spouting it out.  He was

22  clearly upset.

23  Q.  And that was volunteered by Mr. Mendenhall?  In other

24  words, you didn't ask Mr. Mendenhall:  Did you speak to the

25  CTA attorneys?

1    A.  No, I don't recall.

2    Q.  So you were aware that Mr. Mendenhall was concerned.  I

3    think you said that he was concerned about his job or at least

4    getting paid, right?

5    A.  Yeah.  I mean, he brought that up in the conversation, the

6    second one, yeah.

7    Q.  And you didn't follow up with him or ask him any other

8    questions about it after you heard about that the first time?

9    A.  No.  I mean, I just asked who called him and he said

10   ██████.

11   Q.  And you said that he spoke to them.  Did he tell you who

12   he spoke to?

13   A.  No.

14   Q.  And this is in the fourth conversation.  You're not aware

15   of who Mr. Mendenhall spoke to when he got called down again,

16   I think you said?

17   A.  No.  He never gave specifics.

18   Q.  Did he say where he was when he was called down?

19   A.  No.  He -- like I said, he just said called down.  I made

20   the assumption that's 567, you know, but I don't know.

21   Q.  And when you say he was called down, did he say he spoke

22   to lawyers at the CTA?

23   A.  Again, he was very -- you know, very -- he wasn't detailed

24   about it, you know.  He just basically said I was down -- they

25   called me down; I spoke to them.  So, again, I have no names

Cavelle - cross

1   or -- he didn't get specific.

2   Q.  And you said that he said that he didn't need this right

3   now?

4   A.  Right.

5   Q.  He may have used words that were more colorful.

6          Did you then -- you testified that you interpreted

7   that to mean that he was scared for his job, right?

8   A.  Yes.

9   Q.  Okay.  Did Mr. Mendenhall tell you he was scared for his

10  job?

11  A.  He did not say that specifically.

12  Q.  Did Mr. Mendenhall tell you that he was not paid for his

13  time when he met with the CTA?

14  A.  He did not say that specifically.

15  Q.  Did Mr. Mendenhall tell you that he had to make up shifts

16  as a result of speaking to the CTA?

17  A.  He did not say that specifically.

18  Q.  And did Mr. Mendenhall tell you that he reported back to

19  anyone that he had, in fact, spoke for the CTA so that he

20  would be paid?

21  A.  He did not say that specifically.

22  Q.  And you didn't ask him any of that?

23  A.  No.

24  Q.  And after you spoke to him again -- Mr. Mendenhall -- in

25  this fourth instance where you spoke to him and he said he

1    didn't need this right now and you viewed it as he was

2    concerned --

3    A.   Yes.

4    Q.   -- did you contact your lawyers then?

5    A.   No.

6    Q.   And did you tell Mr. Mendenhall that he could contact the

7    union then?

8    A.   No.  I don't believe it was in that conversation.  I don't

9    recall though.

10   Q.   Was that the last time that you spoke to Mr. Mendenhall?

11   A.   No.

12   Q.   When have you spoken to him last?

13   A.   I don't remember the very last time, but I know I haven't

14   spoken to him since the lockdown was put on.

15           MS. BABBITT:  Your Honor, may I have a moment?

16           THE COURT:  Yes.

17      (Brief pause.)

18   BY MS. BABBITT:

19   Q.   Mr. Cavelle, you testified that you couldn't recall if you

20   exchanged any text messages or e-mails with Mr. Mendenhall

21   about the issue that we're here today, correct?

22   A.   Correct, I can't recall.

23   Q.   Okay.  And do you have that cell phone with you today?

24   A.   Yes.

25   Q.   Okay.  Would reviewing your phone and your text messages

Cavelle - redirect

53

1   with Mr. Mendenhall or your e-mails with Mr. Mendenhall

2   refresh your recollection as to whether or not you

3   communicated about that topic?

4   A.  I deleted them all.  I delete messages as I use them.

5           MS. BABBITT:  Nothing further, your Honor.

6           MR. SCHARKEY:  Your Honor, I have just a very few

7   questions for redirect.

8                       REDIRECT EXAMINATION

9   BY MR. SCHARKEY:

10  Q.  Mr. Cavelle, in the lead-up to today's testimony, I know

11  I -- we -- I talked with you about keeping this strictly to

12  these issues.  But when you were cross-examined, counsel

13  raised an issue about whether you knew anything else about

14  other employees who might have suffered or if there were other

15  repercussions.

16          So, Mr. Cavelle, my question is:  Do you know of any

17  other CTA employees who believe that they have suffered

18  serious repercussions in their employment because of their

19  association and their affiliation with you?

20  A.  You're talking other employees now --

21  Q.  Yes.

22  A.  -- not just specific George?

23  Q.  Yes.

24  A.  Oh, yes, most definitely.

25  Q.  How many?

Cavelle - redirect

1   A.   I can name six right off the bat.

2   Q.   Who are they?

3   A.   John McGuire, Robert Covich, Chuck Webber, Tony Valdez,

4   John -- I mentioned John McGuire.  There's probably a couple

5   more.

6   Q.   Okay.  What kind of repercussions did they suffer?

7   A.   John McGuire was fired immediately, probably right after I

8   left.  Robert Covich was fired for no reason, just because of

9   affiliation.  Chuck Webber was immediately -- after I left was

10  immediately demoted and money taken from him.  Tony Valdez was

11  demoted and put in midnights and is still working midnights.

12  Who else?  Don Miller.  Don Miller got fired along with John

13  McGuire.  He's another one.

14  Q.   Okay.

15  A.   It's just -- it's a list.  It's just the way it is, man.

16  Q.   When you say that's the way it is, what do you mean?

17  A.   Listen, I wouldn't be this scared for my friend if I

18  didn't know how it goes at CTA.  This has nothing to do with

19  me or my case.  I know how it goes at CTA, and everybody at

20  CTA knows how it goes at CTA.  If you're not in, you're out.

21          MR. SCHARKEY:  Just one moment, your Honor.

22     (Brief pause.)

23          MR. SCHARKEY:  We have nothing further, your Honor.

24  Thank you.

25          MS. BABBITT:  Just a few.

Cavelle - recross

1          THE COURT:  Sure.

2                       RECROSS EXAMINATION

3    BY MS. BABBITT:

4    Q.  Mr. Cavelle, those six individuals that you just mentioned

5    that Mr. Scharkey asked you about, are you suggesting that

6    those six individuals were fired or had repercussions as a

7    result of them participating or not participating in this

8    lawsuit?

9    A.  No.  I'm not saying participated or not participated in

10   this lawsuit.  I'm saying when I left CTA, they knew they were

11   affiliated with me.  And if you were friends with Cavelle, you

12   had a warrant poster out on your head.

13   Q.  And so none of those six individuals that you named were

14   witnesses that were, quote, tampered with?

15   A.  No.

16          MS. BABBITT:  Nothing further.

17          THE COURT:  Okay.  I'd like to move along to another

18   witness, but it would be helpful for me, just timeline, if I

19   could get a date for when you were in town.  So I know that

20   means checking a phone and a calendar for when he had a

21   probate matter up.  So if the lawyers could just do that and

22   then let me know the date.  If you could get off the stand and

23   do that -- I don't think it has to be under oath -- but if you

24   could just give me that date, that would be helpful.

25          MR. SCHARKEY:  We will do that, your Honor.

```
 1              THE COURT:  Okay.  So the other witnesses, I think,

 2    are wherever they are.  Kara can take you where they are.  But

 3    are we going to put on another witness?

 4              MR. SWEENEY:  We are.

 5              THE COURT:  And does anyone need a break?

 6              MR. SWEENEY:  If we can take five minutes?

 7              THE COURT:  Okay.  Why don't we take five minutes.

 8              You're done.

 9              THE WITNESS:  Thank you, your Honor.

10              THE COURT:  Thank you.

11      (Witness excused.)

12      (Recess taken.)

13              MR. SWEENEY:  Your Honor, we'd call George

14    Mendenhall -- the plaintiff would call George Mendenhall.

15              THE COURT:  Come on up.

16              THE WITNESS:  Hello.

17              THE COURT:  Hello.  Right here.

18              Raise your right hand.

19      (Witness sworn.)

20              THE COURT:  Keep your voice up.  And there's water if

21    you need some.

22          GEORGE MENDENHALL, PLAINTIFF'S WITNESS, SWORN

23                     DIRECT EXAMINATION

24    BY MR. SWEENEY:

25    Q.  Good afternoon, Mr. Mendenhall.
```

Mendenhall - direct

1  A.  Hi.  How are you?

2  Q.  My name is Bob Sweeney, and I represent George Cavelle.

3        To start, the court reporter here is taking down what

4  we say, so if you could state your name and spell --

5  A.  George Mendenhall.

6  Q.  And spell your last name for her.

7  A.  M-e-n-d-e-n-h-a-l-l.

8  Q.  George, where did you grow up?

9  A.  I grew up in LaGrange.

10  Q.  Okay.  And where did you go to school?

11  A.  Lyons Township.

12  Q.  Did you go past high school?

13  A.  I went to trade school after that.

14  Q.  Where did you go there?

15  A.  COD.

16  Q.  College of DuPage?

17  A.  College of DuPage, yeah.

18  Q.  And then where did you -- when did you start working for

19  CTA?

20  A.  2004.

21  Q.  All right.  And what job did you have there?

22  A.  Same thing I have now, rail maintenance.

23  Q.  And what does that entail?

24  A.  We work on mechanics on the trains, so to speak.  The

25  trains come in every day.  We take them apart and fix them.

Mendenhall - direct

1   Q.   Okay.  And you've been doing that since '04?

2   A.   Correct.

3   Q.   Did you know George Cavelle when he was working at CTA?

4   A.   Yes.

5   Q.   Did you know him before that?

6   A.   Yes.

7   Q.   How did you know him before that?

8   A.   I was an electrician before that, and I used to be at a

9   lot of restaurants and stuff with the company I was working

10  for.  He was -- I met him through that.  He was a DJ back

11  then.

