# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   GEORGE CAVELLE,                    )   No. 17 C 5409
                                        )
 5                  Plaintiff,          )
                                        )
 6             vs.                      )   Chicago, Illinois
                                        )
 7   CHICAGO TRANSIT AUTHORITY, DORVAL  )
     R. CARTER, JR., individually, JOHN )
 8   DOE 1, and JOHN DOE 2,             )
                                        )   March 7, 2019
 9                  Defendants.         )   11:05 a.m.

10                   TRANSCRIPT OF PROCEEDINGS
11     BEFORE THE HON. MARY R. ROWLAND, MAGISTRATE JUDGE

12
     APPEARANCES:
13
     For the Plaintiff:    MR. ROBERT D. SWEENEY
14                         MR. JOHN J. SCHARKEY
                           Sweeney & Scharkey LLC,
15                         111 West Washington Street, Suite 1160,
                           Chicago, Illinois  60602
16
17   For the Defendants:   MR. JOHN F. KENNEDY
                           MS. ELIZABETH E. BABBITT
18                         Taft, Stettinius & Hollister LLP,
                           111 East Wacker Drive, Suite 2800,
19                         Chicago, Illinois  60601
20
     ALSO PRESENT:         MS. KAREN G. SEIMETZ
21
22
23                      PATRICK J. MULLEN
                     Official Court Reporter
24                 United States District Court
             219 South Dearborn Street, Room 1412
25                  Chicago, Illinois  60604
                       (312) 435-5565
```

1        THE CLERK:  17 C 5409, Cavelle versus Chicago Transit
2    Authority.
3        THE COURT:  Good morning.
4        MR. KENNEDY:  Good morning, Your Honor.
5        MS. BABBITT:  Good morning, Your Honor.
6        THE COURT:  Okay.  Good morning.
7        MR. KENNEDY:  Judge, for the record, John Kennedy for
8    the CTA and for president Dorval Carter.
9        MS. BABBITT:  Elizabeth Babbitt on behalf of the CTA
10   and president Dorval Carter, Your Honor.
11       MR. SCHARKEY:  Good morning, Your Honor.  John
12   Scharkey, S-c-h-a-r-k-e-y, on behalf of George Cavelle.
13       MR. SWEENEY:  Robert Sweeney on behalf of Mr. Cavelle,
14   S-w-e-e-n-e-y.
15       MR. KENNEDY:  Judge, I should also note for the record
16   that the general counsel for the CTA is present in court --
17       THE COURT:  Good morning.
18       MR. KENNEDY:  -- Karen Seimetz, given the nature of
19   some of the subject matter we'll address today.
20       THE COURT:  Good morning.
21       MS. SEIMETZ:  Good morning.
22       THE COURT:  Okay.  So if we could deal with kind of
23   more of what I would call the more mundane discovery disputes
24   you have, so I read the complaint and I understand plaintiff
25   was terminated after a long career with the CTA.  Could you

1    tell me some of the defendants' defenses?  I don't understand

2    the questions about nepotism, sexual relations, website.  So,

3    you know, they're asking questions about him, you're refusing

4    to give answers, and then you're asking questions back.  So

03:51:44    5    this stuff is either relevant or it isn't relevant.  What's

6    good for the goose is good for the gander.  So I'm either going

7    to order the stuff produced by both sides or I'm going to keep

8    it all out by both sides.  Either way, I don't care.

9            What's happening in terms of that in the case?

03:52:12    10            MS. BABBITT:  Sure, Your Honor.  So to step back,

11    first the defendants filed a motion to compel last week on some

12    of the discovery.  We have met and conferred.

13            THE COURT:  Right.

14            MS. BABBITT:  The topics of those are essentially the

03:52:30    15    financial records and tax returns of the plaintiff.  Those, we

16    would argue, are relevant to the case because one of the

17    contested issues in this case is the issue of Mr. Cavelle and

18    money that was with the CTA.  When Mr. Cavelle resigned from

19    the CTA, a fund of money called the CTA holiday train fund went

03:53:26    20    missing.  The CTA --

21            THE COURT:  And how much money are we talking about --

22            MS. BABBITT:  About $6,000.

23            THE COURT:  -- in the train fund?

24            MS. BABBITT:  So that fund of money went missing.

03:53:50    25    Later on, the CTA determined that Mr. Cavelle had closed the

1   CTA holiday train fund account and --

2           THE COURT:  Is that a bank account, or is that a --

3           MS. BABBITT:  That's a bank account, yes.

4           THE COURT:  Okay.  So it's not something that's just

03:54:18   5   kept as petty cash.

6           MS. BABBITT:  No.

7           THE COURT:  Okay.

8           MS. BABBITT:  It was in a checking account.

9           THE COURT:  Okay.

03:54:28   10           MS. BABBITT:  He closed it.  Then after he resigned

11   from the CTA, the CTA determined that no one at the CTA had

12   access to that money anymore.  They went back to Mr. Cavelle,

13   and Mr. Cavelle returned the money.  So one of the contested

14   issues in this case is whether or not Mr. Cavelle improperly

03:54:53   15   took, stole, what have you, the money before returning it when

16   he was in my words caught to have taken it.

17           THE COURT:  Right.

18           MS. BABBITT:  So that's why we're interested in

19   particular in the bank records.  In some of the financial

03:55:13   20   transactions that we issued in the interrogatories, there's

21   significant sums of money in the, you know, thousands of

22   dollars, 2800, 2300, cash deposits or withdrawals that we're

23   inquiring about.  We think that's relevant to show in the case

24   what he did with that money in that period of time.

03:55:38   25           THE COURT:  How long of a period of time are we

1    talking about?

2         MS. BABBITT:  We had asked for the records for 2015 in

3    part because we wanted to also demonstrate that if

4    Mr. Cavelle -- you know, it appeared in some of the accounts

03:55:52    5    that we do have records for that he was running a deficit.  In

6    other words, he didn't have a lot of money and had a reason or

7    a motive to take and close the holiday train fund account.  So

8    2015 is the year that we're asking for the records for.

9         THE COURT:  Okay.

03:56:12    10         MS. BABBITT:  And to earmark that a little bit for

11   you, the money in the holiday train fund account was closed by

12   Mr. Cavelle in June, I think June 17th, 2015.  The money was

13   returned in early September of 2015.

14         THE COURT:  Okay.

03:56:36    15         MS. BABBITT:  Then with respect to -- I think you

16   mentioned the nepotism and some of the other policies that were

17   the subject of plaintiff's motion to compel.  We actually did

18   produce those policies.  We filed a response just shortly this

19   morning.

03:56:54    20         THE COURT:  I didn't see it.  Okay.

21         MS. BABBITT:  But the subject of it is essentially

22   that we already produced those.  So we gave the Bates ranges

23   for those documents that have already been produced.

24         THE COURT:  And that's nepotism and what?

03:57:20    25         MS. BABBITT:  Nepotism, fraternization with employees,

1   secondary employment, and policies relating to employee's

2   online presence.  Those were produced months ago, I think in

3   December, Your Honor.

4           THE COURT:  Okay.

03:57:45   5           MS. BABBITT:  But one of the issues --

6           THE COURT:  So do you understand that the policies

7   have been produced?

8           MR. SWEENEY:  So they produced 135,000 documents.

9           THE COURT:  Okay.  So they've now identified the Bates

03:58:18   10   for those.

11           MR. SWEENEY:  We hadn't seen it.  We asked for it

12   previously.  Apparently they filed a response today that we

13   didn't see.

14           THE COURT:  So in the response are the Bates ranges?

03:58:30   15           MS. BABBITT:  Yes, that's right, Your Honor.  Then

16   there's a separate issue that's related to at least the

17   fraternization policy that you raised, Your Honor, and this is

18   with respect to Mr. Cavelle's interactions with female

19   employees, specifically any sexually inappropriate relations

03:58:59   20   that he had with those employees.

21           THE COURT:  Okay.  So let's stop for a moment.

22           MS. BABBITT:  Sure.

23           THE COURT:  So as to plaintiff's motion to compel --

24   well, first of all, let me deal with the money stuff because

03:59:16   25   you've got a lot going here.  I'm not going to order the

1   production of tax records over a $6,000 fund.  I'm just a

2   little sensitive about tax records.  I think they have a lot of

3   personal information in them.  The IRS very much wants to keep

4   them confidential.  I'm not ordering tax records over a $6,000

03:59:50   5   issue.

6          MS. BABBITT:  Can I just put another note on that,

7   Your Honor?

8          THE COURT:  Yes.

9          MS. BABBITT:  I understand that is a big request and

04:00:13   10   sensitive, and we're sensitive to that as well.  One of the

11   reasons, in addition to the funds issue that I raised with

12   respect to the tax return -- and this is a significant

13   contested fact in the case -- Mr. Cavelle asserts that he would

14   have received and did receive an offer of employment for a job

04:00:35   15   in Seattle and that he was, you know, going to make a certain

16   amount of money in Seattle.  So the amount of money that he was

17   making in the intervening years that he actually made as

18   opposed to working in Seattle, I think, is relevant and would

19   be something that would go to damages in this case.

04:01:03   20          THE COURT:  Well, has he otherwise mitigated?  Well, I

21   guess you don't -- you don't have a Title VII or a 1983, so you

22   have a defamation and a tortious interference.

23          MR. SWEENEY:  Correct.

24          THE COURT:  Do you have to mitigate under tortious

04:01:25   25   interference, I assume?

1       MR. SWEENEY:  We do.

2       THE COURT:  Okay.  So have you provided information on

3   mitigation.

4       MR. SWEENEY:  He sat for a deposition for six hours

04:01:34   5   already where they asked him --

6       THE COURT:  Have you provided any documentation about

7   tortious -- about mitigation?

8       MR. SWEENEY:  Actually, we will produce tax returns or

9   at least --

04:02:20  10       THE COURT:  From 2014 to the present?

11       MR. SWEENEY:  No.  What we think is relevant is the

12   issue that she just raised, which is what his mitigation might

13   be going forward after CTA.

14       THE COURT:  Okay.

04:02:32  15       MR. SWEENEY:  So we think that probably is relevant.

16       THE COURT:  Okay.  So he was fired in 2015?

17       MR. SWEENEY:  He was --

18       THE COURT:  The end of 2015.

19       MS. BABBITT:  He resigned in lieu of termination in

04:03:00  20   August of 2015.

21       THE COURT:  Right.

22       MR. SWEENEY:  For the record, he was appointed in May

23   of 2015 and let go on August 28th of 2015.

24       MS. BABBITT:  He was a CTA employee for 22 years.

04:03:11  25       MR. SWEENEY:  But in terms of the position that is

1    relevant to this case, he held it for about four or five

2    months.

3            THE COURT:  Okay.  Okay.  So he resigns in 2015.  So

4    you're going to produce tax records for 2016, 2017, and 2018?

04:03:37    5            MR. SWEENEY:  We will do, as I've advised counsel,

6    what we have.  His ex-wife has all the tax returns.  He doesn't

7    have them.  So we can provide a release to them for the

8    relevant returns, and then we can provide the tax return for

9    last year which he has.

04:04:14    10            THE COURT:  So that's -- when you say "last year," you

11    mean 2018 or you mean 2017?

12            MR. SWEENEY:  '18.

13            THE COURT:  So that's been filed?

14            MR. SWEENEY:  Yes.

04:04:23    15            THE COURT:  Okay.  So you're going to provide 2018 and

16    you're going to provide a release that they can file with the

17    IRS -- so that takes a while -- for 2015, 2016, and 2017.

18            MR. SWEENEY:  Correct.

19            THE COURT:  Okay.

04:04:41    20            MR. SWEENEY:  Well --

21            THE COURT:  You should have talked before you came.  I

22    wouldn't have read that.