12  Q.   Okay.

13  A.   And just met him through that.

14  Q.   Did he have any part in you getting the job at CTA?

15  A.   No, not at all.

16  Q.   Did you end up working in the same departments or together

17  at CTA?

18  A.   Well, we both started in the same department.  He moved on

19  to other departments.  I -- he worked at bus.  He worked in

20  rail.  I mean -- but higher up in rail.  I work in the shop

21  where the trains get fixed.

22  Q.   Okay.

23  A.   He was the corporate side of the world.

24  Q.   Where -- where do you work?

25  A.   I --

                     Mendenhall - direct
                                                                    59

 1   Q.  I know you work at CTA, but, like, where?

 2   A.  What shop --

 3   Q.  Yeah.

 4   A.  -- do I work at?

 5          Right now I'm stationed out of the Des Plaines rail

 6   shop, which is 290 -- 290 and Des Plaines Avenue.

 7   Q.  Okay.  Are you married?

 8   A.  I am.

 9   Q.  What's your wife's name?

10   A.  Marlaine.

11   Q.  I'm sorry?

12   A.  Marlaine.

13   Q.  How long have you been married?

14   A.  Going on five years, I think.  Yeah, five years.

15   Q.  Okay.

16   A.  It's been long.

17          THE COURT:  Let's not forget that.

18          THE WITNESS:  Don't tell her.

19   BY MR. SWEENEY:

20   Q.  So I understand that you've had a daughter?

21   A.  I have.

22   Q.  And we won't go too far into it, but is she in the

23   hospital?

24   A.  She is.  She's in the intensive care unit.

25   Q.  Okay.  Where?

Mendenhall - direct

1   A.   Good Samaritan Hospital in Downers Grove.

2   Q.   Was she -- did she come early?

3   A.   Correct, six weeks.

4   Q.   Six weeks early?

5   A.   Six weeks.

6   Q.   And how long has she been in ICU?

7   A.   Today is 32 days.

8   Q.   Okay.

9   A.   Expected another at least two weeks they told us today.

10  Q.   Okay.  Does your wife work?

11  A.   Yes.  Well, not right now because of what's going on.

12  But, yes.

13  Q.   Okay.  Where does your wife work?

14  A.   She works for a company called Viva, which is a computer

15  company.

16  Q.   Okay.

17  A.   Computer programming.

18  Q.   And your benefits, health insurance, is that through CTA

19  through you?

20  A.   Yes, that's correct.

21  Q.   Okay.  So that's how you guys have your health insurance?

22  A.   Correct.

23  Q.   All right.  Do you know what it's costing you, the ICU,

24  daily at Good Sam?

25  A.   No.  But I -- they kind of gave us a rough, like,

Mendenhall - direct

1   somewhere around 10,000 a day.

2   Q.  All right.  Would you be able to cover that on your own if

3   you --

4   A.  No, not at all.

5   Q.  Okay.  What shift -- or I guess I should ask:  Has your

6   shift changed -- like, what shift you work at Des Plaines --

7   over the last year?

8   A.  Yeah.  They change all the time.  I mean, we have a --

9   what's called a rail system pick where job location, shift can

10  change.  In my position that I have, the boss can tell me,

11  here, you're working this shift.  I'm a foreman in the rail

12  shop so he can say, okay, this person is off; you have to work

13  this shift.  I mean, it can change weekly, daily.  This week

14  they're -- like, I'm working a 10:00 to 6:00.  Usually I work

15  1:00 to 9:30.

16  Q.  Okay.  And where do you live?

17  A.  Lemont.

18  Q.  Lemont.  Okay.  So in terms of where you could end up

19  going, Des Plaines, Rosemont, is there anywhere else or --

20  A.  Yes.  There's all the rail shops when it can -- when the

21  union has a pick -- what's called a pick -- where all the jobs

22  are placed out and you pick by seniority where you can go.  At

23  this time, due to my qualifications, I'm forced into a

24  particular job, which is a rail foreman.  And that's -- the

25  places I could pick were -- it was actually Rosemont, but we

Mendenhall - direct

1    moved to Des Plaines.

2    Q.  Okay.  And in terms of the control that, like, let's say

3    your supervisor has over what shift you work or where you have

4    to go, can they do that, change that on a weekly or daily

5    or --

6    A.  Yeah, whenever they want.

7    Q.  And just tell you, hey, now you're going somewhere else?

8    A.  Yeah, we need you over there.

9    Q.  And it could be instead of, let's say, 1:00 -- did you say

10   1:00 to 9:00?

11   A.  On paper my shift currently states I work 1:00 to 9:30.

12   But due to different training and stuff like -- we have to

13   help other, like, newer guys who came into the job.  Right now

14   I'm training a manager.  Right now I'm working 6:00 to 10:30.

15   And that also, you know, can change.  He could say, all right,

16   we're going to move you to the midnight shift.  We're going to

17   move you wherever.  But usually I work and I'm paid for 1:00

18   to 9:30.

19   Q.  Okay.  But as supervisor -- who is your supervisor?

20   A.  My direct supervisor is a gentleman named Jeff Bell.

21   Q.  If Mr. Bell says that, hey, you know, I want you to work

22   at this place and I want you to do this shift, that could

23   happen any day?

24   A.  He can ask me to do that.  Usually it's, you know, we need

25   you over here; we need you to cover this.  I mean, I could --

Mendenhall - direct

63

1    through union ways -- be, like, okay, well, I'm not going to

2    do that.  But, yes, they've asked me to do that many times.

3    Q.  Okay.  So Jeff Bell is your immediate supervisor?

4    A.  Yeah.  He's the senior manager, Jeff Bell.  There's

5    Charles Walker.  It depends which shift I'm working on because

6    the non-union supervisor is what -- who controls me.  So if

7    I'm working on a p.m. shift, that p.m. manager, so to speak,

8    is my boss.  I'm still union.  These are exempt employees.

9    Q.  Got it.  So --

10   A.  The corporate side of it.

11   Q.  So if we see Jeff Bell's name on any --

12   A.  Jeff Bell is the corporate side of CTA.  I'm the union

13   labor side.

14   Q.  Okay.  But if we see his name on e-mails, he would have

15   been your direct supervisor at that time?

16   A.  Yeah.  He is the boss over all the -- all the -- what

17   they're -- they're M1's, I guess.  They call them Manager 1.

18   He's a senior manager.  He's in charge of all the managers of

19   his shop.

20   Q.  Okay.  And then who would ▉▉▉▉▉▉▉▉ be?

21   A.  ▉▉▉▉▉▉▉ would be the ▉▉▉▉▉▉▉▉▉, right?  Or ▉▉▉▉▉

22   ▉▉▉▉▉▉▉▉▉ or --

23   Q.  ▉▉▉?

24   A.  It's all --

25   Q.  ▉▉▉  I think he's referred to.

Mendenhall - direct

64

1    A.  Yes, ███.

2    Q.  And what is that?  ██████ --

3    A.  He's ███████████████████████████.

4    Q.  So he would definitely be ██████████?

5    A.  Of course.

6    Q.  Okay.  So when they -- when we see his -- those letters,

7    ████, in any of these documents that we have, that would be --

8    you understand it to be ████████████████████████?

9    A.  ████████████████████.

10   Q.  ██████████████████?

11   A.  Yes, sir.

12   Q.  Okay.  Do you know how long ██████████ has been ████████

13   ████████████████?

14   A.  I don't know.  Three years maybe.  I don't know the exact.

15   Q.  Okay.  Do you know whether he --

16   A.  I'm not really involved with the corporate side of it.

17   Q.  Okay.  Do you know -- do you ever have any discussions --

18   A.  With?

19   Q.  -- with ██████████, like, sort of on a daily basis?  Is

20   that something you would do?

21   A.  I've had discussions with him about union, you know,

22   positions.  We've -- trying to revamp a position called

23   leader, which is the foreman, which I'm in contact with him

24   about that.  Even when I was told to come down here, he was

25   one of the original people who called, told me that -- here,

Mendenhall - direct

1   contact Mr. Jansen, and there's another firm you need to talk

2   to.  That's usually our conversation.  I mean, I see him in

3   the hall sometimes when he comes by the shops.

4   Q.  Would -- how often --

5   A.  Talk to him on a regular basis?  No.

6   Q.  Okay.  So once a month?

7   A.  It could go on for -- you know, it depends what we're

8   doing.  If we're negotiating -- you know, if we're talking

9   about pick time or jobs, yes, I see him more often.  If we're

10  talking -- you know, if he's coming through a shop just to

11  check on the shop, then I'll see him and say hello.

12  Q.  Sporadic, would that be fair?

13  A.  Sporadic would be more than fair.

14  Q.  Okay.  So you've known George Cavelle for over a decade,

15  right?

16  A.  20 years.

17  Q.  20 years.  And --

18  A.  Probably even a little more.

19  Q.  Say it again.

20  A.  Probably 20 years or more.

21  Q.  Okay.  And would you consider George a friend?

22  A.  Absolutely.

23  Q.  All right.  When you were -- when George was at CTA, would

24  you guys get together outside of work?

25  A.  Yes.

Mendenhall - direct

 1  Q.  Okay.  Does he know your wife?

 2  A.  He does.

 3  Q.  Has he stayed at your house?

 4  A.  He has.

 5  Q.  All right.  With respect to sort of why you're here

 6  ultimately today, have you ever talked to Mr. Cavelle about

 7  his case, his lawsuit against CTA?

 8  A.  Yes.

 9  Q.  Have you ever been shown any of the, like, pleadings,

10  complaints, or any of that stuff?

11  A.  No.

12  Q.  Okay.  Let's clear it up.  Have you ever -- this is the

13  first time we've ever spoken, right?