23            MR. SWEENEY:  -- not 2015.

24            THE COURT:  So you don't agree that 2015 is relevant

04:05:02    25    because that's the year he resigned.

1    MR. SWEENEY:  Right.

2    THE COURT:  Okay.

3    MS. BABBITT:  Well, Your Honor --

4    THE COURT:  I'll agree with that.  Okay.

04:05:13    5    Now, the other things that you're looking for -- and

6    these are in your document requests -- are checking and savings

7    accounts, credit card accounts, certificates of deposit,

8    401(k)'s, IRA's.  I mean, this is too much for a $6,000 theft.

9    It's too much.  So I understand your concern.  I'm happy to

04:05:37    10    give you some documents, but not his 401(k)'s.  I mean, do you

11    think he made a $6,000 deposit into his 401(k) with the $6,000

12    train fund?

13    MR. SWEENEY:  And I will also point out they

14    subpoenaed all of these records already from every bank that

04:06:11    15    Mr. Cavelle -- that they knew about that we disclosed.

16    THE COURT:  Okay.  So do you have these records from

17    subpoenas?

18    MR. SWEENEY:  So that's part of the issue.

19    MS. BABBITT:  No, Your Honor.  We have some of the

04:06:24    20    records.  One of the -- when we did meet and confer, we

21    narrowed it to identify what accounts he actually had, and we

22    asked them to confirm which accounts he had and if they were

23    still open in 2015 or if they were not.  We just wanted to know

24    that.

04:06:43    25    We also, you know, wanted the records that were in

1  some of these accounts because one of the defenses on the theft

2  issue in our view is that we don't know where he got the money

3  to pay the money back.  The plaintiff would say that he kept

4  the $6,000 safely in a drawer until he got a phone call from

5  the CTA that said:  Oh, you still have the money?

6      We would say that, in fact, he didn't have the money,

7  and his bank records would show that he didn't have the money

8  and he had to come up with it somewhere.  So that's why we were

9  interested in getting that.  I concede the 401(k), we don't

10  need to get into that, but I do think that some of these bank

11  records, debit cards, and checking records are relevant unless

12  he made a withdrawal from a 401(k) to get that money.  I don't

13  know that, obviously.

14      THE COURT:  So have you worked this out or not, and do

15  you have these records from subpoenas?

16      MR. SWEENEY:  So they also subpoenaed his son's bank

17  records.

18      THE COURT:  Right.  But do you have the subpoenaed

19  returns?

20      MS. BABBITT:  I have his Chase Bank records.

21      MR. SWEENEY:  Which is all he has.

22      MS. BABBITT:  So we need a confirmation that that's

23  the only account he has.  If that's what they're representing,

24  we'd just like to get that in writing and confirm that that's

25  what it is.

04:07:08
04:07:28
04:07:48
04:07:58
04:08:48

1      THE COURT:  And Chase, whatever that is, a savings

2  account, a checking account --

3      MS. BABBITT:  Yes.

4      THE COURT:  -- a 401(k), whatever Chase has, you have

5  all of that.

6      MS. BABBITT:  We have the Chase checking, yes.

7      THE COURT:  That's all they have is the Chase

8  checking.

9      MR. SWEENEY:  They have the banking institutions where

10  Mr. Cavelle banked.

11      THE COURT:  Okay.  You're talking past each other.  Is

12  Chase the only place where he has any accounts?

13      MR. SWEENEY:  I will confirm that, but my -- yes, I

14  believe that is accurate.

15      THE COURT:  So if there's no 401(k) at Chase, he

16  doesn't have a 401(k)?

17      MR. SWEENEY:  Well, I think he worked at CTA.  I don't

18  know if CTA has a 401(k), but he was there since he's been 21.

19      THE COURT:  Okay.  But you have your own -- do you

20  have your own information if there's some CTA 401(k) account?

21      MS. BABBITT:  I think it's a pension account.

22      THE COURT:  So you'd have to get that from the pension

23  board or something.

24      MS. BABBITT:  Yeah.  Unless if Mr. Sweeney is going to

25  confirm with his client as to what bank accounts Mr. Cavelle

1  had as sources of money, that would be helpful.  You know,

2  we've been trying to narrow that without having the Court deal

3  with it.

4           THE COURT:  Okay.  Okay.  So here's what I would say.

5  I still don't think that -- I don't mean to make light of a

6  $6,000 account, and I don't know if this was a charitable

7  account or what this was.  It sounds like it was maybe kind of

8  a holiday kind of thing, but I'm reluctant to get involved in,

9  you know, someone's retirement account because of a $6,000

10 theft which got repaid.  You know, I want to keep this

11 proportional to what's going on here.

12          But I'm not -- I don't understand if they have

13 everything already from a subpoena or not.  I don't feel like

14 you guys are communicating on one plain.  Okay?  So have you

15 produced what you got from the subpoena?

16          MS. BABBITT:  Yes.

17          THE COURT:  Okay.  So I want you to confirm with your

18 client.  Did you get one year's worth from your subpoena?

19          MS. BABBITT:  I believe so.

20          THE COURT:  Your request says January 2014 to December

21 2015.  So your request is for two years, but maybe you've

22 narrowed that down to just 2015.

23          MS. BABBITT:  Yes.

24          THE COURT:  Okay.  So I want you to confirm with the

25 plaintiff that that's the only account he had during 2015, one

1    checking account.  So he didn't have a savings account, and he

2    didn't have a separate checking account or a separate savings

3    account.

4          MR. SWEENEY:  I don't believe that their subpoena was

04:12:22   5    limited to a checking account.

6          THE COURT:  Okay.  Well, I'm going to write in my

7    order that you're going to confirm it.  I'm going to give you a

8    date by which you're going to confirm it.

9          MR. SWEENEY:  We'll do that.

04:12:34  10          THE COURT:  And I'm going to allow them to get from

11    you any other checking or savings account that he had, either

12    get that information from you so they can subpoena it or get

13    the information directly from your client, because you can get

14    on any savings or checking account in ten seconds online and

04:12:57  15    print out all those statements.

16          MR. SWEENEY:  Okay.

17          THE COURT:  You guys can work out whether you feel

18    better subpoenaing it or whether you'd take it from the

19    plaintiff, but we can all get online and do that in seconds.

04:13:23  20          MS. BABBITT:  Understood.

21          THE COURT:  Okay.  But I'm not so interested in the

22    401(k).  I want you to -- and/or the pension.  Okay?  Now, I do

23    want you to verify for them that he did not do a withdrawal

24    from his pension to repay.

04:13:46  25          Did you ask him that at his deposition?  Did he do a

1    withdrawal from his pension to repay the train fund?

2         MR. KENNEDY:  We were new counsel, Your Honor.

3         THE COURT:  Okay.  Did you take the dep?

4         MR. KENNEDY:  No.

04:14:12    5    MS. BABBITT:  No, we did not.

6         THE COURT:  Okay.  So I want you to verify whether he

7    withdrew money from a retirement account, any kind of

8    retirement account, pension, 401(k), annuity, all those things,

9    to repay the money.  If the answer is no, we're not getting

04:14:31    10   into any pension, any kind of retirement documents, which I

11   would prefer.  If the answer is yes, he withdrew a thousand

12   dollars or $50 or $500 or $5,000 to repay that money, then they

13   have a right to those documents and those documents only.  So

14   if he has a 401(k) plus his pension or an annuity plus his

04:15:00    15   pension, they're just going to get those documents that pertain

16   to that withdrawal.  Okay?

17        MR. SWEENEY:  Understood.

18        THE COURT:  So very limited.

19        MR. SWEENEY:  Sure.

04:15:31    20   THE COURT:  Okay.  Monthly statements, receipts,

21   records of all debit card, credit card, charge accounts.

22        MR. KENNEDY:  Can we clarify one thing?

23        THE COURT:  Okay.  Hurry up.

24        MR. SWEENEY:  One point.  He was -- Mr. Cavelle was

04:16:01    25   working at CTA for about 19 years.

1    THE COURT:  I know that.

2    MR. SWEENEY:  On August 28th, they came in and advised

3  him with no prior warning on a Friday:  This is your last day.

4    THE COURT:  I read the complaint.

04:16:16  5    MR. SWEENEY:  Okay.  Then on September 1st, Monday --

6  well, they let him take all his stuff out as you're aware.

7  They do that on Saturday morning and put it in two different

8  cars.

9    THE COURT:  Yes.

04:16:40  10    MR. SWEENEY:  He goes away.  They call him.  His

11  secretary calls him on September 1st, Monday.

12    THE COURT:  I read the complaint.

13    MR. SWEENEY:  Okay.  Well, then you're aware of the

14  fact that the issue with respect to when this money was missing

04:17:09  15  was the weekend, or if they say that he closed the account in

16  June, then the money was brought to them in a sense within one

17  day.

18    THE COURT:  The question is just:  Did he withdraw

19  money to repay it, or was it sitting in a box under his bed?

04:17:52  20  That's the only issue.

21    MR. SWEENEY:  Okay.  Well --

22    THE COURT:  If he withdrew money, they have a right to

23  know that.  Whether they can make hay with that or not, that's

24  a battle for another day.

04:18:06  25    MR. SWEENEY:  Well, I guess (inaudible) is credit

1    cards, all these sorts of things.

2              THE COURT:  Well, I'm just getting to that question --

3              MR. SWEENEY:  Okay.

4              THE COURT:  -- because I don't understand the

5    relevance of that.

6              MS. BABBITT:  It's the same principle, Your Honor.  We

7    wanted to determine what his spending looked like, if he was,

8    you know, taking money out of a debit account or paying off

9    other charge accounts with the cash that he received in June

10   when he closed the account.  So I think the same ruling that

11   you had with respect to pension or 401(k), we just want to know

12   if there was money taken from these accounts to pay back that

13   money.

14             THE COURT:  You want to know if he went into a debit

15   account -- to a credit card and said:  I need to borrow $5,000

16   from my Visa to pay back this money.

17             MS. BABBITT:  Yes.

18             THE COURT:  Borrow money, same question, I'll let them

19   have that.  I don't care what he's spending.  He might have

20   been spending like crazy.  Three-quarters of Americans do.  I'm

21   not getting involved in that.  That's not relevant.  If he went

22   to Visa and said "I'm going to pay you 30 percent interest to

23   borrow money to pay back CTA," I want that record.  Again, he

24   can get it online.

25             MR. SWEENEY:  I'm positive that didn't happen, so

1    we'll do it.

2           THE COURT:  Verify.

3           MR. SWEENEY:  Sure.

4           THE COURT:  Only payback, I'm not -- I'm not getting

5    involved in how much he was spending and was he overspending.

6    He probably was.  A lot of people do.

7           Okay.  Oh, my God.  We're only through the money.

8    Okay.  Now, plaintiff's motion, you have the records, the

9    policies that you want.  I don't understand the relevance of

10   kissing, having relationships.  What's going on?

11          MR. KENNEDY:  Judge, may I address that?

12          THE COURT:  Yes.

13          MR. KENNEDY:  John Kennedy for the record.  We have

14   the same concern and the same question.  I did ask counsel

15   several weeks ago:  Is this question -- and they refer to it as

16   paramours -- is this question of Mr. Cavelle sleeping with

17   female employees of the CTA a part or not part of your

18   defamatory case against president Carter or the CTA?