14  A.  That's correct.

15  Q.  I've never met you before --

16  A.  That is correct.

17  Q.  -- right?

18          Okay.  Do you know when the first time was that you

19  were contacted by CTA with respect to being interviewed or

20  talked to by lawyers in this case?

21  A.  Early February I was contacted at Des Plaines rail shop by

22  ████████.  ████████ then referred me to Mr. Jansen, and

23  Jansen to the law firm Taft, I -- yeah.

24  Q.  So as I understand it, that was -- that was the second

25  time you had actually met with attorneys about George's

Mendenhall - direct

```
 1   case --
 2   A.  That's correct.
 3   Q.  -- right?
 4   A.  I was called in maybe a year prior.  I don't know -- we
 5   can check e-mails for the dates.  But, yes, I've been brought
 6   in by another group of attorneys with CTA and --
 7   Q.  Okay.  So let's -- I just want to talk about that first
 8   time.
 9   A.  Okay.
10   Q.  So the first time, it wasn't, you said, the Taft
11   attorneys?  It wasn't them, right?
12   A.  No.
13   Q.  It was the --
14   A.  I believe it was CTA's attorneys.
15   Q.  Okay.  Where was the meeting, the first one?
16   A.  At CTA headquarters, 567.
17   Q.  Okay.  567 Harrison, is that --
18   A.  Lake Street.
19   Q.  I'm sorry.
20   A.  That's why we call it 567.
21   Q.  So when we see that in the e-mails and all it says is 567,
22   it's talking about --
23   A.  It means Lake Street, yeah.
24   Q.  Okay.
25   A.  Or headquarters.
```

Mendenhall - direct

68

1   Q.  So sometime about a year ago, you get called to come down

2   to headquarters?

3   A.  That's correct.

4   Q.  Who called you that time?

5   A.  Oh, man.  I don't remember actually.  I don't know.

6   Usually, you know, your boss tells you, hey, you've got to do

7   this.  E-mails will follow.  The GM or something along -- I

8   don't know.  The exact person, I don't remember.

9   Q.  Okay.

10  A.  But I'm sure you guys could figure it out.  I mean --

11  Q.  Sure.

12  A.  -- everything is e-mailed.

13  Q.  Right.  So you went down there to headquarters, and you

14  met with the attorneys for the CTA.  How long did that last?

15  A.  How long did it last?  I don't know.  Usually a couple of

16  hours I'm down there.  I think I went down there twice.  That

17  was it.  I never really heard nothing from them --

18  Q.  Okay.

19  A.  -- again.

20  Q.  Twice with the first group?

21  A.  With the first group, yeah, I think so.

22  Q.  Okay.  So you said a -- have you had to do this before,

23  where you had to go and meet with the attorneys at CTA about

24  other issues or is this the first --

25  A.  Well, the only other -- the only other issues are more

Mendenhall - direct

1   union issues where we talk about the jobs and the -- you know,

2   how we pick our positions and stuff like that.  Plus, you

3   know, when a new regime comes in, they want to see what people

4   think, you know, how to fix different programs in the company

5   and all that.  It's just usually things like that, but that's

6   more union stuff.

7   Q.  But as a witness, have you ever been --

8   A.  No, no.

9   Q.  So this case is sort of the first time you've had --

10  A.  Absolutely.

11  Q.  -- to deal with that?

12  A.  For sure.

13  Q.  So you come down to CTA.  You meet with them a couple of

14  hours.  And that's attorneys for CTA you think?

15  A.  The original time, yes, which I can pretty much guarantee

16  you they were because I think --

17  Q.  Would it have been like Ken Yeadon?  Does that name sound

18  familiar?  Hinshaw & Culbertson?

19  A.  I honestly don't --

20  Q.  Was it Brad Jansen?

21  A.  No.

22  Q.  Okay.  So it was someone other than Jansen?

23  A.  Yeah.  I don't think Mr. Jansen was involved with that.

24  I'm sure that, like I said, there's an e-mail asking me to be

25  at that meeting.  So I'm sure it's on e-mail.

Mendenhall - direct

1   Q.  Understood.  And then you think maybe you came down and

2   met with them again?

3   A.  I think so, but I -- I could be mixing -- I know I was

4   down there once for sure.  I think I was called down -- maybe

5   it was canceled -- but I think I -- I might be thinking about

6   a meeting that was about some union stuff.  Plus, I went down

7   there -- actually I was down there for another court

8   proceeding, but that was for an arbitration.  Maybe that's

9   what I'm thinking of.  It was an arbitration.  There was a

10  court hearing for some back pay for people in my position.

11  Q.  Okay.  So at the first meeting, were you asked about the

12  case, George's?

13  A.  Correct.

14  Q.  Okay.  And do you know, were they taking down -- people

15  writing things down, taking notes?

16  A.  Correct.

17  Q.  Do you know, was it recorded?

18  A.  I wasn't told it was recorded if it was.

19  Q.  Okay.  Was there any issue with you getting paid for that?

20  A.  Getting paid for it?  You know, anything out of the

21  ordinary, you're always -- you're chasing your paycheck.  I

22  mean, that's just standard here.  I'm not a corporate

23  employee.  So me, I'm out in the field, so there's a lot of

24  red tape, paperwork.  You know, you're chasing your check for

25  the hours that you were down there.  Yes, that's a regular

Mendenhall - direct

71

1   thing.

2   Q.  Okay.  The -- and then did you hear anything about it in

3   terms of anything from the attorneys then after that first

4   meeting until this --

5   A.  No.

6   Q.  -- second meeting you were --

7   A.  Not until I was called lately.  And then ████████████

8   called me, told me to get a hold of Brad.  Brad gave me more

9   details about it.  And then I talked to Mr. Kennedy, I think

10  his name is, and Allison.

11  Q.  With respect to the meeting with Taft, the documents we

12  have say that on February 7th, that you were to get -- I'm

13  sorry -- Jeff Bell was to have -- tell you to call ████████████

14  on his cell phone.

15  A.  Yes, I believe that's what happened.

16  Q.  Did that happen?

17  A.  Yeah, I believe so, yeah.  That was -- I talked to him on

18  his cell phone.  He told me then at that point, you know, I'm

19  going to go downtown; it's about George Cavelle case.  That's

20  pretty much all the details.  I went in and said, okay, let

21  these guys know so, you know, my time ain't -- is not messed

22  up.

23          I talked to Mr. Jansen.  Mr. Jansen then gave me more

24  details.  Same thing:  You're here for Cavelle case, but it's

25  outside people; you have to talk to them.  That was pretty

Mendenhall - direct

72

1   much it.

2          Then I talked to someone from the office about -- to

3   let my boss know so, again, my paycheck wasn't screwed up.

4   And there's e-mails back and forth.  I saw him do that.  The

5   clerk got involved.  And that was pretty much it.  And then

6   like a week or two later, I went down and met them.

7          MR. SWEENEY:  One second, your Honor.

8     (Brief pause.)

9   BY MR. SWEENEY:

10  Q.  So does it sound right that on February 6th, you would

11  have been working the 2:00 to 10:30 shift?

12  A.  Correct, I think so because -- yeah, because --

13  Q.  And having --

14  A.  -- the baby hasn't -- yes, 2:00 -- or 1:00 to 9:30.

15  Q.  Okay.  So if it said you were on the 14:00 to the

16  22:30 shift --

17  A.  Same thing, yeah.

18  Q.  Okay.  And you say that Bell, on the 6th, did tell you

19  call --

20  A.  Yes, I was --

21  Q.  -- ██████████ on his cell phone?

22  A.  I was advised to call -- I was, I think, out in the truck.

23  I came back and they said that I need to get a hold of ██████

24  ██████.  I think they -- I don't know.  I might have used his

25  phone or whatever.  I talked to ████████████.  He advised me

Mendenhall - direct

73

1    that I've got to come here.

2    Q.  Okay.  And then you did that, right?  You said you called

3    ████████?

4    A.  Correct.

5    Q.  What time would that have been?

6    A.  It was later at night.  It was probably 7:00 maybe,

7    somewhere around there.

8    Q.  Okay.

9    A.  I don't know.  It's -- usually I get back from being

10   out -- because I'm in emergency response.  You know, we follow

11   the defects around on the rails, so usually we get back around

12   6:30, 7:00.  So it's somewhere around there is my guess.

13   Q.  And then -- so you think you would have called him

14   around -- in the evening?

15   A.  I believe that's when it happened.

16   Q.  Okay.

17   A.  I don't -- I've had a lot going on.  I don't know the

18   exact time, but the -- most likely I get-- I leave at around

19   1:00 p.m. to go out and follow around the trains that are

20   defective.  I usually get back somewhere between 6:00,

21   7:00 p.m. and then do my reports and all that.  So it's got to

22   be somewhere around in that parameter.

23   Q.  Would you have ████████'s cell phone number?

24   A.  I do not have ████████'s cell phone number.

25   Q.  So someone would have had to give you that?

Mendenhall - direct

74

```
 1   A.  Correct.

 2   Q.  Okay.  Who gave it to you?

 3   A.  I believe it was Jeff Bell who -- Jeff Bell did.  He

 4   advised me to get a hold of ███████████.

 5   Q.  Okay.

 6   A.  They might have called while I was out.  It could have

 7   been something like that and then --

 8   Q.  Did Mr. Bell tell you it was about Mr. Cavelle's case?

 9   A.  No.

10   Q.  So you didn't know what it was about?

11   A.  No.

12   Q.  Okay.  You said that you also spoke to Brad Jansen?

13   A.  I did.

14   Q.  Okay.  Same day?

15   A.  No.  I think it was, you know, the day later, whatever it

16   is.

17   Q.  The next --

18   A.  I don't know.  It wasn't the same day.  I know that.  I

19   spoke to Mr. Jansen.  He advised me that, you know, you're --

20   it's been outsourced to another company.  He told me it's

21   about the Cavelle case.  He told me at this time I don't need

22   union representation; I don't need any type of legal team;

23   that that's being provided by CTA.  I need to talk to Taft.

24   That's the legal representation.  And I spoke to someone from

25   Taft on the telephone.  I believe it was Allison.  I don't
```

Mendenhall - direct

1   know.  But that was about setting up the meeting.  That was,

2   like, a day later I think.  I talked to Jansen then Taft --

3   ▇▇▇▇▇▇▇, Jansen, and then Taft.