19          In other words, did anybody from the CTA call the

20   folks in Seattle and say:  Listen, this guy has a problem with

21   women at the CTA.  He's sleeping with a lot of them.  He's

22   doing this.  He's doing that.

23          Whatever it is, is that part of your case?  Because if

24   it is, we need to know that so we can defend against it.

25          And I believe counsel told me it was not part of the

1    case.  The amended complaint kind of suggests that it's still
2    in there.
3               THE COURT:  Okay.  I did not read the amended
4    complaint.  What is going on with this?  I'd like to say it's
5    not relevant and we get it out of discovery.  What is
6    happening?
7               MR. SWEENEY:  So the amended complaint, we had advised
8    them, defendants, in the deposition of Dorval Carter we used
9    several exhibits that have been designated confidential.
10              THE COURT:  Okay.
11              MR. SWEENEY:  We asked them to remove the designation.
12   There has been a blanket designation.
13              THE COURT:  Okay.  Let's get to the question.  Are you
14   alleging that there's defamation of your client based on the
15   fact that he is a philanderer, that he has sexual encounters,
16   mild or more intimate, with staff, with colleagues, with people
17   that he works with?
18              MR. SWEENEY:  The statement that was made by Dorval
19   Carter to Robert Gannon, who's the head of --
20              THE COURT:  Washington?
21              MR. SWEENEY:  -- the King County Metra train system --
22              THE COURT:  Okay.
23              MR. SWEENEY:  -- he said that George Cavelle was
24   involved in inappropriate relationships with direct reports.
25   That's what he told Seattle.

1          THE COURT:  Okay.

2          MS. BABBITT:  That's what Gannon testified to.

3          MR. SWEENEY:  Yeah.

4          MR. KENNEDY:  So the question, Judge, is --

04:24:36    5          THE COURT:  That's what who testified to?

6          MS. BABBITT:  That the Seattle witness testified to,

7     Your Honor.

8          THE COURT:  Oh, okay.

9          MS. BABBITT:  Dorval Carter did not testify to that.

04:25:08   10          MR. SWEENEY:  Mr. Carter --

11          THE COURT:  Okay.  So the guy in Seattle says that the

12     guy at the CTA says:  Mr. CTA told me he's got a problem with

13     direct reports, a sexual relations problem.

14          MR. SWEENEY:  Yes.

04:25:42   15          THE COURT:  Okay.  Well, it seems like that's in the

16     case.

17          MR. KENNEDY:  Well, the question is:  Is it?  If it

18     is, we've gone down some of this road in discovery already, and

19     Mr. Cavelle's ex-wife has already testified that he was having

04:26:10   20     a serious relationship with another female employee, a sexual

21     relationship with another female employee, and she testified

22     that she saw on an iPad, quote, correspondence between he and

23     this female employee where he's telling the female employee:

24     I'm going to leave my wife for you.

04:26:42   25          That's sent back and forth.  So that's an employee

1    relationship that's already at issue.  That would be relevant

2    to a defense of truth.

3         My question is:  Do they assert that as part of the

4    defamatory case or not?  If it is, then I have to pursue this

04:27:04    5    further.  If it's not, we can step back on that.  I just need

6    to know.  I mean, I'm not disputing his characterization of the

7    witness' statement in Seattle.  Is it part of their defamation

8    claim?

9         THE COURT:  Okay.

04:27:20    10         MR. SWEENEY:  So we provided -- Judge Dow asked us and

11    we had already agreed to provide them a draft of the amended

12    complaint which we would intend to file.

13         THE COURT:  I see.  Okay.  That's why I didn't read

14    it.

04:27:32    15         MR. SWEENEY:  We've given it to them --

16         THE COURT:  Okay.

17         MR. SWEENEY:  -- and we're awaiting their response.

18    Judge Dow asked them to let us know whether they're objecting,

19    and he gave some direction as to what he would do if we brought

04:28:00    20    the motion.  It's currently in their court.

21         MR. KENNEDY:  So that's why --

22         THE COURT:  Is it in the amended complaint?

23         MR. KENNEDY:  We have, and there is some suggestion

24    that they're trying to keep this in.  So I just need

04:28:23    25    clarification so we know where discovery needs to go.

1         THE COURT:  Okay.

2         MR. KENNEDY:  So is this something they're going to

3  argue to the judge or the jury?

4         THE COURT:  Is it in the complaint?  It sounds like it

04:28:33    5  is.

6         MR. SWEENEY:  It is.

7         THE COURT:  It is.  Okay.  So I take it the woman that

8  your client was -- does your client admit he was having the

9  affair?

04:28:46   10         MR. SWEENEY:  They took -- they didn't, but prior

11  counsel went through the deposition and asked him about the

12  relationships already.

13         THE COURT:  Okay.  So he was.

14         MR. SWEENEY:  So, yes, he admits that --

04:29:23   15         THE COURT:  Okay.

16         MR. SWEENEY:  -- with one.

17         THE COURT:  Okay.  So the woman he was having the

18  affair with was a subordinate.

19         MR. SWEENEY:  She did not work anywhere near his

04:29:34   20  department.

21         THE COURT:  Okay.  But did she have less status than

22  him?  I mean, would she have been a subordinate?  Could it have

23  potentially created liability for the CTA?

24         MS. BABBITT:  Yes.

04:30:02   25         MR. SWEENEY:  He was number 3.

1         THE COURT:  Okay.  Okay.  So that's a problem, a
2 potential problem under Title VII.
3         Okay.  So you have the policies.  So I'm good on your
4 motion to compel in terms of the policies.
04:30:18
5         Now what are you asking for?  So you have questions
6 out then to him about, well, how many relationships were there.
7         MR. KENNEDY:  How many, who, when, where, et cetera,
8 and their answer is it's unduly burdensome.
9         THE COURT:  Okay.
04:30:34
10         MR. SWEENEY:  Well, the answer is that we've already
11 answered all of these questions.
12         THE COURT:  Right.
13         MR. SWEENEY:  But if you want us to say the woman's
14 name again, we can do that.
04:30:44
15         THE COURT:  Yes, and there's only one.
16         MR. SWEENEY:  Right.
17         THE COURT:  Okay.  Well, then that's not unduly
18 burdensome, so I'm going to order you to answer that.  Be sure
19 it's truthful because we don't want to get down that path.  So
04:31:10
20 I know this is sensitive, and I'm sure your client doesn't want
21 to answer it, you know, all that.  But just remind him he's
22 swearing to this and it's got to be truthful because we don't
23 want, we don't want any trouble in that regard.  This is
24 obviously a very touchy case and very hotly contested, and I
04:31:29
25 can tell it's being very -- well, it's contentious.  So just

1    remind your client that he needs to be truthful, although it's
2    a sensitive area.
3            Okay, nepotism.  What's going on with that?  I saw
4    that issue raised.  Is that a thing that's a problem?  Did he
04:31:59   5    hire his nephew?
6            MR. SWEENEY:  They spent almost an hour at his
7    deposition the first time going through the fact that his son
8    was hired at CTA --
9            THE COURT:  Okay.
04:32:11  10            MR. SWEENEY:  -- who he worked for, asking whether or
11    not people advised Mr. Cavelle that there were problems with
12    his son there.
13            THE COURT:  Was that a basis of the termination or
14    resignation, nepotism, a basis of the resignation?
04:32:59  15            MR. SWEENEY:  What they came and told him is:  We're
16    going in a different direction.
17            THE COURT:  Yes, I know that.
18            MR. SWEENEY:  So we don't know.
19            MS. BABBITT:  Your Honor, they asked for the nepotism
04:33:22  20    order.
21            THE COURT:  You're not pursuing any nepotism
22    discovery.
23            MS. BABBITT:  Beyond I think what's already been
24    asked, I don't think we had any subject in the motion to compel
04:33:48  25    on that point.

25

|  |  |  |
|---|---|---|
|  | 1 | THE COURT: Okay. |
|  | 2 | MR. SWEENEY: If that's off the table, then fine. |
|  | 3 | THE COURT: Fine. |
|  | 4 | MR. SWEENEY: Yeah. |
| 04:34:00 | 5 | THE COURT: Online presence, posting on websites, |
|  | 6 | social media, you've got the policies. Do you have any |
|  | 7 | outstanding discovery on that? |
|  | 8 | MR. KENNEDY: Yes, we do, Judge. |
|  | 9 | THE COURT: Okay. What's up with that? |
| 04:34:15 | 10 | MR. KENNEDY: To put it in context, Mr. Cavelle had a |
|  | 11 | side job or a side career, depending on how it's characterized. |
|  | 12 | He referred to himself as the G Cavelle Project, and he |
|  | 13 | represents himself to be a DJ, musician, artist, and the like. |
|  | 14 | He had a Facebook page at the time that has since been taken |
| 04:34:43 | 15 | down, and we wanted to get access to his Facebook page. His |
|  | 16 | website that he had at the time has been taken down, and we |
|  | 17 | wanted access to that, and his various social media. |
|  | 18 | The reason, Judge, is that as the number 3 at the CTA, |
|  | 19 | the images depicted in these various outlets depict Mr. Cavelle |
| 04:35:11 | 20 | in bars, depict scantily clad women. They project an image not |
|  | 21 | of somebody who's the number 3 and responsible for CTA safety, |
|  | 22 | but somebody who's out clubbing and suggests a certain |
|  | 23 | lifestyle that doesn't reflect the gravity of the job that he |
|  | 24 | holds. |
| 04:36:02 | 25 | We wanted to -- that was part of the culture that |

1    Mr. Cavelle had when he was at the CTA.  Oftentimes, and one in

2    particular where there was a catastrophe, where there was a

3    derailment, Mr. Cavelle was at one of these jobs, these side

4    jobs, and the bottom line for the person in charge of safety is

04:36:38    5    you're on 24/7.  If you're not available, you make plans to

6    have your underlings cover everything, and you're instantly

7    available by phone.

8         So this side career was an issue that we do intend to

9    inject into the trial because it gets into that the person

04:37:01    10   who's now representing the CTA to the media and to the public

11   is now also available online doing all these other sorts of

12   things that put the CTA in the worst possible light.

13         THE COURT:  Well, I mean, I can see why that's

14   interesting.

04:37:20    15         MR. KENNEDY:  But it's part of the reason why the CTA

16   was done with him.

17         THE COURT:  Well, right, but it doesn't -- how does it

18   go to defamation if you didn't relay this stuff to Seattle, and

19   how does it go to tortious interference?  I mean, he's not

04:37:46    20   suing you for termination, is he?

21         MR. SWEENEY:  No.

22         THE COURT:  So I get in a classic Title VII or in a,

23   you know, termination case, yes, this is why you terminated

24   him, that he's a disaster, but I don't -- what's the relevance?

04:38:06    25         MR. KENNEDY:  Well, it depends on what -- again,

1  that's why I asked for the clear boundaries of their claim.

2  What do they say the CTA or president Carter or whomever said

3  is a defamatory statement?  Are they saying that we falsely

4  alleged that Mr. Cavelle had issues with respect to spending a

5  lot of time in bars or with respect to spending a lot of time

6  in this other lifestyle.  If they're not putting those at

7  issue, then I can pull back on that.