4   Q.  Okay.  So when you talked to Mr. Jansen, did you address

5   the issue of whether you were going to get paid?

6   A.  I addressed the issue with Mr. Jansen.  I addressed -- I

7   always address the issue just because I've chased my check

8   around so many times in things I've done outside my regular

9   job.  There are e-mails that can be seen that -- back and

10  forth from Taft, Cesar Bolanos, Jeff Bell.  I think pretty

11  much everybody involved with this is on the e-mails to make

12  sure that was all properly handled.

13  Q.  Do you know, was it -- based on the first experience you

14  had last year, was that --

15  A.  Absolutely.  Not only the first experience but the

16  experience of the corporate side.  I don't work in the

17  corporate building, so there's layers of paperwork and people

18  who -- it's just -- I'm in a different entity so they don't

19  know how to pay it or they don't have their proper paperwork

20  or there's always a reason why; oh, no, you can't get paid for

21  that, here, take a day.  I was just done with it.  I've got

22  enough going on.  That's just -- I make sure before.  I always

23  say, okay, let my boss know so I don't have any issues

24  following.

25  Q.  Okay.  Did you tell Mr. Jansen that he needed to tell

Mendenhall - direct

76

1   ████████ and Bell to contact the payroll clerk to make sure you

2   get paid?

3   A.  I told Mr. Jansen that --

4   Q.  Just -- we'll do them step by step.

5           But did you tell Jansen to tell ████████ and Bell you

6   need to get paid on February 7th?

7   A.  It would be Mr. Bell and everyone else, but I didn't

8   specifically say ████████, to get -- to let him know.

9   Q.  Okay.  And then on February 7th, you believe you spoke to

10  Ms. Czerniak, Allison?

11  A.  I spoke to Jansen.  He told me that everything was being

12  outsourced.  I spoke to this company --

13  Q.  Right.  But just --

14  A.  -- here.

15  Q.  Right now just, did you talk to Allison?

16  A.  Yes.

17  Q.  Okay.  And when you talked to Allison, did you tell her

18  that the notice for you coming down to headquarters needed to

19  go to ████████ and to your supervisor, Jeff Bell; and you

20  also asked that they notify the CTA payroll clerk, Cesar

21  Bolanos, to confirm you'd get paid?

22  A.  Yes.

23  Q.  All --

24  A.  I told everyone to let them know to everyone that -- so I

25  don't have any issues, yes.

Mendenhall - direct

77

1  Q.  All --

2  A.  All on e-mails back and forth.

3  Q.  All on February 7th you would have done that?

4  A.  Correct.  I believe there's other e-mails though that --

5  of other conversations with it, but --

6  Q.  Say again.

7  A.  About the Taft crew making sure I was getting paid.

8  They -- you know, they talked to everyone.  I was involved;

9  Mr. Bell my supervisor knew.

10  Q.  Okay.  Do you recall speaking with Mr. Cavelle on

11  February 6th?

12  A.  I think I talked to him -- I don't know if it was the 6th.

13  I talked to him early February.

14  Q.  Okay.  So once you got notified by ██████ --

15  A.  Yeah.

16  Q.  -- on, let's say, February 6th that you were going to have

17  to go talk to the lawyers again about Cavelle --

18  A.  Yeah.

19  Q.  -- did you call George?

20  A.  I talked to him, I believe it was the day I spoke to the

21  Taft people.  And I already had talked to everyone by then,

22  Jansen and everybody.  And he was calling saying he was coming

23  to town.  I said, oh, by the way, I'm getting, you know, calls

24  saying that I've got to go downtown.  And that was it.

25  Q.  Okay.  So when --

Mendenhall - direct

1   A.  I vented a little bit about, you know, it's a pain in the

2   ass.  You know, I don't need this.  I got enough of my own

3   things going on right now, you know, things along that line.

4   Q.  Got it.

5   A.  He's a friend of mine for 21 years.  You know, I was

6   having a conversation with a friend of mine.

7   Q.  Understood.

8           So when you say that you talked to George after you

9   talked to the Taft lawyers, I understand the meeting actually

10  took place -- the second meeting with the Taft lawyers -- on

11  February 13th?

12  A.  Yeah.

13  Q.  Okay.  So all the setup for it looks like it started

14  sometime around February 5th, 6th, 7th?

15  A.  Yeah, yeah.

16  Q.  So when you called George to tell him -- or when you told

17  him that, hey, you're being called down again, would that have

18  been on February 6th or 7th, somewhere in there?

19  A.  It would have been the day -- it was before my wife's baby

20  shower, so it had to be the 7th or 8th.

21  Q.  Okay.

22  A.  Somewhere in there, before that weekend.

23  Q.  Okay.

24  A.  It was right after I talked to whoever I talked to on the

25  telephone from Taft about setting up -- making sure my pay

Mendenhall - direct

1   wasn't screwed up.

2   Q.  Okay.  And you said you told George about -- saying I

3   don't need this right --

4   A.  Yeah.  I don't -- I got enough going on.  I got a wife

5   that thinks she's going to lose her baby, and it's just -- we

6   got enough going on.  I don't need to chase my paycheck.  I

7   vented to him.  I won't lie.  I vented to him and that was it.

8   Q.  Did --

9   A.  We talked about going out to dinner when he came -- comes

10  into town.

11  Q.  Did at any point you tell him that they -- someone told

12  you, you don't get compensated, you don't get paid if you're

13  testifying -- if you're not testifying for CTA?

14  A.  Well, it was:  At this time you're being -- you know, at

15  this time CTA is providing it for you.  At this time you don't

16  need, you know, your union representation.  So I guess I maybe

17  took it -- I did take it as, okay, what does that mean; what's

18  going on here.  But --

19  Q.  Okay.

20  A.  -- after I talked to everyone, they -- there was

21  clarification and -- but, yes, I took it as what's going on,

22  you know.

23  Q.  That you might not be getting paid?

24  A.  I -- at that point, I'm like, okay, what's -- I was

25  confused; what's going on.  And, yes, am I getting paid, who

Mendenhall - direct

1    is paying me.  And that's another reason why I brought it up

2    to everybody; what's going on.

3    Q.  Okay.  Did you -- did anyone tell you that you were going

4    to have to go down to CTA and it might be for a couple of days

5    or that you were going to have to be there --

6              MR. KENNEDY:  Objection, your Honor, leading.

7              MR. SWEENEY:  One, I'd say he's adverse.

8              THE COURT:  Yes, I'm wondering if he is adverse.  Try

9    to ask it in a non-leading way.

10   BY MR. SWEENEY:

11   Q.  Did anyone explain to you how long you might have to be

12   down at CTA?

13   A.  I believe some -- I believe -- I don't know if it was Taft

14   or whatever, this -- whatever it takes, you'll be -- you know,

15   you've got to come down here and do this.

16   Q.  Did they talk about, like, hours, days?

17   A.  I don't remember.  I think there was something what- --

18   whatever the days you need to be down there, that's --

19   wherever your representation -- you know, things along those

20   lines.  I don't know the exact conversation, but that they are

21   the staff that's representing me.  And CTA is not involved

22   anymore.  Jansen was just like the liaison over to them.

23              I'm not sure what you're -- did they give me an exact

24   time frame?  No.

25   Q.  Just, did they tell you how long you might have to be down

1    there?

2    A.  I believe it was that they said whatever days it takes is

3    what it takes.  They -- nobody really had a solid answer.  I

4    mean, nobody knew what it was.

5    Q.  Based on your conversations with either ████████, Jansen,

6    or the Taft team --

7    A.  Uh-huh.

8    Q.  -- did you tell them that you had already done an

9    interview?

10   A.  Yes.

11   Q.  Who did you tell that to?

12   A.  The Taft team.

13   Q.  Okay.  Did it seem like they knew about that?

14   A.  Yes.

15   Q.  Okay.  So they wanted you to come down again?

16   A.  Correct.

17   Q.  All right.  Was there any indication given to you that,

18   under some circumstance, you might not be paid?

19   A.  The only indication of that is when I was told at this

20   time -- at this time -- you don't need union representation;

21   at this time, you're -- you know, we're providing you your

22   legal team or whatever.

23          At that point, okay, what does somebody think?  Okay.

24   What does "at this time" mean?  What, does -- what, does that

25   change or -- you know.

Mendenhall - direct

1    Q.   Okay.   In terms of your compensation --

2    A.   Yeah.   I mean --

3    Q.   -- did you --

4    A.   -- all right, so, what, have I got to come up with a

5    lawyer now?   I -- you know, I didn't know.   Mr. Jansen is the

6    first one who told me that:   At this time you're going to --

7    you know, you don't need union representation; you don't need

8    legal representation; an outside firm is taking care of this.

9    What does "at this time" mean?

10   Q.   In terms of you getting paid?

11   A.   Of me getting paid or me having to get my own lawyer or

12   anything along those things.   I mean, that's a very big window

13   of what does "at this time" mean.

14   Q.   So it was your understanding based on what they were

15   telling you that --

16          MR. KENNEDY:   Objection, your Honor, leading.

17          THE COURT:   I'm going to allow it.

18   BY MR. SWEENEY:

19   Q.   It was your understanding based on what they were telling

20   you at that point that, at that moment, you were going to have

21   representation?