8            THE COURT:  Is that it?  I mean, I get that they

9  said as I'm understanding it, they said something about he

10 stole from them --

11           MR. SWEENEY:  Right.

12           THE COURT:  -- which has to do with this train fund,

13 charitable train fund, and then he had sexual relations with a

14 subordinate.  You know, you have a right to defend on that and

15 truth and all that, but did anything come up about his either

16 having extra employment, which I don't even know if you're

17 allowed to do, but okay there's that, and then the type of

18 extra employment?  You know, whether it's being an altar boy or

19 whether it's running in a bar, was any of that reported to

20 Seattle?

21           MR. KENNEDY:  Well, counsel had mentioned it earlier.

22 There's an e-mail that was sent to the former president of the

23 CTA Frank Kruesi from president Carter where president Carter

24 talks about Mr. Cavelle's drinking and essentially an

25 intervention by his colleagues or friends to address his

1    drinking.

2              THE COURT:  Okay.

3              MR. KENNEDY:  It alludes to this sort of thing.  So if

4    they're claiming that we, the CTA or Mr. Carter, president

5    Carter, made statements to the Seattle folks saying "this guy

6    has an alcohol problem or a cocaine problem and you ought to

7    take heed," then we have to get into that.

8              If they're saying, "well, that's not part of our case,

9    counsel," then we can adjust discovery appropriately.

10             MR. SWEENEY:  So what counsel is referencing is an

11   e-mail that Mr. Carter sent to the former president of the CTA,

12   Frank Kruesi.

13             THE CLERK:  Counsel, I'm sorry to interrupt.

14             MR. SWEENEY:  Oh, I'm sorry.

15             THE CLERK:  Can you move the mic a little closer to

16   you?

17             MR. SWEENEY:  Yeah.

18             THE CLERK:  Thank you.

19             MR. SWEENEY:  What the current president, Dorval

20   Carter, sent to Frank Kruesi was an e-mail in which he said

21   that Mr. Cavelle stole $6,100 and that they made him pay it

22   back.  That's not true.  They said that he was a potential drug

23   abuser and abused alcohol and that there was going to be an

24   intervention by his friends.  I forget the details.  We've

25   given it to them in the amended complaint, but to the extent

1  we're going to get into the fact that he -- he did list the CTA

2  does have a policy with respect to secondary employment, and he

3  did list that he did this as secondary employment, even if he

4  didn't get paid most of the time, and I don't believe that the

04:42:44  5  G Cavelle Project had anything to do with anything that was

6  said to either Seattle or to Mr. Kruesi.  It looks like they're

7  just trying to embarrass him.

8  THE COURT:  So the defamation, it goes to Seattle and

9  to the former president of CTA?

04:43:11  10  MR. SWEENEY:  Yes.

11  THE COURT:  I see.  So to the former president of

12  CTA -- and maybe president Carter didn't communicate this to

13  Seattle -- but to the former president of CTA who I imagine has

14  a number of contacts in this area, president Carter also raised

04:43:38  15  this drug abuse, potential drug abuse and alcohol abuse issue,

16  which means this kind of more a lifestyle issue.

17  MR. SWEENEY:  I don't know if that would be lifestyle

18  but, yeah, he did say that to Mr. Kruesi.

19  THE COURT:  Okay.  And you have a claim for that.

04:44:11  20  MR. SWEENEY:  Yes.

21  THE COURT:  That he should not have, that president

22  Carter should not have said that.

23  MR. SWEENEY:  That's true.

24  THE COURT:  Okay.

04:44:18  25  MR. SWEENEY:  But we're saying if you take somebody's

1    Facebook page, for instance, and start using that as -- I don't

2    know why you'd be using it, but pictures of people that they

3    might have posted on their Facebook page or linked on their

4    Facebook page, that doesn't go at all to the issues raised with

04:44:43    5    Mr. Kruesi.

6    THE COURT:  So they're -- so president Carter is

7    moving to discover the Facebook postings.

8    MR. SWEENEY:  Say it again?

9    THE COURT:  So president Carter is moving to discover

04:44:57    10    the Facebook postings.

11    MS. BABBITT:  As well as his website, Your Honor,

12    which has the images we believe with him with drugs -- or not

13    drugs, drinking, nightclubs, that sort of thing.

14    THE COURT:  Okay.  So here's my thought on that.  I

04:45:49    15    think you can have a fight about the admissibility of this

16    stuff, and there's a lot of fights in the courts about

17    admissibility of this kind of stuff.  But given that president

18    Carter is -- I thought that the defamation was limited to what

19    went out to Seattle, but given that he also has this

04:46:14    20    communication with the former president of CTA and it's a

21    little broader because it's going kind of after the character

22    of the plaintiff in terms of his use, I think that this is fair

23    game.  So whether Judge Dow is going to admit it, that's a

24    fight for another day.

04:46:39    25    But what does it take to get this discovery?  I mean,

1    this is -- this gets beyond my technical capacity.  I don't

2    know how old these websites are or how old these Facebook posts

3    are, so that would be my question in terms of -- and I know

4    he's moved to Florida, so there's been some moving of the

04:47:04    5    computer and stuff.

6         But I think it's fair to go after these.  I don't know

7    if that means subpoenaing something, someone, Facebook,

8    something like that, but I think it's fair for them to have

9    access to this.  If Judge Dow thinks you shouldn't use it,

04:47:24    10    that's fair.  You can have that fight later, but I think it's

11    fair for you to get it.

12         You know, I would wonder has doctor -- or has

13    president Carter seen it.  So I don't know that it really

14    informed him at all, but that's a fight for another day.

04:47:55    15         MR. KENNEDY:  Right.  And the last person that

16    controlled all of these areas of social media was the owner of

17    these sites, Mr. Cavelle.

18         THE COURT:  Of course.

19         MR. KENNEDY:  So he would have --

04:48:18    20         THE COURT:  But that doesn't mean that Mr. Carter had

21    any idea of any of this.

22         MR. KENNEDY:  No, no.

23         THE COURT:  But that's a different fight.

24         MR. KENNEDY:  Right.  My point is getting to your

04:48:36    25    technical question, who's in the best position to re-access

1    these.  It's the person who owns those website pages and can go

2    to the servers, the website or the Facebook pages, and say:  I

3    need to regenerate the archives of these various websites and

4    have them --

04:49:09    5        THE COURT:  Right.

6        MR. KENNEDY:  -- as opposed to a third party coming in

7    and subpoenaing them, which is a whole different battle.

8        THE COURT:  Right.  I would not have the technical

9    capability to access my old Facebook page, but I'm happy to say

04:49:28    10   in an order that plaintiff has to produce these.  But I also

11   understand that that's easier said than done, given the age of

12   them.  So I think it's fair game that they be produced, but I

13   want the parties to work together to get them produced.

14        It might be that you have to send this 2015 computer,

04:49:54    15   which probably doesn't work anymore because we're in 2019 and

16   they do die after two or three years, you know, to somewhere to

17   get it re-accessed.

18        MR. SWEENEY:  We will.  We can attempt to do what

19   you're asking.  I think I understand what you're saying.

04:50:15    20        THE COURT:  Yes.

21        MR. SWEENEY:  I tell you that George Cavelle is not

22   the most technically advanced individual.

23        THE COURT:  Right.

24        MR. SWEENEY:  When we say that, I think the language

04:50:26    25   we're using here probably isn't accurate.  He didn't own the

1  website, so he never like hosted it.  But we can certainly

2  provide information as to who did and help assist in trying to

3  recover whatever might be there.

4          THE COURT:  Okay.  So, counsel, you have -- I've been

5  looking at your requests for production.  You know, I'm trying

6  to follow on the motions that are pending, and you have some

7  rog requests, interrogatories 3, 4, 6, and 7.  Have I hit those

8  by talking about the websites, the financial documents?

9          MS. BABBITT:  Your Honor, I think the rog requests

10  that we had still outstanding, 3 and 4 were specific questions

11  that we had with respect to cash withdrawals from his Chase

12  Bank checking account.  So those, I think we need additional

13  information specific to the answer.  We're asking for, you

14  know, why he withdrew it, the reason and purpose, the identity

15  of the receipt of these withdrawals.  Those two are still

16  outstanding.  I think 6 and 7, based on your rulings today, are

17  resolved based on your rulings.

18          THE COURT:  Okay.  So are you guys able to talk about

19  these?  They're very specific.

20          MR. SWEENEY:  He has -- I can represent he has no

21  recollection of specific withdrawals from his bank account --

22          THE COURT:  Okay.

23          MR. SWEENEY:  -- relative to those.

24          THE COURT:  I mean, one of these questions is:

25  There's a check to David Moreno for $2,000, and who is David

04:50:49

04:51:17

04:51:46

04:52:12

04:52:26

1    Moreno?

2          MR. SWEENEY:  I'm trying to recall from his deposition

3    because I think they asked him about this.  I believe he was a

4    -- I can't say.  I can't say.

04:52:49    5          THE COURT:  Okay.

6          MR. SWEENEY:  If he was a friend or relative, I can't

7    say.

8          THE COURT:  Yes.  I mean, I feel like the document

9    production that I'm ordering and the verification is adequate,

04:53:03   10    and I'm not going to order, I'm not going to order responses to

11    these.

12          MS. BABBITT:  Okay.

13          THE COURT:  Okay?

14          MS. BABBITT:  Understood.

04:53:11   15          THE COURT:  Okay.

16          MS. BABBITT:  And, Your Honor, I have one final point

17    on the interrogatory answers.  Mr. Cavelle hasn't provided a

18    verification.

19          MR. SWEENEY:  We can.

04:53:23   20          THE COURT:  Okay.

21          MR. SWEENEY:  Certainly.

22          THE COURT:  I'm going to give you a date certain to do

23    that.

24          MR. KENNEDY:  Judge, if I could just add for the

04:53:29   25    record?

1        THE COURT:  Yes.

2        MR. KENNEDY:  I'm advised by somebody who is much more

3    savvy with them that oftentimes these websites are archived and

4    can be revived pretty simply.

04:53:42    5        THE COURT:  I think they all can be.  I just think you

6    have to pay or you might have to pay somebody to do that if

7    you're not savvy enough to do that.  I mean, I think they all

8    can be.  They all exist forever.  That's what we're told,

9    right?

04:53:56   10        MR. KENNEDY:  Yeah.

11        THE COURT:  So I'm finding that they have to be

12   produced, but you guys are going to have to work together to

13   get them produced and there might be some costs to it.  Even

14   though we think it's simple, you might have to pay somebody to

04:54:14   15   help.

16        Okay.  So I think I've dealt with defendants' motion.

17   I think plaintiff's motion basically is done, although

18   plaintiff had some December discovery requests.  You raised it

19   in your motion, but then I don't think you had really met and

04:54:39   20   conferred, and I don't know if I'm -- am I supposed to be

21   ruling on that, or are you guys still working that out?  Is it

22   due yet, and what's happening with that?

23        MR. KENNEDY:  There's been no meet-and-confer, and

24   it's not due yet.

04:54:55   25        THE COURT:  Okay.  So I'm okay?

1    MS. BABBITT:  Sorry.  If I can clarify that a little
2    bit, there was discovery that was --
3    THE COURT:  Let's let the person who's really doing
4    all the work get into it.
04:55:08    5    MR. KENNEDY:  Judge, I'll see you later.
6    THE COURT:  There you go.  Nice meeting you.
7    MS. BABBITT:  I might have to order this transcript
8    now, Your Honor.
9    So the discovery that was issued to defendant CTA was
04:55:22    10   answered timely.  The identical requests for production and
11   interrogatories were also issued to president Carter.  We
12   provided counsel this morning with those written responses --
13   THE COURT:  Okay.
14   MS. BABBITT:  -- which generally are part and parcel.
04:55:42    15   The other broader subject of the plaintiff's motion to compel
16   was those policies that they said --
17   THE COURT:  Yes, yes.
18   MS. BABBITT:  -- had not been produced, and we
19   identified those by Bates range.