22   A.   Correct.

23   Q.   But it could change?

24   A.   But at one time maybe that's not -- you know, when you say

25   at this time, what does at this time mean?   Exactly what I

Mendenhall - direct

1   said the first time.  All right.  So you're telling me at this

2   time, I don't need union and legal representation; you're

3   providing it.  Okay.  When does at this time change?

4   Q.  Did you tell that to ████████ or Jansen or Ms. Czerniak?

5   A.  No.  My final conversation was with the Taft team, and the

6   Taft team said they are my representation.

7   Q.  Okay.

8   A.  And they're the ones working for CTA and they're my legal

9   representation, you know, at this time.

10  Q.  Okay.  When you said you were venting to Cavelle on

11  whatever day that was you called him after --

12  A.  Yeah.

13  Q.  -- you found out you were going to come down, how long did

14  that call last?

15  A.  I don't know.  We -- five, ten minutes.  We were talking

16  about he was coming into town.  We were going to grab some

17  dinner at a Chinese joint we both like.  It wasn't a very --

18  you know, I talk to him all the time.

19  Q.  Okay.  And do you recall him talking to you about the

20  situation, about you either getting paid or not getting paid?

21          MR. KENNEDY:  Objection, your Honor, leading.

22          THE COURT:  So what did he say?

23          THE WITNESS:  What did who say?

24          THE COURT:  What did Cavelle say?

25          THE WITNESS:  When I said -- when I was venting?

Mendenhall - direct

84

1              THE COURT:  Yes.

2              THE WITNESS:  He said, you know, he knows a lot of

3    people.  You know, he knew Brad.  When I mentioned Brad, he

4    said he was a good guy.  He said that, you know, that's

5    typical CTA, you know, chasing your money and all that.  I

6    said I don't need this.  I got -- my wife is sick, pregnant.

7    We're about to -- we're worried we're losing a baby.  I mean,

8    I don't need this hassle basically.  I was just venting to

9    him.  I didn't know my private conversation was of, you know,

10   this court proceeding.  But that's all it was, venting.

11             THE COURT:  Don't worry.  You haven't done anything

12   wrong.

13             THE WITNESS:  I'm like -- yeah.  But, yes, I vented

14   to my friend of 20-plus years, yes, I did.

15             THE COURT:  I don't want you to be worried about your

16   job or anything like that.

17             THE WITNESS:  No.

18             THE COURT:  You haven't done anything wrong.

19             THE WITNESS:  No.

20             THE COURT:  Okay.

21             Go ahead.

22             THE WITNESS:  I appreciate that.

23   BY MR. SWEENEY:

24   Q.  Did Mr. Cavelle tell you that he was going to help you or

25   do anything to offer you any guidance?

Mendenhall - cross

1   A.  No.

2   Q.  Did he call you back and ask you who you spoke to from

3   CTA?

4   A.  Later in the conversation, yeah, he -- maybe just

5   called -- who called -- actually called you from the CTA.  And

6   I said, you know, ████, Jansen.  There's a new firm.  I

7   think he was -- there was some other parts of the conversation

8   about him coming into town.  Nothing -- nothing besides that.

9   I mean, there's nothing else to talk about.

10  Q.  Did Mr. Cavelle tell you at all that he spoke to his

11  lawyer?

12  A.  That he spoke to his lawyer?  No.

13  Q.  Did he offer you any advice?

14  A.  No.  It was just -- you know, just deal with it, you know.

15  It is what it is.  I'm going to deal with it and move on.

16          MR. SWEENEY:  Your Honor, if I could have a minute?

17          THE COURT:  Sure.

18     (Brief pause.)

19          MR. SWEENEY:  Thank you, Mr. Mendenhall.  We have no

20  further questions.

21          THE COURT:  Okay.  You may direct.  Or cross?

22          MR. KENNEDY:  Maybe a mix, Judge.

23                      CROSS-EXAMINATION

24  BY MR. KENNEDY:

25  Q.  Good morning, Mr. Mendenhall.  My name is John Kennedy for

Mendenhall - cross

1   the CTA.  We've met once before?

2   A.  We have.

3   Q.  Tell the judge the circumstances, without getting into the

4   content.

5   A.  I was called downtown about the Cavelle case through ███

6   ████, Mr. Jansen, and then referred to him.  We had a

7   meeting downtown about details of the case.  That was it.

8   They told me they would call me back if I needed to come back.

9   Q.  Do you recall how long you were downtown for that meeting?

10  A.  About an hour and a half, two hours.

11  Q.  Okay.  Did anybody ever tell you that you were going to

12  have to come downtown for 40 hours and be quarantined?

13  A.  No.  They said that it could take longer.  It could take

14  whatever.  It could take two days, three days down here,

15  whatever it is.  We will contact you and we will let you know

16  what is necessary for you to be there.

17  Q.  Okay.  And at that meeting, Ms. Czerniak -- or, I'm

18  sorry -- Ms. Babbitt was with me?

19  A.  That's correct.

20  Q.  Okay.

21  A.  She was there first.  You showed up later.

22  Q.  Okay.  Without getting into the contents of the meeting,

23  we talked about Mr. Cavelle's case against the CTA and various

24  issues?

25  A.  That's correct.

Mendenhall - cross

87

1  Q.  Okay.  And you were -- you were as honest as you could be

2  and, based on your memory, you were --

3  A.  Yes, I was.

4  Q.  -- answering questions?

5          Yes?

6  A.  Yes.

7  Q.  Okay.  Did anybody ever intimidate you or threaten you to

8  testify or tell us a certain story under the threat that you

9  wouldn't be paid?

10  A.  Under the threat?  No.

11  Q.  Under any threat?

12  A.  No.

13  Q.  Did Mr. Jansen, to be more specific, ever threaten you or

14  suggest to you that if you don't tell Kennedy and Babbitt what

15  they want to hear, you ain't getting paid?

16  A.  No.

17  Q.  Same question for ███████████.

18  A.  No.

19  Q.  Did you ever tell Mr. Cavelle that you were afraid for

20  your job if you didn't testify according to the CTA's version

21  of the truth?

22  A.  Like I said, I vented to Mr. Cavelle, a friend of mine.

23  Of course -- you know, I think maybe at one time, I said, you

24  know what, what's the retaliation hiding around the corner.

25  What's -- what's the retaliation hiding around the corner, you

Mendenhall - cross

1   know.

2   Q.  What was the context of that statement?

3   A.  Could I lose my job, you know.  You know, things -- I'm

4   down here.  You're asking me to come here from CTA.  I work

5   for CTA.  Okay.  What -- I don't know any of the details.

6   Everyone is giving me little bits and pieces.  And, yes, of

7   course, just fear of retaliation.

8   Q.  I see.  So this -- this whole exercise of you coming down

9   to see Magistrate Judge Rowland is what you're referring to?

10  A.  The whole process.  Not only just coming here, the whole

11  process in general.

12  Q.  Okay.  Fair enough.

13         So let me be very specific though --

14  A.  Okay.

15  Q.  -- did anybody threaten you --

16  A.  No.

17  Q.  -- to testify?

18  A.  No one has threatened me from CTA.

19  Q.  Okay.

20  A.  Or you.  No one has given me any threats.

21  Q.  Okay.  Did you tell anyone that anyone from the CTA or

22  counsel were threatening you to testify a certain way in the

23  Cavelle case?

24  A.  No.

25  Q.  Okay.  You said you spoke with George Cavelle in early

Mendenhall - cross

1   February, if I heard you right, after you spoke with

2   Ms. Czerniak the first time?

3   A.  I believe that was you I spoke on the phone with.  I spoke

4   to somebody on the telephone.  I believe it --

5   Q.  So if the documents that the judge has shows that the

6   first time you talked to anyone at Taft was on February 7 and

7   that person was Ms. Czerniak, would that refresh your

8   recollection that that's the person?

9   A.  Yes, if that's her name, yes.  I don't -- at that time, I

10  don't --

11  Q.  Okay.  And if the document that refects that conversation

12  that you had with Ms. Czerniak is dated February 7, would that

13  be the date of that conversation?

14  A.  Yeah.

15  Q.  Yes?

16  A.  Yes.  And there's e-mails that will provide that.

17  Q.  Okay.  ████████████ --

18  A.  Yes.

19  Q.  -- you've had interaction with him for union matters?

20  A.  Yes.

21  Q.  You've had some sporadic interaction with him with respect

22  to his role as the ███████████████████████?

23  A.  Correct.  He comes out.

24  Q.  Okay.  And how long have you known him?  Since he started

25  a few years ago?


Mendenhall - cross

90

```
 1   A.  I've known him -- I mean, known he's worked there or --
 2   Q.  Yeah.
 3   A.  I know he was in a different -- he was in ███████████.
 4   He was -- and he, I believe, went to this job next.
 5   Q.  Okay.  And in those various communications you had with
 6   ███████████, would you characterize that as professional?
 7   A.  Yes.  ███████████ has been nothing but respectful and
 8   professional to me.
 9   Q.  Okay.  And did ███████████ ever threaten you with your job
10   or --
11   A.  Not at all.
12   Q.  -- or with money; that you wouldn't be paid if you didn't
13   testify according to the CTA's version of the truth?
14   A.  No, not at all.
15   Q.  Okay.  Did you ever communicate to anyone that ███████████
16   had threatened you like that?
17   A.  No.
18   Q.  Did you ever tell Mr. Cavelle that ███████ had threatened
19   you like that?
20   A.  No.
21   Q.  Okay.
22   A.  The only thing I -- if you would like me to --
23   Q.  Yeah, sure.
24   A.  I told Mr. Cavelle that I had been in contact -- that ██████
25   ███████ called me, Jansen called me, you guys called me, when
```

Mendenhall - cross

1   I was venting, yes.

2   Q.  Okay.

3   A.  He knows he called me, yeah.

4   Q.  Yeah.  Okay.  And then the -- assume the following is

5   correct:  That you had a conversation with Allison Czerniak on

6   February 7 --

7   A.  Okay.

8   Q.  -- sometime in the middle of the afternoon of the 7th.

9   A.  Uh-huh.

10   Q.  If that's the time period, does that recall -- does that

11   sound right?