04:56:10    20   THE COURT:  Okay.  So they're going to look at
21   president Carter's responses.  You may or may not have issues
22   with them.  You may or may not have issues with the CTA
23   responses.  You'll meet and confer, and we'll stay tuned.
24   Okay.  Now we have the motion under seal.  That's all
04:56:35    25   that's left.  Okay.  So tell me a little bit about what

1    happened.

2         MR. KENNEDY:  Judge, could I ask if it's okay if the

3    general counsel approaches as well?

4         THE COURT:  Sure.

04:56:47    5         MR. KENNEDY:  For the record, Karen Seimetz.

6         I'll do my best to frame the question, Judge, or the

7    issue, and it's part of the motion to compel.

8         THE COURT:  I was thinking maybe plaintiff would tell

9    me what happened.

04:57:02   10         MR. SWEENEY:  So I think they've attached as Exhibit 1

11    the February 6th e-mail where we learned that there was an

12    issue surrounding potential statements made to witnesses in

13    this case.

14         THE COURT:  And are those witnesses people who work at

04:57:29   15    the CTA right now?

16         MR. SWEENEY:  Yes.

17         THE COURT:  Okay.  And did you learn about that

18    through your client?

19         MR. SWEENEY:  Yes.

04:57:39   20         THE COURT:  Okay.  So your client is living in

21    Florida.  He's a former employee, but he still has friends, of

22    course, who work at CTA.

23         MR. SWEENEY:  He worked there for two decades.

24         THE COURT:  Of course.

04:57:55   25         MR. SWEENEY:  Yeah.  So I want to, I guess, be careful

1    with respect to privilege issues, but we became aware of

2    statements being made to potential witnesses in the case that

3    were interpreted as threatening.  We obviously had been going

4    back and forth through several meet-and-confers.

04:58:32    5    There's a lot of discovery at this point where we

6    talked about a number of issues.  It seemed like, based on what

7    we were hearing, that there was a significant amount of

8    activity happening over at CTA with respect to witnesses.  I

9    don't know.  We've talked about it.  We've looked at it in

04:58:59    10   terms of how could the statements that were made be

11   interpreted.  Would they be something that would be actionable?

12   Would we bring a motion based on it or something more than

13   that?

14   THE COURT:  When you say "actionable," do you mean --

04:59:20    15   MR. SWEENEY:  Bring it to you, bring it to Judge Dow.

16   THE COURT:  So do you mean that the witnesses would

17   have a cause of action, or you mean to raise it in this case?

18   MR. SWEENEY:  Raise it in this case.

19   THE COURT:  Okay.

04:59:30    20   MR. SWEENEY:  Whether we would do something that

21   would --

22   THE COURT:  Okay.  Just since I'm new to the case, how

23   many witnesses from CTA are we really dealing with?  I mean, we

24   have your client, and we have the person who terminated him.  I

05:00:14    25   know.  It's a resignation.  Then we have Dr. Carter, and we

1  have the new direction.  But how many people are really dealing

2  with the issues over there?  I mean, we have the woman who had

3  the affair with him.  That's a problem.  That's a witness who's

4  put in an uncomfortable position.  How many other witnesses are

05:00:41  5  over there?

6          MR. SWEENEY:  So one of the -- well, we both

7  identified a ton.

8          THE COURT:  Okay.

9          MR. SWEENEY:  I would say I can't remember off the top

05:00:50  10  of my head, but I know we're both over 20.

11          THE COURT:  So 20 total, you think?  20 to 25 total?

12          MR. SWEENEY:  No, I think we've identified in the

13  26(a)'s close to 50 witnesses.  That's my guess.

14          THE COURT:  At CTA.

05:01:16  15          MR. SWEENEY:  Yes.  And the issue that seems to

16  implicate the most witnesses, but it's a small issue, is the

17  exhibit that was attached to the complaint, which is what we

18  referred to as a wanted poster.

19          THE COURT:  Yes, I saw that.

05:01:37  20          MR. SWEENEY:  So to this point, counsel that was

21  involved representing the defendants before this had indicated

22  to us that the CTA's position was or was going to be that the

23  wanted poster was a practical joke done by someone at the CTA

24  who they could not identify.  Discovery went based on that

05:02:10  25  premise.

1        THE COURT:  That was prior counsel?

2        MR. SWEENEY:  Yes.

3        THE COURT:  Okay.  Was the -- did the poster appear

4    after the resignation?

05:02:24    5        MR. SWEENEY:  Yes.

6        THE COURT:  Okay.  And we all agree on that?

7        MR. KENNEDY:  It surfaced shortly after the

8    resignation.

9        THE COURT:  Okay.

05:02:32    10        MR. SWEENEY:  So we actually have -- and this is why

11    we didn't think that this was going to be the issue that it has

12    become.  On September 16th, we have the chief of security,

13    Mr. Keating, sending an e-mail to the chief of staff to

14    president Carter with a copy of the wanted poster attached to

05:04:05    15    his e-mail, telling the chief of staff:  This has been sent to

16    me, and it's appearing on our property.

17        It appears that someone -- he called it photo-bombed

18    in the e-mail.  I think he meant photo-shopped.  Someone

19    photo-shopped a picture of George Cavelle and put it on a

05:04:37    20    different lookout bulletin for a different employee who had

21    been seen on a Facebook page with guns and dismissed --

22        THE COURT:  I see.  Okay.

23        MR. SWEENEY:  -- on August 28th.  So he sends it to

24    the chief of staff on the 16th of September.  On the 18th of

05:04:55    25    September, an assistant, like an admin assistant sends it to

1    Mr. Cavelle's replacement and to Dave Kowalski, who was a

2    special advisor to president Carter.  She sends a screenshot of

3    the wanted poster to Mr. Bonds and Mr. Kowalski and says:  We

4    need to figure out where this is.

05:05:35    5    Mr. Cavelle is not involved.  He's not on the

6    property.  He doesn't have access to CTA.  He's been dismissed

7    for more than three weeks at this point.

8    THE COURT:  So at this point from the e-mails you're

9    seeing, the CTA, the officials at least that are e-mailing this

05:06:13    10    around seem to be taking this seriously, I mean, responding

11    appropriately.

12    MR. SWEENEY:  Well, they certainly --

13    THE COURT:  This has been photo-bombed or

14    photo-shopped, and we need to figure out what's happening here.

05:06:38    15    MR. SWEENEY:  They certainly looked at it.

16    THE COURT:  Okay.

17    MR. SWEENEY:  And the question is what happens next --

18    THE COURT:  Okay.  So now we're on the 18th of

19    September.

05:06:48    20    MR. SWEENEY:  -- and where this poster was.  So

21    there's been testimony in the case from the ex-wife.  They

22    apparently had a condo close to headquarters of CTA.  She's a

23    dog walker, and she claims that she saw it on, I believe, a

24    pylon taped up outside of CTA headquarters.  We have also

05:07:17    25    identified 26(a)(1) witnesses, a host of them that say they saw

1    the poster at -- well, I should say Maria Roberts who works at

2    headquarters said she saw it behind the security desk at the

3    loading dock.  Then there's other witnesses that say they saw

4    it at both the Rosemont and Des Plaines depots, that they saw

05:08:13    5    the poster.

6              THE COURT:  Okay.

7              MR. SWEENEY:  So --

8              THE COURT:  And have these people been deposed, or we

9    know that these are just statements made?

05:08:36    10             MR. SWEENEY:  Two have.  Two have.

11             THE COURT:  Okay.  Oh, they have been.  So under oath

12   they've said:  I've seen it at this depot.  I've seen it at

13   this depot.

14             MR. SWEENEY:  Yes.

05:08:59    15             THE COURT:  Okay.

16             MR. SWEENEY:  So --

17             THE COURT:  So they felt free to testify to this at

18   least.

19             MR. SWEENEY:  Those people did, yeah.

05:09:08    20             THE COURT:  Okay.

21             MR. SWEENEY:  So the case has sort of proceeded with

22   the assumption that, okay, it was a joke, that it was posted at

23   multiple locations owned by the CTA, places that Mr. Cavelle

24   could not get to, and that's --

05:09:30    25             THE COURT:  Is anyone saying that Mr. Cavelle did

1   this?

2          MR. SWEENEY:  Well, that's where we're going.  No one

3   had said that --

4          THE COURT:  Okay.

05:09:38   5          MR. SWEENEY:  -- until recently.  There's been an

6   assertion.  Well, they haven't gone so far as to say it, but

7   they've insinuated that Cavelle did this back in 2015 and that

8   he's responsible for it.

9          THE COURT:  Okay.

05:10:10   10          MR. SWEENEY:  Now keep in mind that he didn't file a

11   lawsuit until after Seattle in 2017.

12          THE COURT:  Yes.  Can I get back to -- and all this

13   happened around 2015, around the resignation, the depots.

14          MR. SWEENEY:  It looks three weeks after.

05:10:28   15          THE COURT:  Okay.  Can I just get back to one thing

16   then before I go to defendants?  Is any of this posting part of

17   the claim?  Is any of this or does any of this make up the

18   defamation?

19          MR. SWEENEY:  Yes.

05:10:44   20          THE COURT:  Okay.  So how does that happen?  I just

21   want to understand the proof.  How is the CTA -- how are you

22   going to get there?

23          MR. SWEENEY:  So the amended complaint also brings a

24   false light claim.

05:11:14   25          THE COURT:  False?

1        MR. SWEENEY:  False light.

2        THE COURT:  False light?

3        MR. SWEENEY:  False light.

4        THE COURT:  Oh, okay.  I didn't know that.

05:11:21  5        MR. SWEENEY:  And based on the testimony we've gotten

6 pretty much from every CTA employee that we've asked about it,

7 those bulletins are only posted for individuals who pose a

8 threat.

9        THE COURT:  So false light, that's a state claim.  I

05:11:44 10 don't know that.  So you paint someone in a false light?

11        MR. SWEENEY:  Yeah.

12        THE COURT:  And you get damages for that?  Do you have

13 to impact their employment opportunities or, I mean, what's the

14 damage?

05:12:08 15        MR. SWEENEY:  There is no special damage requirement,

16 so you can assert damage to reputation.

17        THE COURT:  And how is the CTA or how do you prove

18 liability?  Like, who in the CTA has to be responsible for

19 that?

05:12:29 20        MR. SWEENEY:  And I think that's where the fight --

21        THE COURT:  I mean, if some bus driver did this as a

22 joke, you know, photo-shopped it because they had some issue

23 with him, stupid, but some low-level employee, does that create

24 liability for CTA or director Carter?

05:13:03 25        MR. SWEENEY:  We think the liability will come, if not

45

1     from permitting this to be posted on multiple places and not

2     having control of your systems that allow someone to do that,

3     the fact that you didn't take some sort of remedial action to

4     notify the -- one, the investigation as it's been described to

05:13:32    5     us by counsel was:  Well, we took them down.

6               THE COURT:  Okay.

7               MR. SWEENEY:  We've asked a ton of questions about:

8     Well, you know, how did you do it?  Who did it?

9               THE COURT:  Okay.

05:13:48    10              MR. SWEENEY:  All that kind of stuff.

11              THE COURT:  Okay.

12              MR. SWEENEY:  And we're getting --

13              THE COURT:  So getting back to witnesses being

14     threatened, how do we get back to that?