12   A.  I was -- it was in the afternoon.  I know I was out in my

13   truck, so it's somewhere after 1:00 o'clock.

14   Q.  Okay.  And then you had a conversation with Mr. Cavelle

15   after that where you vented?

16   A.  I believe it was that evening.

17   Q.  Okay.  Can you give us the best time -- your best

18   recollection of the time of the conversation with Mr. Cavelle

19   on the 7th which you had when you vented?

20   A.  I don't know.  There's so much going on right -- actually,

21   you know what, I -- actually I think I missed a call from him;

22   and I called him back after -- right after I had talked to

23   her.

24   Q.  Allison Czerniak?

25   A.  Yeah.

Mendenhall - cross

1    Q.   Okay.

2    A.   I'm sorry.  Allison Czerniak, yeah.

3    Q.   And so it was shortly after you talked to --

4    A.   Yeah, shortly -- yeah, probably within an hour or so --

5    Q.   Okay.

6    A.   -- because I missed a call because he was coming into town

7    and we were going to go get some dinner.

8    Q.   That's when you talked to him about going for Chinese

9    food?

10   A.   Yeah, I talked to -- I talk to him all the time.

11   Q.   Okay.  All right.  In all those times, you never said to

12   Mr. Cavelle that anyone threatened you from the CTA?

13   A.   No one has threatened me from the Chicago Transit

14   Authority.

15   Q.   Okay.  You talked about chasing your paycheck?

16   A.   Yes.

17   Q.   Is that a common occurrence when you go from the union

18   side to the corporate side?  It sounds like it happens a lot.

19   A.   Chasing your paycheck, it's, you know -- you go -- it's

20   something out of the ordinary.  So they pull me downtown.  The

21   last time I think I was here, you know, I've got to argue with

22   the clerks.  I've got to argue with everybody involved because

23   nobody knows how to get you paid right.  The system they use

24   downtown is different than -- you know, you need paperwork

25   I've got to get to a clerk; I never received it; I never --

Mendenhall - cross

93

 1  that's why in the beginning of all this, I brought it to

 2  everyone's attention that, here, just please make sure

 3  everything is in line.

 4  Q.  So you've been through this drill before unrelated to --

 5  A.  I've been through this drill many times with Chicago

 6  Transit Authority.

 7  Q.  All right.

 8  A.  And this time, once again, I had to argue when I got back

 9  after our meeting and same thing.

10  Q.  Right.  So you had to chase your paycheck, as you call it,

11  not just -- hopefully not in the Cavelle case, but you had

12  to -- you covered yourself there, but you definitely had a lot

13  of times other than the Cavelle case?

14  A.  That's correct.

15  Q.  Okay.  And in this case, after our meeting, did you check

16  in with ███████████ to tell him what we talked about?

17  A.  I have not spoke to ███████████ till today.

18  Q.  Until?

19  A.  Today I saw him outside.

20  Q.  What did you say to him today?

21  A.  Hello.  We talked about the trains.

22  Q.  Okay.  All right.  So you didn't check in with ███████████

23  to make sure he was okay with the way you spoke to us or what

24  you told us?

25  A.  Absolutely not.

Mendenhall - cross

 1   Q.   Okay.  All right.  And you did get paid following your

 2   meeting with us, right?

 3   A.   I did after the -- you know, after a bunch of yelling with

 4   my clerk and my boss, yes.  I was eventually paid, yes.

 5   Q.   Okay.  And you had asked us to make sure that we could

 6   intervene on your behalf in case there was any wrinkles?

 7   A.   That's correct.  And there's e-mails here -- I have your

 8   e-mails --

 9   Q.   Okay.

10   A.   -- to verify that.

11   Q.   And then after you met with the first law firm that you

12   talked about --

13   A.   Uh-huh.

14   Q.   -- you got paid for that as well?

15   A.   Eventually, yes.  Still the same issue clerk wise,

16   paperwork wasn't done right, we don't have this.  I actually

17   brought the paperwork for you this time.

18   Q.   I have it too, as the judge does.

19   A.   Okay.

20   Q.   So on both occasions you got paid?

21   A.   Yes, yes.

22   Q.   And none --

23   A.   Eventually, yes.

24   Q.   Okay.

25   A.   Everything -- yes, even this time -- yes, I've been paid.

Mendenhall - redirect

95

1   Q.  Okay.  And did Mr. Cavelle come to visit you?

2        You said you guys went out when he was in town?

3   A.  Yes.

4   Q.  Was your daughter born at that time?

5   A.  No.

6   Q.  What's your daughter's birthday?

7   A.  February 20th.

8   Q.  February 20th.  Okay.  So he came to town before the 20th?

9   A.  He's been in town a bunch of times before the 20th.

10   Q.  Oh, he has?  Okay.

11        MR. KENNEDY:  May I have a moment, your Honor?

12        THE COURT:  Yes.

13   (Brief pause.)

14        MR. KENNEDY:  Nothing further, Judge.

15        THE COURT:  Okay.

16        Mr. Sweeney?

17        MR. SWEENEY:  Thank you, your Honor.

18                 REDIRECT EXAMINATION

19   BY MR. SWEENEY:

20   Q.  Mr. Mendenhall --

21   A.  Yes.

22   Q.  -- when you met with the first set of lawyers, did they

23   ever tell you that you were going to have to provide them with

24   your private banking information?

25   A.  Private banking information?

1    Q.   Bank statements?

2    A.   No.

3    Q.   Or e-mails?

4    A.   No.  The e-mails -- I think the e-mails came up because

5    they kept talking about a picture that was hung up in the shop

6    and e-mails about it.

7    Q.   So who asked you if -- who told you they were going to

8    need your private e-mails?

9    A.   They didn't say my private e-mails.  They said my CTA

10   e-mails because --

11   Q.   Okay.

12   A.   -- they were asking me about a photograph that was in the

13   shop.

14          MR. KENNEDY:  Judge, may I make a statement?

15          This is going to get into privilege.  If it doesn't

16   constitute a waiver, I won't object, as long as I can claim a

17   privilege thereafter.

18          THE COURT:  Are you going to try to claim a waiver?

19          MR. SWEENEY:  I --

20          THE COURT:  You're talking about his conversations

21   with Hinshaw, right?

22          MR. SWEENEY:  Right now we're just asking if anyone

23   asked him for bank statements.

24          THE WITNESS:  No.

25          THE COURT:  Hold on, Mr. Mendenhall.

Mendenhall - redirect

1              THE WITNESS:  I'm sorry.

2              THE COURT:  That's all right.

3              MR. SWEENEY:  I think there is a waiver.

4              THE COURT:  Well, then I'm not going to let him

5    answer the question.  What do you mean you think there's a

6    waiver?

7              MR. SWEENEY:  I think they've waived the privilege.

8              THE COURT:  Objection sustained.

9              MR. SWEENEY:  Okay.

10   BY MR. SWEENEY:

11   Q.  Mr. Mendenhall --

12             MR. SWEENEY:  One moment, your Honor.

13             THE COURT:  Sure.

14     (Brief pause.)

15   BY MR. SWEENEY:

16   Q.  All right.  Maybe I should be clear.  With respect to your

17   conversations with the Taft attorneys, were you ever asked for

18   your e-mails?

19   A.  Yes.

20             MR. KENNEDY:  Same objection, Judge.

21             THE COURT:  Are you --

22             MR. KENNEDY:  If they don't claim a waiver, I will

23   not --

24             THE COURT:  Are you allowing -- I'm willing to let

25   you have some leeway, as I allowed the other lawyers, but I

Mendenhall - redirect

1   don't want you then saying he's somehow waived his privilege.

2           MR. SWEENEY:  Okay.  We won't say that certainly with

3   respect to this part.

4           THE COURT:  Okay.  Go ahead.

5   BY MR. SWEENEY:

6   Q.  You said you were asked for your e-mails?

7   A.  Correct.

8   Q.  And what about bank statements?

9           THE COURT:  Your CTA e-mails; am I correct?

10          THE WITNESS:  I was asked for my private e-mail

11  address and I was asked for my CTA.

12          THE COURT:  Okay.

13  BY MR. SWEENEY:

14  Q.  So with the Taft attorneys, they were asking for your

15  private e-mail and your CTA e-mails?

16  A.  There was -- it was about the picture they were looking

17  for.  And this picture -- I said, well, you have the CTA

18  e-mails.  They say, well, maybe could you have sent it through

19  your other e-mails.  We went through all this.  We checked it.

20  I have no picture, the picture they're talking about.  And

21  that was it.

22  Q.  What about -- did they ask you about your wife's e-mail?

23  A.  They asked me -- they didn't ask me about my wife's

24  e-mail.

25  Q.  What about texts?

Mendenhall - redirect

99

1   A.   No.   They asked me about my texts.   Could it be a

2   photograph off your telephone.   We went back; talked to

3   Allison.   We went -- I was able to, through the Google cloud,

4   go back to '14.   The picture wasn't there, the picture they're

5   talking about, the one that was in the shops.

6   Q.   And did they -- was there any suggestion that they were

7   going to look at your bank statements?

8   A.   Bank statements?   They said -- the only thing they said in

9   this whole thing is he asked me at the end of the conversation

10  is, here, I got your word because we got -- he saw that I

11  wasn't -- this isn't something I want to do.   If I got to go

12  bring other people in -- if you talk to people, now I got to

13  get in everyone else's business.   And, you know, keep this --

14  you know, you can't say nothing, so to speak, or I'm going to

15  have to make everybody else's life, you know, miserable going

16  into all their stuff or whoever they talk to -- or whoever I

17  talk to is what I mean.