05:13:59    15              MR. SWEENEY:  So a lot of people saw it --

16              THE COURT:  Okay.

17              MR. SWEENEY:  -- saw the poster at various places.

18              THE COURT:  Sure.

19              MR. SWEENEY:  The new theory that Mr. Cavelle may have

05:14:10    20     created the document or some -- I don't know -- conspiracy of

21     people that would have done it to plant it at various places

22     that he wouldn't be able to get to, because I assume that's --

23     they're going to have to explain how it got throughout the

24     system.

05:14:46    25              THE COURT:  Sure.  So how are we getting to someone

1    being -- I mean, I'm hearing witnesses give you good testimony.

2            MR. SWEENEY:  Witnesses see it.  Witnesses see it.

3            THE COURT:  Okay.  And they tell you that under oath?

4            MR. SWEENEY:  Two have.

05:15:13   5            THE COURT:  Okay.

6            MR. SWEENEY:  And we didn't think it was going to be a

7    contested issue with respect to that people saw it in other

8    places.

9            THE COURT:  Okay.

05:15:25  10            MR. SWEENEY:  We didn't think it was going to be a

11    contested issue that someone on their side put it together.

12    Apparently a lot of people were contacted who may have seen the

13    poster --

14            THE COURT:  Okay.

05:15:41  15            MR. SWEENEY:  -- and statements were made to at least

16    one that we know that I don't think there's much you could do

17    to interpret it that you wouldn't say it's threatening.

18            THE COURT:  So statements were made to one of these

19    potential witnesses that said what?  What was said?

05:16:09  20            MR. SWEENEY:  The witness was told that he needs to go

21    down to headquarters.  He's being quarantined for a week.  If

22    he testifies for the CTA, it will be paid for.  If he doesn't,

23    then he'll have to make up the shifts.  Now keep in mind, this

24    is a case where this person is not a party and has no

05:16:51  25    involvement other than seeing a poster.

1    THE COURT: So let me understand. He has to go down

2 to headquarters for a week. That means he's pulled.

3    MR. SWEENEY: That's what he was told.

4    THE COURT: He's pulled out of his job.

05:17:15 5    MR. SWEENEY: That's what he was told.

6    THE COURT: Okay. When you're down at headquarters

7 for a week, you're going to work every day, but you're going

8 down to headquarters. So you're doing some other job, maybe a

9 menial task or something, an administrative task.

05:17:30 10    MR. SWEENEY: I don't think he's doing anything.

11    THE COURT: Okay, so just sitting Downtown. Then you

12 have your deposition, and during your deposition if you testify

13 for CTA --

14    MR. SWEENEY: It's not a deposition. He's not being

05:17:47 15 deposed.

16    THE COURT: Okay.

17    MR. SWEENEY: He's being interviewed --

18    THE COURT: Okay.

19    MR. SWEENEY: -- by CTA lawyers.

05:17:53 20    THE COURT: Okay. So if during that interview or at

21 trial or if he's called to be deposed or whatever, if when

22 things happen he makes statements favorable to CTA, he'll be

23 paid for those 40 hours down in headquarters. If he doesn't,

24 if he says, "yes, I saw the poster or I know who made the

05:18:22 25 poster," or whatever that information is, he then will not be

1    paid for that 40 hours of time?

2         MR. SWEENEY:  So you're reading into it the same way

3    that we did and the same way the witness did.

4         THE COURT:  Okay.

05:18:37    5         MR. SWEENEY:  I'm not involved in this case.  You want

6    me to go to headquarters.  You want me to talk to the CTA

7    lawyers.  Why wouldn't my time be paid for no matter what?

8         THE COURT:  Was this person -- is this person on a

9    26(a)?

05:18:53   10         MR. SWEENEY:  He is.

11         THE COURT:  On your 26(a)?

12         MR. SWEENEY:  I think he's on both, but he's

13    definitely on ours.

14         THE COURT:  Is he going to be deposed anyway?

05:19:03   15         MR. SWEENEY:  Probably.  I don't know.  We weren't

16    anticipating having to depose these people because there could

17    be a number of them.

18         THE COURT:  Well, is this the only threat we know

19    about?

05:19:16   20         MR. SWEENEY:  Yeah.

21         THE COURT:  Okay.

22         MR. SWEENEY:  And keep in mind, we specifically

23    reached out to counsel and said:  We've become aware of an

24    issue.  We don't want to turn it into a federal case.  We don't

05:19:34   25    believe you did it, we don't think the attorneys at CTA would

1  necessarily do it, but this is what's being communicated.

2  Please make it stop.

3  THE COURT: Well, it's hard for them to make it stop

4  when they don't have any information, and I don't want to spend

5  a lot of time on -- I appreciate all your exhibits and that you

6  tried to reach out and you tried to figure out what's going on,

7  and I can kind of understand your reluctance. I get that this

8  is a very contentious case. I've already said that. So I

9  don't want to get too involved in the weeds in how many times

10 you asked for information so that you could do what it is your

11 job to do. I know you would have done that and taken it very

12 seriously.

13 I also don't want this to get away from us because I

14 think we've got enough challenges in this case, given the

15 allegations. So, I mean, one thing that's coming to my mind is

16 why don't we just depose this guy in two weeks and get it

17 behind us. Let him come in and tell the truth. Then if we're

18 very concerned about it, we can do the deposition in my jury

19 room, and he can feel comfortable and get it done.

20 Because I think people can feel very concerned, and I

21 assume this information is coming from your client -- I could

22 be wrong about that -- and I'm sure he's very emotional and

23 he's got friends. So I just think things can be very --

24 sometimes can be misconstrued and misunderstood. Maybe the

25 client or maybe the plaintiff heard something and then felt --

05:19:53

05:20:16

05:20:35

05:20:57

05:21:30

1    I mean, have you talked to this witness?

2    MR. SWEENEY:  I wouldn't do that.

3    THE COURT:  Oh, right, because he's a current

4    employee, right.  I'm sorry.  So I don't know.  I mean, I don't

05:21:46    5    want to --

6    MR. SWEENEY:  I will tell you --

7    THE COURT:  I don't want to just push this under the

8    rug, but I also don't want it to blow up where then I have 20

9    witnesses who are coming in here saying:  Somebody looked at me

05:22:23    10    sideways, and now I'm feeling like I can't do my job, or I'm

11    getting fired and it's because -- you know, you can't run your

12    shop because these people are on a 26(a) list and you're afraid

13    that if you put someone on a PIP it's going to be a problem

14    because they're on a 26(a) list.

05:22:50    15    You know, I mean, this could get unnecessarily crazy

16    when it could have been a misunderstanding, although I hear you

17    that this is a very peculiar thing for anybody to say.  Do we

18    know who said it?

19    MR. SWEENEY:  Yes.

05:23:08    20    THE COURT:  Okay.  Well, it seems that person maybe

21    needs some counseling about how to interact.  Was it somebody

22    in authority?

23    MR. SWEENEY:  Yes, and so the concern is clearly on

24    the witness' side.

05:23:30    25    THE COURT:  Of course.

1      MR. SWEENEY:  You know, he's been in the CTA for a
2  long time.  You know how things work.

3      THE COURT:  Of course.  Of course.

4      MR. SWEENEY:  People have long memories.  There's a
05:23:41    5  lot of concern:  I'm going to somehow be adversely affected in
6  my employment now because of something.

7      THE COURT:  Okay.

8      MR. SWEENEY:  And the bigger the issue becomes, the
9  greater the concern.

05:23:59    10      THE COURT:  Well, it's a big issue.

11      MR. SWEENEY:  Sure.

12      THE COURT:  We've got a document under seal, and we've
13  got six lawyers in court.  What would you like to say?

14      MR. KENNEDY:  Several things, Judge.  I'm biting my
05:24:27    15  tongue.  There has been before Your Honor as we sit here today
16  a conscious and intentional and deliberate slide of what's
17  happened here.  They told us today that they had an issue that
18  they were fronting with us about witness tampering.  That is
19  not true.  They don't have an issue.  What they said on
05:24:55    20  February 6th was the CTA was engaging in, quote, blatant
21  witness tampering and that they were going to pursue discovery
22  on it.  That was on the 6th, and Your Honor notes that I asked
23  five times.  They never gave me an answer.  I met and conferred
24  with them, and they said:  We're not authorized to tell you.

05:25:31    25      So I fronted it with Judge Dow because this is a class

1    3 felony and general counsel for the CTA and I as counsel need

2    to get in front of this. Two things are going on. So that's

3    the first misrepresentation that there was an issue, their

4    February 6th e-mail. He states:

05:25:57    5    "CTA has threatened potential witnesses in this case

6    with loss of pay or potentially more serious repercussions if

7    they do not testify to the CTA's favor. This constitutes

8    blatant witness tampering and is unethical."

9    I have a right to know and the CTA has a right to know

05:26:29    10    and the Court has a right to know who said this to any of our

11    people, when did they say it, what did they say, and how was it

12    received. Was it e-mail? Was it directly? They won't tell us

13    who said it. They won't tell us who heard it. They won't tell

14    us, other than what we heard today, what was said. And now

05:26:54    15    we're learning for the first time that it's secondhand through

16    Cavelle who also won't say, and now they're also hiding behind

17    a privilege. As soon as they raise this issue, there's a

18    subject matter waiver. So they're using the privilege as a

19    sword and a shield to say: We're going to inject and taint

05:27:16    20    this entire proceeding with this notion of witness tampering so

21    that any CTA witness who testifies against Cavelle is going to

22    be marked with the potential for having been tampered with.

23    We're shadow boxing in the dark against a ghost

24    because they won't disclose. I would love, Your Honor, to put

05:27:53    25    people under oath and ask: Who told you to sharpen your

1    testimony in favor of CTA?  When was it said, and how did they
2    say it?
3              Your Honor, that's exactly what should happen in this
4    case.  This is the most cynical tactic, and the premise for all
5    this is they say:  The CTA has changed its position.  It's not
6    a wanted poster.  It's a lookout poster.
7              The CTA has never taken a position in this case in any
8    of its pleadings that this document was a CTA document
9    promulgated as a practical joke.  We have been attempting to
10   get to the foundation and authenticity of the document from day
11   1, and counsel still to this day refuses to answer that
12   discovery.  Here's how that becomes important.
13             THE COURT:  Wait.  You served discovery about the
14   poster?
15             MR. KENNEDY:  I've asked how did counsel get it.  I've
16   asked it in discovery.
17             MS. BABBITT:  How did plaintiff get it.
18             MR. KENNEDY:  How did plaintiff get it.  Here's the
19   best information, which is an incredible gap.  In 2015, this
20   thing is circulated.  Internal people at the CTA said that this
21   thing is circulated, and it comes down within days.  In 2015,
22   the ex-wife says:  I saw it on a pylon on the outside of the
23   headquarters.
24             There's no pylons on the outside of the headquarters.
25   There are supports.  Nevertheless, she says:  I saw it on the

1   outside on the pylons in 2015.  I called George and said I

2   didn't know you were fired.

3          Then he hangs up quickly after saying a few words.

4   She doesn't take a photograph of it.  She doesn't take it down.

05:30:16   5   She doesn't send it to him.

6          Another person says he saw it at the CTA headquarters.

7   She doesn't take a photograph of it.  She doesn't take it down.

8   She doesn't send it to him.

9          Another person said he saw it in Rosemont.  He doesn't

05:30:33   10   take a photograph of it.  He doesn't take it down.  He doesn't

11   send it to him.