18  Q.   So if you talk --

19  A.   If I talk to anyone else besides them after this meeting,

20  that at that point, now they have to drag these people into

21  it.   They said don't talk to your spouse, I think, or

22  something.   Don't talk to anybody or -- like that.   It was

23  just don't talk to nobody.

24  Q.   And what about the bank part?

25          THE COURT:   What about the bank records?

Mendenhall - recross

1          THE WITNESS:  No, nothing on bank records.

2          THE COURT:  They didn't ask to see your bank records?

3          THE WITNESS:  They asked -- they did not ask to see

4    my bank records.

5    BY MR. SWEENEY:

6    Q.  Did they ask whether you gave George money?

7    A.  They did.

8    Q.  Okay.  Did they want --

9    A.  So did the other people.

10   Q.  Okay.  And -- but there was no discussion of whether you

11   were going to have to turn over your bank stuff?

12   A.  The bank, no, not that I remember.  Nothing about bank --

13   me turning over my Chase Bank statements?  No, no.

14   Q.  Okay.

15         MR. SWEENEY:  No further questions.

16                      RECROSS EXAMINATION

17   BY MR. KENNEDY:

18   Q.  Mr. Mendenhall, just picking up on a couple of the

19   questions counsel just asked you.  You referred to a poster

20   that was discussed in our meeting, right?

21   A.  That's correct.

22   Q.  The judge has a packet.  I'm going to show you what's been

23   marked as Exhibit 16.

24   A.  That's it.

25   Q.  It's a lookout bulletin information, dismissed employee.

Mendenhall - recross

1       Is this the poster you're referring to?

2  A.  Yes.

3  Q.  Okay.  And that photograph on the poster is a version of

4  Mr. Cavelle's image?

5       May I approach, Judge?

6       THE COURT:  Sure.

7  BY THE WITNESS:

8  A.  Yes.

9  BY MR. KENNEDY:

10  Q.  And so that's the lookout poster --

11  A.  Yes.

12  Q.  -- that you were asked to look for?

13  A.  I wasn't asked to look for it.  It was in Rosemont rail

14  shop.  What?  Do you mean in my e-mail?

15  Q.  Yes.

16  A.  Yes.

17  Q.  I'll be more specific.  You were asked to check your

18  e-mails to see if --

19  A.  That's correct.

20  Q.  -- you had sent a version of that lookout bulletin to

21  Mr. Cavelle?

22  A.  I was asked to check my CTA e-mail, my private e-mail, my

23  photographs, and my text messages.

24  Q.  And you did all those things?

25  A.  I did, and I got back to you guys.

Mendenhall - recross

102

1   Q.  And tell the judge the results of your search.

2   A.  There was nothing in my e-mails or -- there was nothing.

3           THE COURT:  Okay.

4   BY MR. KENNEDY:

5   Q.  And you had never sent that to Mr. Cavelle?

6   A.  I did not send this to Mr. Cavelle.

7   Q.  Okay.

8   A.  We went through all this with --

9   Q.  And then with respect to the closing comments you referred

10  to, about keeping things between us, I was asking you to keep

11  things confidential, to maintain a privilege so that --

12  A.  Yes.

13  Q.  -- people outside --

14  A.  Yes.

15  Q.  -- the meeting would not be able to get into the substance

16  of the meeting?

17  A.  Or if I was to talk to somebody else, then we couldn't

18  maintain --

19  Q.  Could blow the privilege?

20  A.  You -- you would blow the privilege, and you would not be

21  my legal team at that point.

22  Q.  Right.  And you did your best to abide by that?

23  A.  Yeah.  I haven't talked -- I mean, I've seen people in the

24  hallways.  Today I was asked by ▓▓▓▓▓▓▓▓ why I was going

25  downtown.  I didn't tell nobody nothing.

Mendenhall -

1    Q.   Okay.

2              MR. KENNEDY:  All right.  Nothing further, Judge.

3              THE COURT:  I have some questions.

4              THE WITNESS:  Okay.

5              THE COURT:  When you've talked to Mr. Cavelle about

6    this matter, did you tell him that you were required to turn

7    over your personal financial records or your wife's personal

8    financial records?

9              THE WITNESS:  No.

10             THE COURT:  Did you tell him that you were required

11   to turn over your personal texts or your personal e-mails?

12             THE WITNESS:  No.  I haven't even talked to anybody

13   by -- this conversation I had with him was before the meeting

14   with Taft.

15             THE COURT:  Okay.  But you've talked to him -- you've

16   had --

17             THE WITNESS:  Other conversations.

18             THE COURT:  Yes.  You had conversations --

19             THE WITNESS:  Since my baby was born and all that.

20             THE COURT:  Okay.  Hold on.

21             So you've talked to Mr. Cavelle about the case since

22   your meeting with the Taft lawyers?

23             THE WITNESS:  No, no.

24             THE COURT:  You've never talked to Mr. Cavelle about

25   the case since your meeting with the Taft lawyers?

Mendenhall -

1        THE WITNESS:  The day I spoke to Mr. Cavelle was

2    after I spoke to her on the telephone; and I was like, oh,

3    look, your thing is starting again, you know.

4        THE COURT:  Yes.  Venting?

5        THE WITNESS:  Yes.

6        THE COURT:  Okay.

7        THE WITNESS:  And that was pretty much it.  We had

8    other conversations, more about the baby, him coming to town.

9        THE COURT:  Right.

10        THE WITNESS:  There was -- no, it's just the same

11    like last time; they call you down here; they're asking me

12    about this picture and --

13        THE COURT:  Right.  And they had you downtown to meet

14    with you on February 20th, I think.

15        THE WITNESS:  No.

16        MS. CZERNIAK:  February 13th, your Honor.

17        THE COURT:  February 13th.  And when was the baby

18    born?  February 20th?

19        THE WITNESS:  20th.

20        THE COURT:  But between February 13th -- between the

21    time you met with them, did Mr. Cavelle spend some time at

22    your house?  Spend the night at your house?

23        THE WITNESS:  Spend the night at my house?

24        THE COURT:  Yes.

25        THE WITNESS:  I don't know.  He spent there early

Mendenhall -

1    February.

2              THE COURT:  Oh, so it was earlier in February?

3              THE WITNESS:  Yeah.

4              THE COURT:  So did you talk to him about the fact

5    that the CTA was wanting you to turn over your bank records

6    and --

7              THE WITNESS:  Nothing about bank records.  I spoke to

8    Mr. Cavelle on the telephone.  I've spoke to him after -- I

9    mean, if you're asking me if I spoke to him about the -- this

10   case or if I spoke to him in general?

11             THE COURT:  About this case.

12             THE WITNESS:  No.  I spoke to -- if anything that

13   came up, oh, you went downtown.  No details or anything like

14   that because Mr. Taft -- or Mr. Kennedy said that I can't talk

15   to anyone.  And that's, you know, what he told me to do.

16             THE COURT:  But what about in your living room at

17   your house when he was staying with you because he was in town

18   for a court case --

19             THE WITNESS:  Yeah.

20             THE COURT:  -- were you venting, again understandably

21   maybe, but venting --

22             THE WITNESS:  Yeah, I vented.  I don't know if it

23   was -- yeah, maybe it was at my house.  I don't remember

24   exactly when.  I know the first time was -- I know I vented to

25   him on the telephone.  That is for sure.  If I wasn't supposed

Mendenhall -

1    to do that, I'm sorry about that.

2           THE COURT:  That's okay.

3           THE WITNESS:  But, yes, he was at my house.  But I

4    don't know if we really got into it.  My wife was there and

5    sick and -- I don't -- I don't recall, I guess would be the

6    best way to put it.  I don't want to say something that's not

7    true.

8           THE COURT: Okay.  Okay.

9           THE WITNESS:  I did -- I have spoke to him.  It

10    really is not coming up.

11           THE COURT:  Okay.

12           THE WITNESS:  We're talking about -- my main concern

13    right now is living in a hospital.

14           THE COURT:  Okay.

15           THE WITNESS:  This --

16           THE COURT:  That's fair.

17           THE WITNESS:  -- picture is not my top priority.

18           THE COURT:  Of course.

19           My concern is just, do you think you told Mr. Cavelle

20    that you were in fear of your job?

21           THE WITNESS:  I told Mr. Cavelle that I was in fear

22    of just, you know, the -- what's hiding around the corner;

23    what's the repay of me being down here.  I still work for the

24    company.  I got a baby that's -- or the mother that's sick.

25    We're about to maybe lose a baby.  And I don't need this, you

1    know.  And it's just the fact, I mean.

2              THE COURT:  Okay.

3              THE WITNESS:  What am I -- this poster that everyone

4    keeps asking me questions about is the least of my worries --

5              THE COURT:  Okay.

6              THE WITNESS:  -- right now.  I mean, it's just as

7    simple as that.

8              THE COURT:  All right.

9              Okay.  I don't have anything further.  Does anybody

10   else have anything for Mr. --

11             MR. SCHARKEY:  Your Honor, we don't have anything for

12   the witness.

13             You asked about the court date.

14             THE COURT:  Yes.

15             MR. SCHARKEY:  We do have that date.  It was

16   February 15th before Judge Terrence McGuire at 10:00 a.m.

17             THE COURT:  Okay.

18             All right.  Thank you very much.  Good luck to you

19   and your baby.

20             THE WITNESS:  Thank you.

21             THE COURT:  You can go for the day.

22             THE WITNESS:  For the day?

23             THE COURT:  Yes.

24     (Witness excused.)

25             THE COURT:  Anybody else?

1          MR. SWEENEY:  Not from the plaintiffs, your Honor.

2          MR. KENNEDY:  Your Honor, may we have a moment?

3          THE COURT:  Sure.

4     (Brief pause.)