12          So I'm now confronted with where the heck did this

13   document come from and how did it become Exhibit B to a

14   complaint filed two years later.  So I ask:  How did you get

05:30:54   15   this document?

16          They won't tell me.  So the ex-wife says --

17          THE COURT:  What happened at the dep?

18          MR. KENNEDY:  Well, here's what the dep says.  Here's

19   what Cavelle says.  Cavelle says in 2017, two years after he

05:31:15   20   was let go and on the eve of the filing of this lawsuit, his

21   ex-wife called her divorce lawyer and said there's a poster

22   issue.  Her divorce lawyer calls his divorce lawyer and says

23   there's a poster issue.  His divorce lawyer calls counsel

24   standing before you today and says there's a poster issue.  So

05:32:01   25   that's two years later, when everybody else has said they never

1   sent it to George Cavelle.

2          So I said to counsel:  How did your client get it?

3          Then he says:  Well.

4          Then I said:  Well, I want to see those e-mails.  If

05:32:17   5   that's the only chain of custody you have to authenticate this

6   document, I'm entitled to see it and it's not privileged.

7          He said:  Well, I'll check my e-mails, but he hasn't

8   gotten back to me yet.  Maybe I'll have to assert a privilege.

9          That's a fair question.  They're saying it's a CTA

05:32:49   10   document.  Your Honor's question is spot on.  How is that

11   liability against the CTA?  They also know, because I gave an

12   offer of proof, it's not a CTA document.  The CTA database

13   creates these posters in the normal course using CTA photos

14   from their HR database.  The photo on the bulletin is not in

05:33:26   15   their database.  And every one of those bulletins is preserved.

16   This is not a document preserved in the database.  Third, this

17   was a bulletin created for Mr. X.  Somebody just took Cavelle's

18   picture on an authentic CTA document, put his mug on there, and

19   said there's a lookout bulletin.

05:34:20   20          THE COURT:  Right.

21          MR. KENNEDY:  And now they're saying --

22          THE COURT:  So you've a motion on this count.  I mean,

23   you're going to file a motion on this count.

24          MR. KENNEDY:  I will.  But the witness tampering, if

05:34:35   25   it's based on this notion of a lookout bulletin, I don't care

1    what the contested issue is for the case.  We're entitled to

2    know who, what, where, when, and how, and they should do it

3    under oath and they should do it under seal so that it's

4    transparent to the Court and so that the CTA isn't marred by

05:34:58    5    this.  Then when we have a trial, no jury and no judge is going

6    to have to deal with:  Well, I wonder if they're putting their

7    thumb on the scale because they were tampering.

8    It's outrageous to suggest any of it is true without

9    any foundation, and they still slide from it from Your Honor.

05:35:40    10    THE COURT:  So --

11    MR. SWEENEY:  There's so many things that I want to

12    respond to, but I'll --

13    MR. KENNEDY:  Judge, general counsel would also like

14    to talk on this.

05:35:53    15    THE COURT:  Okay.

16    MS. SEIMETZ:  Hi, Judge.  For the reasons that you

17    stated, this is an issue that's very important to the CTA.

18    Separate and apart from this lawsuit, a very serious allegation

19    has been made presumably concerning another employee at the

05:36:12    20    CTA, and we now have, with the receipt of that information, an

21    affirmative duty to investigate it and determine its veracity.

22    You know that the CTA cannot sit back and do nothing when an

23    allegation like this is made.

24    So I am here in court this morning specifically to get

05:36:35    25    the information, to get it to my EEO officer because it deals

1   directly, as far as I can tell from what's been said, with
2   retaliation and punitive job action.
3          Now I don't really know based on the fact that I now
4   hear that it's secondhand if it is true, but it's enough to me
05:36:59   5   that it deserves an investigation.
6          Moreover, I will tell you just on the topic of
7   reimbursing witnesses, if a witness is called in a CTA case to
8   testify, the person's boss or a co-worker, they don't get to
9   decide if that person gets paid.  The law department handles
05:37:23   10  all of that.  Everyone is paid.  We do the vouchers for it.  So
11  if anyone is saying that, they don't even have the authority to
12  say it, which is another reason.
13         THE COURT:  Right.
14         MS. SEIMETZ:  I can't have this happening in other
05:37:40   15  cases if this is happening.  So this is critically important to
16  the CTA and to me as its general counsel to protect my client
17  and make sure that this gets investigated and dealt with if
18  it's true.
19         MR. KENNEDY:  And if it's not true, Judge, then we
05:40:12   20  would seek appropriate sanctions.
21         THE COURT:  I know.  Okay.
22         MR. SWEENEY:  So if it is true, if it is true, then I
23  would assume that we're going to have the same sort of
24  repercussions for the CTA.
05:40:31   25         THE COURT:  Right.

58

1    MR. SWEENEY:  Right?

2    THE COURT:  Right.

3    MR. SWEENEY:  The CTA is going to be facing witnesses

4  at trial that it will have to confront that say:  My testimony

05:40:43  5  was threatened by one of my ████████ --

6    THE COURT:  Right.

7    MR. SWEENEY:  -- when I came here today.

8    THE COURT:  Right.

9    MR. SWEENEY:  So if they want to make this an issue --

05:40:52  10    THE COURT:  Okay.  Okay.

11    MR. SWEENEY:  But the other thing I would say, this

12  shouldn't be under seal.  I don't believe this should be under

13  seal.

14    THE COURT:  I'm not sure about the under seal part,

05:41:16  15  either.  I'm holding that in abeyance.  Okay.  So we're going

16  to embark now on a hearing on an investigation.  Okay?  I know

17  this is very important to your entity and your job, which is a

18  bigger job than this case, much bigger, but as for this case,

19  this is a single-plaintiff case who lost -- a person who lost a

05:41:57  20  job after a long time.  I know that we have those cases in this

21  court all the time.  This is going to start being the dog that

22  is overtaking the tail that is wagging.  Okay?  The case is now

23  the tail, and this investigation is going to start being the

24  dog.  Okay?

05:42:19  25    MR. SWEENEY:  We agree.  That's why we said --

1      THE COURT:  That is not, if I can be so bold,

2  necessarily in your client's best interest.  Okay?  I don't

3  know the value of this case from the plaintiff's perspective.

4  I know there are no fees because this is not a fee-shifting

05:42:44     5  case as far as I know, state law claims.

6      So I'm wondering about the wisdom of this, about what

7  we're about to embark on.  I mean, what are we saying?  We're

8  just going to call these people in, and they're going to

9  testify cold.  We're not going to do any deps.  We're just

05:43:18    10  going to call them in, and I'm going to decide their

11  credibility.  I mean, I'm happy to do that.  If that's what

12  we're going to do, let's have them in next Friday.  Let's do

13  it.

14      Who are they?  I mean, you can't prep them even though

05:43:37    15  they're your employees.  I mean, I don't know if I can do it

16  next Friday, you know, but I can do it.

17      MR. KENNEDY:  If I may on that point, Your Honor --

18      THE COURT:  I can't do it next Friday.

19      MR. KENNEDY:  That's fine, but I also do want to make

05:43:51    20  another point.  I understand what you're saying, and we welcome

21  the hearing.

22      THE COURT:  But this is getting ugly.

23      MR. KENNEDY:  Well, it's more than --

24      THE COURT:  You know, I know not to have the hearing

05:44:03    25  does a disservice to you in terms of what else you need to

1    accomplish in terms of other cases and people getting paid to

2    be witnesses.  I know you've got lots of litigation going on,

3    not just employment cases but, you know, PI cases and stuff

4    like that.

05:44:33   5         I want to be sure plaintiff, plaintiff not you, that

6    plaintiff is very sober about this decision, because if these

7    employees don't back this up this is a very dangerous road to

8    go down, a very dangerous road.  So I'm happy to set a hearing,

9    but we've got to put these people's names on the record and the

05:45:11  10    CTA has to bring them in, give them the day off, pay them.

11         MS. BABBITT:  We will.

12         THE COURT:  And the ████████ has to come in, too, or

13    whoever the threat-maker is, to come in and testify.  I would

14    suspect the plaintiff is going to have to come in because he

05:45:37  15    relayed the information, and I suspect we're going to get

16    involved in some attorney-client finagling.  So it's a real

17    kettle of fish or a can of worms.

18         MR. SWEENEY:  And if it's proven true?

19         THE COURT:  Well, you know, that will be the second

05:46:09  20    can of worms.  I mean, I don't know what to say.

21         MR. SWEENEY:  Very good.

22         THE COURT:  If it's true, we're going to have a

23    problematic ████████ on our hands at CTA who's probably going

24    to lose his or her job.  I mean, that's one thing that's going

05:46:46  25    to happen.  That's not my decision, lucky for me.

1   MR. SWEENEY:  Well, I'm talking about in terms of this

2 case, in terms of the costs of the evidentiary hearing.

3   THE COURT:  I suppose you're going to move for costs,

4 and I'm going to have to decide.  I mean, that's down the road.

05:47:16 5 But it doesn't get us any closer to the merits of this case,

6 and frankly this claim is the least of your claims in terms of

7 damages.  I mean the claim.

8   MR. SWEENEY:  We agree.

9   THE COURT:  This didn't mean he couldn't get a job.

05:47:40 10 So in terms of the tail and the dog, what are we doing with the

11 amount that's going to go into this?  I mean, I'm supposed to

12 keep things proportional.  I mean, with all due respect to the

13 seriousness of the allegation, this is not proportional.  I

14 mean, I'm not going to lose sight of the seriousness of the

05:48:08 15 allegation, but I want to make sure this is -- I want to make

16 sure that the plaintiff is aware of what he's unleashing.

17   MR. SWEENEY:  I think the plaintiff is telling the

18 truth, and we are --

19   THE COURT:  Well, that's your job.

05:48:37 20   MR. SWEENEY:  Right.  You know, we're going to have

21 issues, I think, ultimately when witnesses start walking in

22 front of a federal judge and have to start talking about under

23 oath whether or not their supervisor or boss or someone else

24 above them threatened them.  I don't know what they're going to

05:49:08 25 say, but we are not the ones that -- we brought it to someone's

1    attention.  We did not bring a motion based on it.  But if

2    that's what they want to do, then we'll stand behind what was

3    said.

4          THE COURT:  Okay.  So we'll put the names of the

05:49:39   5    witnesses on the record.  There's going to be two witnesses,

6    and I assume we'll want to depose -- I mean, we'll want to talk

7    to the plaintiff as well.

8          MR. KENNEDY:  Yes.

9          THE COURT:  Okay.  So the plaintiff, that will be

05:49:52  10    limited to his reporting on this issue, of course.  We're not

11    going to talk to him about the claims and all of that.  The

12    name of the person who was threatened and the name of the

13    person who issued the threat, that's all we know, right?

14    There's not other people that we're concerned with.

05:50:11  15          MR. SWEENEY:  I'm not aware of them.

16          THE COURT:  Okay.  I mean, I don't want to do this

17    hearing twice, so you need to check with your client and make

18    sure there's not other people.

19          MR. SWEENEY:  I mean, he's not working there anymore.

05:50:37  20          THE COURT:  Right.

21          MR. SWEENEY:  So he's not privy to what might be being

22    said throughout CTA, you know.

23          THE COURT:  Sure.  But I'm sure the witness who was

24    threatened will be asked on the stand:  Are you aware of any

05:50:54  25    other people?  Have you talked to other people?

1     You know, but I don't want to hear from your client

2 after the fact:  Oh, I talked to Joe on the phone, and he had

3 the same experience.