5          MR. SCHARKEY:  Your Honor, nothing further for

6     Mr. Cavelle.

7          MR. KENNEDY:  Your Honor, after doing this for

8     30 years, you never put on a witness you don't know what

9     they're going to say.  This is a weird situation.  I have both

10    ████████████ and Mr. Jansen available to the Court.  I can

11    bring them in very quickly to have them testify as to however

12    they are going to testify if your Honor would like to hear

13    from them.

14         THE COURT:  I don't need to hear from them, so it's

15    totally at your discretion.

16         MR. KENNEDY:  Okay.  Then if the plaintiff Cavelle

17    has nothing, then we're done.

18         THE COURT:  Okay.

19         Okay.  So do you want to excuse them and we can talk

20    about what's next?  Does somebody want to go out and excuse

21    them?

22         MR. KENNEDY:  Yes.

23         THE COURT:  Okay.  Would you like an opportunity to

24    file something?

25         MR. KENNEDY:  We would, Judge, a short paper.

```
 1              THE COURT:  Come on up.

 2              Yes.  So I'm going to -- in terms of the under seal

 3    thing, I'm going to -- I'll enter an order today putting

 4    everything pertaining to this under seal temporarily.  And

 5    I'll get some briefing from the CTA.  I'm out next week, so

 6    I'm in no rush.  So I'd ask for briefing from the CTA on that

 7    by Friday, April 5th.

 8              MR. KENNEDY:  That would be fine, Judge.

 9              THE COURT:  Okay.  Now, as for today's hearing, what

10    would you propose counsel?  Do you want to file cross-motions?

11    Would you like to have somebody go first?  Would you like to

12    propose something to me tomorrow that you would agree on?  Is

13    that possible?

14              MR. KENNEDY:  Cross-motions would be fine with us,

15    Judge.

16              MR. SWEENEY:  That's fine.

17              THE COURT:  Okay.  So how about April 5th, same time.

18    Are you going to want a transcript?

19              MR. KENNEDY:  Yes, Judge.

20              THE COURT:  Okay.  So let's be a little more

21    reasonable now.

22      (Brief pause.)

23              THE COURT:  So you won't have the transcript for a

24    week, so how about, do you want 14 or 21 days after that?

25              MR. KENNEDY:  14 should be fine.
```

1          MR. SWEENEY:  We have a Seventh Circuit brief due

2    that week, so if we could get three, that would be good.

3          THE COURT:  So the 19th for the motion.  So then the

4    third week after -- so I'll have two weeks for a response, so

5    that's May 3rd.  And I guess I'll allow replies by May 10th.

6          I'll probably just have you back and rule.  I may

7    issue something -- oh, it's a report and recommendation.  Yes.

8    Who is this?  Judge Dow?

9          MR. KENNEDY:  Judge Dow.

10         THE COURT:  Okay.  So since it's a report and

11   recommendation, I will issue something so he has something to

12   work with.

13         What else is happening?  Are you doing discovery

14   otherwise?

15         MR. KENNEDY:  We are, Judge.

16         THE COURT:  So we're going to march forward.

17         MR. SWEENEY:  Yes.

18         MR. KENNEDY:  Yes.

19         THE COURT:  Okay.

20         MR. KENNEDY:  You had entered an order last time we

21   were here where certain discovery is due from the plaintiffs.

22   There's also some outstanding discovery that's about a week

23   late from the plaintiffs.  We've gone back and forth to try

24   and set up meet and confers.  I think it's worthwhile to try

25   and have one more before we bring anything to the Court's

 1    attention, see if we can round it out.

 2          THE COURT:  Okay.

 3          MR. KENNEDY:  Some of it is mundane.  It's like

 4    Mr. Cavelle's signature on a verification.

 5          THE COURT:  Okay.

 6          MR. KENNEDY:  Some of it is answers to supplemental

 7    interrogatories and document requests.

 8          THE COURT:  Okay.

 9          MR. KENNEDY:  And we owe them an answer on whether we

10    have an objection to their amended complaint.  And our concern

11    there is whether they'll use the amended complaint to -- as a

12    basis to expand discovery when, as a matter of Court order,

13    discovery actually officially closed on February 15.  So we're

14    concerned that it's just never going to stop.

15          And based upon their explanation the last time we

16    were here, there's a new claim involving an e-mail to

17    Mr. Kruesi that they're now making part of the complaint.  And

18    I didn't know if their expectation was to reopen discovery on

19    that new thread of communication that they claim to be

20    defamatory.  And I -- that would be helpful -- if that's the

21    case, I would file an objection and highlight that issue for

22    the Court to get some guidance as opposed to let the amended

23    complaint stand and then pivot off of that to argue, even

24    though it's a duly filed amended complaint, they shouldn't

25    take discovery on it.

1        So that's -- those are the competing interests that

2   I'm asking for an answer from the plaintiff's counsel as to

3   whether they are going to use the amended complaint to expand

4   discovery beyond what was in place by the February 15 cutoff

5   date.

6        MR. SWEENEY:  So I'll address a few of those points.

7        First, the outstanding discovery is with respect to

8   what we did today, namely, who statements were made to, who

9   was threatened, who -- it's the same information.  So the

10  outstanding discovery that he says is a week late is

11  essentially what we did today.  We can certainly give him

12  that.

13       THE COURT:  Okay.  That would seem moot to me, but

14  okay.

15       MR. SWEENEY:  It seems moot, yes.

16       MS. BABBITT:  Your Honor, I know that there's at

17  least one interrogatory -- I mean, we have a set of them

18  here -- relating to where Mr. Cavelle got the lookout poster.

19  So that, I don't think, was related to this tampering issue

20  that was at issue here today.

21       THE COURT:  Okay.

22       MR. SWEENEY:  You had set out a timeline for us to

23  respond to the other issues.  I think the first deadline is

24  tomorrow.

25       THE COURT:  Okay.

1          MR. SWEENEY:  We're intending to comply with your

2    order.

3          THE COURT:  Okay.

4          MS. BABBITT:  To just make it a little clearer, we

5    had issued second supplemental discovery requests.  The

6    answers were due last Monday.  And that included that

7    interrogatory that I just mentioned with respect to where

8    Mr. Cavelle got the poster.

9          There's other discovery in there.  Some of it is

10   related to the witness tampering, and I agree it would likely

11   be moot.  But some of it is substantive to the claims of the

12   case.

13         THE COURT:  Okay.

14         MR. SWEENEY:  We will address it.  We've answered it.

15   They've deposed him on it, but we'll answer that for sure.

16         THE COURT:  Okay.  Well, if --

17         MR. SWEENEY:  With respect --

18         THE COURT:  -- discovery closed on February 15th,

19   let's get it done.

20         MR. SWEENEY:  For sure.

21         THE COURT:  Okay.

22         MR. SWEENEY:  With respect to the amended complaint,

23   Judge Dow had asked us to provide them with a copy.  Then they

24   were to let us know whether they had an objection.

25         THE COURT:  It sounds like they are deciding whether

1    to object or not based on whether you are going to require

2    more discovery.

3         MR. SWEENEY:  I don't believe we are requiring more

4    discovery.  I think, if anything, it would be them.  But

5    they're the ones that are now saying, as a result of this,

6    they want to go into all the relationship material, but so be

7    it.  We're not going to require more discovery as a result of

8    the amended complaint.

9         THE COURT:  So you put in an e-mail to him by

10   tomorrow -- to them by tomorrow -- that this will not result

11   in any more discovery --

12        MR. SWEENEY:  From plaintiff.

13        THE COURT:  -- given the amended complaint.  And then

14   you'll let them know by Monday whether or not --

15        MR. KENNEDY:  We will.

16        THE COURT:  -- you object to the amended complaint.

17   Okay.  And that's in front of Judge Dow anyway.

18        MR. SWEENEY:  Right.

19        THE COURT:  At least we can wrap that up.

20        Okay.  And I'm not anticipating any more discovery

21   needed based on what happened today.  Am I right?

22        MR. SWEENEY:  We don't intend to do any more.

23        THE COURT:  I thought that was true.  Okay.

24        MR. KENNEDY:  Judge, as a housekeeping matter for

25   today's hearing, I would move Exhibits 1 through 16 that we

1    provided to the Court and opposing counsel into evidence.

2         THE COURT:  Any objection?

3         MR. SWEENEY:  Based on your statement earlier that --

4    I don't know what basis we would use.  So, no, no objection.

5         THE COURT:  Okay.  Thank you for that.

6         All right.  So thanks everybody.  Do I have a status

7    set?  I'll check the docket.

8         THE CLERK:  I don't think so.

9         THE COURT:  We don't have one?  Okay.  So let me get

10   the briefing and then I'll set a status.  If you have a

11   different discovery dispute arise, either call and I'll get

12   you on the calendar, or file something.  But if you don't

13   think you need to file something, you just want to come in,

14   just call and I'll get you on the calendar.  Okay?

15        MR. SWEENEY:  Thank you, your Honor.

16        MR. SCHARKEY:  Thank you.

17        MR. KENNEDY:  Thank you.

18        MS. BABBITT:  Thank you, your Honor.

19        MR. SWEENEY:  Your Honor, if we can clarify one point

20   with respect to your order that people not -- is Mr. Cavelle

21   free to talk to Mr. Mendenhall, not necessarily about the case

22   but just period or is -- is the restriction --

23        THE COURT:  Yes, they're friends and --

24        MR. SWEENEY:  No.  Understood.  But there was an

25   order that no one was supposed to talk to anyone.  And is that

1    over?

2              THE COURT:  I think that order is over, yes.  Do you

3    have an objection to that?

4              MR. KENNEDY:  As long as it doesn't waive privilege,

5    your Honor.

6              THE COURT:  No.  Okay.  Thanks, everybody.

7       (Which were all the proceedings heard.)

8                        *    *    *    *    *

9

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

11

12
     _/s/ Nancy C. LaBella___              _March 27, 2019_
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25