4     So I do want you to check with your client beforehand.

05:51:22    5     MR. KENNEDY:  If I may, Judge, in their February 6th

6 e-mail, they say that the CTA is threatening potential

7 witnesses, plural.  So if it's only one now that they're

8 putting at issue, that's different from what they initially

9 accused us of.

05:51:49   10     MR. SWEENEY:  This witness is concerned about his

11 identity.  It wasn't until today that I revealed that he was

12 male because I think they already know who it is.  But, you

13 know --

14     MR. KENNEDY:  Judge, I've interviewed the witnesses

05:52:12   15 that we've presented for deposition.  If he's talking about one

16 of my clients that tampered, I need to know that.  If he's

17 trying to drive a wedge between me and my client, I want to

18 know that, too.  But I want to know the name, and I think we're

19 entitled to know the name.

05:52:44   20     THE COURT:  Yes, I don't know a way around identifying

21 the person.  I understand they're feeling scared.  I don't

22 know.  I mean, we have to.  We're going to have a -- I mean, if

23 you want to take a break and come back next week and tell me if

24 you want to withdraw these allegations, but we've got to know.

05:53:09   25 I've got to know the name of the witnesses, and I've got to

1    know the name of the person who issued or insinuated or however

2    direct it was.  It sounds like it was pretty direct.  But, you

3    know, what was said, I've got to know the name of the person

4    who said that.

05:53:28    5    Now, you know, I can only advise CTA, obviously, I

6    don't want anything negative to happen to these people, but I

7    trust that they know that.

8    MR. SWEENEY:  I would suggest that we take a short

9    break, a week or whatever it might be.  I will see what the

05:53:57   10    resolve, if I can determine it, of the witness is with respect

11    to how willing he is to stand behind what was said.  If he's

12    not, then we won't have an issue.  If he is, then I guess

13    counsel will have to decide whether they want to face that.

14    MR. KENNEDY:  Judge, may I respond?

05:54:24   15    THE COURT:  You may.

16    MR. KENNEDY:  I object to that.

17    THE COURT:  Yes.

18    MR. KENNEDY:  Judge, we have no choice but to follow

19    the evidence wherever this goes.  This is not a discretionary

05:54:34   20    item for general counsel for the CTA or for us in representing

21    these clients in this case.  We'll follow that evidence

22    wherever it goes, period.  I'm the one and CTA is the one who

23    brought this to the Court's attention, not counsel.  CTA

24    brought it to Judge Dow, and CTA brought it before you.

05:54:57   25    This process that he's just articulated, think about

1    what he's saying.  Cavelle is going to call my client, whoever

2    it is, and say:  Hey, what about this tampering thing?  Are you

3    sure you want to come to Chicago and testify under oath before

4    a magistrate judge as to this, that, or the other thing?

05:55:28    5    Then my client is going to talk to Cavelle, and then

6    Cavelle is going to talk to his lawyer.  Then I'm going to find

7    out after my client and Cavelle have conferred as to what's

8    happening.

9    My recommendation, Judge, is they disclose the name

05:55:43    10   now and you issue a bench subpoena or order him to be present

11   in court at a time and date certain.  We won't talk to him.

12   In-house counsel won't talk to him.  Plaintiff's counsel won't

13   talk to him, and Cavelle doesn't talk to him.  He comes in

14   clean and untainted, and he tells Your Honor what happened, if

05:56:06    15   anything.  The last thing we want is Cavelle getting involved

16   and conditioning this witness by this backroom channeling.

17   MR. SWEENEY:  I thought I was just following your

18   suggestion.

19   THE COURT:  Yes, I understand that.  Yes, I'm

05:56:26    20   concerned, and I don't want to put Mr. Cavelle in a compromised

21   position, either.  I didn't mean for him to be involved in

22   checking with the witness or anything like that.  That's not

23   going to help anybody.

24   So I am going to just -- we're just going to decide on

05:56:56    25   a date today.  We'll assume these witnesses can be present.

1    I'd like to get this done.  I'm out the last week of March.  I

2    think it would be best if we could get it done before that.

3              MR. KENNEDY:  The 18th, Your Honor?

4              THE COURT:  I'm looking at that.

05:57:46    5              MR. KENNEDY:  I'm going to lose my general counsel on

6    the 19th for about a week.

7              THE COURT:  Okay.

8              MR. KENNEDY:  I think it would be important for

9    general counsel to be present.

05:57:54   10              THE COURT:  Yes.  So why don't we do the 18th.  I

11   could do -- well, why don't we say -- oh, heck.  I guess I'll

12   just cancel that thing.  Why don't we say 9:30.

13              MR. KENNEDY:  Thank you, Judge.

14              MR. SWEENEY:  On the 18th?

05:58:31   15              THE COURT:  Yes.  No counsel and plaintiff are to have

16   contact with the following two witnesses.

17              MS. SEIMETZ:  Judge, what I would like to do, if I

18   have a name, somebody has to get this person over to court.

19              THE COURT:  Yes.

05:58:49   20              MS. SEIMETZ:  So with the Court's permission, I would

21   like to simply have my assistant call this person and, first of

22   all, make sure that person is not on vacation or on night shift

23   or something.  I don't know who it is, but that they're

24   available so that we can make arrangements to get them there.

05:59:17   25   I won't tell them necessarily why.  I'll just say:  An issue

1   has come up on a lawsuit involving CTA, and the judge would

2   like to speak with you.

3           That's all I'm going to say.

4           THE COURT:  Yes.

05:59:38   5   MS. SEIMETZ:  Do you think that's appropriate?

6           THE COURT:  Yes, and it will be two witnesses.

7           MS. SEIMETZ:  Okay.  I need to know both the names

8   then for availability.

9           THE COURT:  Okay.  So who are the two witnesses?

05:59:59   10  MS. SEIMETZ:  So can I get that?

11          MR. SWEENEY:  I will say the threatened witness is

12  George Mendenhall.

13          MS. SEIMETZ:  Okay.

14          MR. SWEENEY:  ▓▓▓▓▓▓▓▓▓  I think I know ▓ first

06:00:16   15  name, but I don't know his last name.

16          THE COURT:  Oh, dear.  What's the first name?

17          MS. BABBITT:  I can look and see if I have it in an

18  e-mail --

19          THE COURT:  Sure.

06:00:27   20  MS. BABBITT:  -- if you want to take a short break.

21          THE COURT:  Sure.

22       (Brief pause.)

23          MR. SWEENEY:  Can I make a quick phone call?

24          THE COURT:  Who are you calling?

06:02:27   25  MR. SWEENEY:  The client knows the name.  I don't know

1    the ▮▮▮▮▮▮▮ name.

2          THE COURT:  Yes, that's tricky.  Would you know who

3    this person's ▮▮▮▮▮▮ is?

4          MR. KENNEDY:  I'd have to check, Judge, or counsel

5    would have to check.

6          MS. SEIMETZ:  I don't even remember what department

7    Mr. Mendenhall is in.  Do you know?  Does anyone remember that?

8          THE COURT:  But we don't know if it's ▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮  do we?

10         MS. SEIMETZ:  And I also don't know -- I mean,

11   obviously, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so

12   I don't know if he's talking about a ▮▮▮▮▮▮▮▮▮▮ or

13   somebody that's --

14         THE COURT:  Right.

15         MS. SEIMETZ:  -- you know, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   It's very hard to know.

17         THE COURT:  Right.  Well, I don't want to do this

18   hearing without ▮▮▮▮▮▮▮▮

19         MR. SWEENEY:  Nor do we.

20         THE COURT:  Do we know ▮▮ first name?  ▮▮▮▮?

21         MR. SWEENEY:  No, I think it's ▮▮ or ▮▮.  I can't --

22   this is just my memory.

23         THE COURT:  Yes.

24         MR. SWEENEY:  I could find out pretty fast.

25         THE COURT:  Can you send your client a text and just

1    ask what is the witness -- you know, who threatened the

2    witness, and just not get into a big conversation with him?

3                MR. SWEENEY:  Sure.

4                THE COURT:  And the plaintiff will need to be here

06:05:21   5    that day as well.

6                MR. SWEENEY:  He's in Florida.  Could he participate

7    by phone?

8                THE COURT:  No, but it's a Monday if that helps.

9                I'm going to take a short break, and I'll be back to

06:05:46  10    try to sort out who this other person is.

11                MR. KENNEDY:  Thank you, Judge.

12                MS. BABBITT:  Thank you.

13                MR. SWEENEY:  Thank you, Your Honor.

14             (Recess.)

06:06:02  15                THE COURT:  We're back on the record.

16                MR. SWEENEY:  The other witness is ███████.

17                THE COURT:  Oh, good.

18                MR. SWEENEY:  I don't know how that's spelled.

19                THE COURT:  All right.  So we will meet at 9:30 on

06:06:19  20    March 18th.  The witnesses will be here.  No lawyer will have

21    contact with them.  The plaintiff will be here.  I have a 1:00

22    o'clock, so that's our timeline.  Okay?

23                MR. KENNEDY:  And Mr. Cavelle will have no contact

24    with Mendenhall or ███████.

06:06:39  25                THE COURT:  Plaintiff will not have any contact with

70

1  the other witnesses, plaintiff's counsel, defense counsel, and

2  general counsel, general counsel or your staff.

3      MS. SEIMETZ:  Right.  I'm just going to only make the

4  arrangements to make sure that they're --

06:07:01

5      THE COURT:  Yes, you're going to make sure they're

6  escorted and they know they have to be here.

7      MS. SEIMETZ:  Yes.

8      THE COURT:  And you can talk to your client, of

9  course.  Now, what if they're not available?

06:07:30

10     MS. SEIMETZ:  I'll have to find that out pretty

11  quickly when I get back to the office.

12     THE COURT:  Yes.

13     MS. SEIMETZ:  I'll advise counsel.

14     THE COURT:  So I guess if the witness is unavailable

06:07:40

15  you'll file some kind of motion, and we'll pick a new date.

16     MS. SEIMETZ:  Right.

17     THE COURT:  You'll get on the phone with my staff, and

18  we'll pick a new date.  Okay?

19     MS. SEIMETZ:  Well, I would say, you know, unless

06:08:03

20  somebody is on a vacation somewhere, they won't be not

21  available because of work commitments --

22     THE COURT:  Right.

23     MS. SEIMETZ:  -- because this is more important.

24     THE COURT:  Right.

06:08:17

25     MS. SEIMETZ:  But if they're already scheduled to be

1    out of the office or they're out of the country or something,

2    there's not much I can do about that.

3         THE COURT:  Right.

4         MR. SWEENEY:  Same rule for plaintiff, I assume?

06:08:38    5    THE COURT:  Yes, but let's hope he's available.

6         MR. SWEENEY:  Yeah, sure.

7         THE COURT:  All right.  See you soon.

8         MR. KENNEDY:  Thank you, Your Honor.

9         MR. SWEENEY:  Thank you.

06:08:46    10    MS. BABBITT:  Thank you.

11       (Proceedings concluded.)

12                    C E R T I F I C A T E

13           I, Patrick J. Mullen, do hereby certify that the
     foregoing is an accurate transcript produced from an audio
14   recording of the proceedings had in the above-entitled case
     before the Honorable MARY R. ROWLAND, one of the magistrate
15   judges of said court, at Chicago, Illinois, on March 7, 2019.

16                         /s/ Patrick J. Mullen
                           Official Court Reporter
17                         United States District Court
                           Northern District of Illinois
18                         Eastern Division

19

20

21

22

23

24

25