**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE CAVELLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:17-cv-5409 |
| v. | ) | |
| | ) | Jury Trial Demanded |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| and DORVAL R. CARTER, JR, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, George Cavelle ("Cavelle"), through his undersigned attorneys, for his complaint against Defendants, Chicago Transit Authority (the "CTA"), and Dorval R. Carter, Jr. ("Carter"), states as follows:

**Introduction**

1.     This action arises out of the malicious and intentional conduct of the CTA's president Dorval Carter, Jr. who set out to ruin Cavelle's life and career prospects. During nearly 20 years of dedicated and faithful service to the CTA, Cavelle was a model employee who rose through the ranks from an entry-level worker responsible for rail car repairs and maintenance to become Chief Transit Operating Officer at the CTA. Despite his excellent track record and the myriad contributions he made to the CTA during his tenure, Cavelle's career came to an abrupt and unceremonious end in August 2015, almost immediately after Carter became President of the CTA. Cavelle's was a political casualty of the new Carter regime, but the injury became far more serious thereafter.

2.     Beyond forcing Cavelle's resignation at the CTA, Carter and the CTA set out to interfere with and ultimately ruin Cavelle's reputation and ability to earn a living

in the transit industry by publicizing falsehoods about his character and trustworthiness, his ability to meet the demands of his chosen profession, and the basis for his forced resignation at the CTA. In particular, in August 2016—a year after his resignation—Cavelle was offered and accepted a position with King County Metro Transit, the transit agency serving the Seattle, Washington area. Upon hearing the news of Cavelle's hiring, Carter, using his contacts and influence in the transit industry, sought out and informed high-ranking members of King County Metro Transit that Cavelle had been fired for stealing from the CTA—an intentionally and demonstrably false statement. Upon hearing from Carter as President of the CTA, King County Metro Transit informed Cavelle that its offer of employment was being rescinded. Cavelle has been unable to secure a position with the same compensation package as the King County Metro Transit position since Carter's and the CTA's false statements about Cavelle.

3.      As outlined more fully below, Defendants' conduct was intentional, malicious, and without justification. Cavelle seeks damages, including punitive damages, through this action.

## The Parties, Jurisdiction, and Venue

4.      George Cavelle is a citizen of the State of Florida.

5.      The CTA is a municipal corporation organized under the laws of the State of Illinois with its principal place of business in Cook County, Illinois.

6.      Carter is the president of the CTA and a citizen of the State of Illinois.

7.      This Court has original jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.     Venue is proper in this Court under 28 U.S.C. § 1391 because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred.

## Cavelle's Employment History with the CTA

9.     Cavelle began his career with the CTA over twenty years ago, in 1996, working in the Rail Maintenance department maintaining rail cars and other vehicles and assisting with operations. Though hard work, dedication, and self-sacrifice, Cavelle ascended the ranks within the CTA, despite the turbulence and uncertainty of approximately seven regime changes that inevitably followed the different political figures and administrations that ran and controlled the CTA.

10.     In 2015, Cavelle was promoted to Chief Transportation Operations Officer by then CTA president Forest Claypool ("Claypool"). Cavelle was promoted ahead of many more senior candidates who were connected to the CTA's former leadership before Claypool became president. Cavelle's promotion, although meritorious, did not please senior members who had worked either with or directly for Mr. Carter in his previous time at the CTA.

11.     The Claypool administration was known as a no-nonsense administration. Claypool launched various initiatives to clean up the CTA both operationally and fiscally. Numerous CTA employees who failed to show for work, violated safety standards or generally broke the rules were fired on Claypool's watch. In fact, between 2011 and 2014, the Claypool administration dismissed approximately 900 CTA employees.

12.     Cavelle's mandate from the Claypool administration was to bring efficiency, fiscal discipline, and budgetary restraint to CTA transit operations, a charge

he took seriously and pursued vigorously. Cavelle's decisions and initiatives, though financially beneficial for the CTA, caused internal upheaval and abandoned many decades-old institutionalized inefficiencies that Cavelle identified within the CTA.

### Regime Change at the CTA and Cavelle's Forced Resignation

13. In April of 2015, Claypool left the CTA to become Mayor Rahm Emanuel's Chief of Staff. Shortly thereafter, Carter was installed as Claypool's successor. Carter joined the CTA from the Department of Transportation in Washington D.C., although he had worked at the CTA for many years before he joined the Department of Transportation and was thus no stranger to the CTA or its internal politics.

14. Upon his return to the CTA, Carter was not shy about reshuffling the ranks—demoting or promoting certain personnel as he saw fit—in order to insure that his administration was staffed with individuals that were loyal to him, that he could trust, and spoke favorably of his management style and leadership experience.

15. Cavelle did not fit Carter's bill and was an early political casualty of the Carter administration. Specifically, in August 2015, Carter's Chief of Staff, Sylvia Garcia ("Garcia"), and CTA counsel, Brad Jansen ("Jansen"), summoned Cavelle to Carter's office and informed him—without any prior notice and for no stated reason—that he was being removed from his position as Chief Transportation Operating Officer, effective immediately.

16. Cavelle advised Garcia that he had been employed by the CTA for 19.5 years and that his separation before 20 years of service could have a significant, adverse impact on his pension benefits, which he had worked very hard to earn. In order to avoid

that scenario, Cavelle advised that he was willing to work in a maintenance facility or take a demotion in order to stay affiliated with the CTA and to prove his value to the CTA. Cavelle stated that he was aware that this accommodation had been made for several other high-ranking personnel in the past and that he had knowledge of it because in some cases he was instructed to facilitate the accommodation.

17.     Garcia denied the request and advised Cavelle that his separation from the CTA needed to be finalized that day and that he needed to leave the CTA premises immediately. Cavelle was nonetheless advised that he could refer to his departure from the CTA as a resignation.

18.     Recognizing the inequities of the situation, the CTA's Director of Security, James Keating ("Keating") said there was no need for Cavelle to be marched out of the building during work hours. Garcia was nevertheless adamant that Cavelle be walked out of the building to the point of aggressively debating the issue with Keating.

19.     In order to avoid publicly humiliating Cavelle, Keating offered to return with Cavelle the next day, a Saturday, to permit Cavelle to gather his personal effects and allow for a more reasonable and dignified departure.

20.     Garcia relented. The parties agreed that Cavelle would tender his resignation that day and return the following day in order to pack his personal effects and leave the building under security escort.

21.     Shortly after Cavelle tendered his resignation, Carter immediately and publicly announced Cavelle's separation and thanked Cavelle for his years of service and dedication to the CTA.

22.     The following day, Saturday, August 29, 2015, Cavelle returned to the CTA as promised with his assistant and Keating. They moved as much of Cavelle's personal files and effects, which had accumulated over 19 plus years, as they could into boxes and packed those boxes into Cavelle's car and his assistant's car. Cavelle inauspiciously departed the building saying goodbye only to Keating and his assistant.

23.     Cavelle did not make specific plans with his assistant to get his personal effects out of her car, but he informed her that he was going to a friend's house in Fox Lake to reflect on what had happened, clear his mind, and plan a path forward.

24.     Cavelle left for Fox Lake the following day.

## The Holiday Train Fund

25.     Several days after his resignation from the CTA, Cavelle received a call from his assistant on his cell phone. She advised him that "they" were looking for the Holiday Train Fund file but could not locate it.

26.     The Holiday Train Fund was an annual fundraiser run by the CTA employees to support a small charitable cause. Employees at the CTA typically collected a few thousand dollars in cash and checks. The fund was generally maintained in its own account, but due to a transition between banks was being kept in a file in Cavelle's office at the time of his resignation.

27.     Cavelle told his assistant where he believed the Holiday Train Fund file was located. She advised him that it was not in the file cabinet. Cavelle told her it could have been inadvertently removed while they were boxing his personal effects and loading them into their cars.

28.     Cavelle asked her to look in the materials in her car and he would do the same when he returned that weekend, as the boxes had been hurriedly stored before he left for Fox Lake.

### The CTA Creates and Publishes a Wanted Poster

29.     Cavelle's assistant called again shortly thereafter and told Cavelle that the search for the Holiday Train Fund was becoming "more serious." Cavelle, in utter disbelief, said he would cut his trip short, return to Chicago, and see if the Holiday Train Fund was among the personal effects and files in the boxes he had stored.

30.     What Cavelle did not know at the time—and only discovered in February 2017—was that by August 28, 2015, the CTA had created a fugitive-style "wanted" poster featuring a black and white photograph of Cavelle, and posted them all over CTA property (the "Wanted Poster").

31.     The Wanted Poster states in large bold font at the top, "CTA SECURITY LOOKOUT BULLETIN," "Law Enforcement Use Only, Not for Media," and "DISMISSED EMPLOYEE."

32.     The Wanted Poster includes a photograph of Cavelle and it states below the photo: "THE ABOVE INDIVIDUAL IS A RECENTLY DISMISSED CTA EMPLOYEE. IF HE IS OBSERVED ON CTA PROPERTY, CONTACT CTA SECURITY SERVICES AT (312)***-****.  THIS IS FOR INFORMATIONAL PURPOSES ONLY."

33.     The poster says, in large capital letters on the bottom border, "CONTACT PUBLIC TRANSPORTATION 24 Hr. HOTLINE 312-745-4443.  NOTIFY JIM HIGGINS @ CELL (773) 820-1019." (A copy of the Wanted Poster is attached as Exhibit A.)

34.     Cavelle was advised that the posters were put up throughout the interior of the CTA building, outside the CTA building, and at various depots and other CTA facilities where Cavelle did not have regular contact, nor access after August 28, 2015.

35.     On information and belief, CTA does not create and post signage like this for employees unless there is a risk of violence or other potential criminal activity by the separated employee against staff or property.

36.     Nonetheless, following the calls regarding the Holiday Train Fund, Cavelle and a friend dug through the boxes. They located the Holiday Train Fund file that evening. Cavelle notified Karen Siementz, Carter's General Counsel, that the file had been mistakenly removed but that everything was intact and that he would drop it off at the CTA the very next morning.

37.     As promised, on September 1, 2015, Cavelle met Siementz and the general manager of Payroll, Linda Davis, the next morning on a loading dock at the CTA, as directed, and gave Siementz the Holiday Train Fund file.  Siementz thanked Cavelle and stated, "Thank you George, just hang in there everything will work out", after which both Ms. Siementz and Ms. Davis gave Mr. Cavelle a hug goodbye, and nothing further was said about the matter.

**Carter Defames Cavelle to Former CTA President**

38.     Two days after Cavelle returned the Holiday Train Fund file to the CTA, Carter reached out to former CTA President Frank Kruesi about Mr. Cavelle.

39.     In the September 3, 2015 email, Carter wrote to Kruesi from his CTA email account, "FYI. Had the head of operations resign on Friday. Found out today that

he stole $6,100 from the account that funds the holiday train! Definitely made the right

move." (A copy of the September 3-5, 2015 email chain is attached as Exhibit B.)

40.     On September 5, 2015, Kruesi responded to Carter and stated, "Is this

Buford, the guy who came up from nowhere, or Cavelle, the supposed FBI guy? What's

your follow-up for this guy? If you know that he took $6,100, I'd bet two things: that's

not all he took and you're not the only one who knows about it. Act accordingly… It is

good that you're getting folks you can rely on in the key positions: that will ensure that

you're the guy actually running the place, and that people know it. That makes things

easier all around." (Ex. B)

41.     That evening Carter wrote back to Kruesi and stated:

> Buford was the FBI guy who was made VP over transit operations with no
> experience. We let him go on Thursday. Cavelle was the guy who went
> from a Maintenance manager to head of Ops in like 18 months. Came to
> find out after he left that his entire personal life is falling apart seriously
> heavy drinking [sic.], possible drug use and recently separated from his
> wife [sic.]. His friends are about to do an intervention to try to get him
> help. In any event I'm glad we got him out of CTA. I am looking deeper
> into what he was up to during his time at CTA. He has paid us back the
> $6100 apparently by borrowing money from his friends here at CTA….
> Things are starting to come together as I build a team that I can trust.
> Thanks again for the advice." (Ex. B)

**Cavelle Lands a Job with King County Metro Transit**

42.     Over the course of the next several months, Cavelle set out to find new

employment with transit agencies throughout the country. With the assistance of an

employment placement firm he was introduced to the transit agency for the Seattle area,

King County Metro Transit, located in the State of Washington.

43.     Cavelle was extensively vetted through multiple rounds of interviews and

selection procedures, culminating in King County Metro Transit offering Cavelle the

position as Vehicle Maintenance Manager, a position in which he would oversee 1,500 transit coaches, and 550 non-revenue support vehicles.

44.     Cavelle countered King County Metro Transit's offer seeking better compensation. King County Metro Transit agreed to Cavelle's demand and offered Cavelle the position on August 3, 2016.  In response to Cavelle accepting the position, the Deputy General Manager for King County, Nancy Grennan ("Grennan"), wrote to Cavelle and said, "Whoohoo! Great news. We can recommend some realtors.  We have the hope you can have some time to work a little bit with John Alley, our outgoing VM head . . . Yeah! . . . And let us know that start date. People here are too excited for words, so this will be great news." *Id.* (August 3, 2016 email from N. Grennan to G. Cavelle, attached as Exhibit C.)

45.      On August 5, 2016, King County issued a press release announcing that the Vehicle Maintenance Head, John Alley, was retiring and that Cavelle, formerly with the Chicago Transit Authority, was assuming Alley's position. (*See* King County Metro Transit Press Release dated August 5, 2016, attached as Exhibit D.)

**Carter Contacts King County and Interferes with Cavelle's Contract**

46.     On August 9, 2016, a low level manager at CTA forwarded language from the King County Metro Transit press release very early in the AM to Donald Bonds, then Chief Transit Officer, and David Kowalski, special advisor to the President, at CTA. The language of the press release was then sent to the Chief of Staff, Garcia, from two separate sources later that morning.  By noon, the same day, President Carter had reached out to representatives in Seattle to discuss Cavelle's hiring.

47.     Using his influence and contacts in the transit industry, Carter contacted the chief executives at Sound Transit and King County Metro Transit.

48.     Carter told them that Cavelle had misappropriated funds, and after learning that the funds were missing, Cavelle was asked to repay the funds which he eventually did.

49.     Carter told them that Cavelle had been involved in improper relationships with female employees who were direct reports.

50.     According to the General Manager at King County Metro Transit, Robert Gannon, Carter created the impression that Cavelle was asked to leave or be terminated under a cloud of suspicion.

51.     Carter advised Gannon that Cavelle could not reapply for employment with the CTA, which is not true, and further, that if Carter was in Gannon's position, he would not hire Cavelle.

52.     The following day, on August 10, 2016, Grennan informed Cavelle that King County was rescinding its offer of employment

53.     Cavelle was in disbelief. He had already started making plans to move out to Seattle and taking steps to transition and could not understand why in the course of seven days King County Metro Transit would completely reverse itself.

54.     Grennan pressed Cavelle why he actually left the CTA. Cavelle reiterated, as he had stated in his initial interview, that there was a change of leadership, and that the new president wanted his own administration and his own people in the C-Suite positions. Cavelle reiterated that he was told there was going to be a change of direction and he was allowed to resign.

55. Grennan then asked Cavelle, "Are you sure you weren't fired for stealing from the Holiday Fund?" Cavelle met this inquiry with disbelief. He pointed out that it was completely inaccurate and that he had an email from Carter announcing his resignation and congratulating him on his years of service. Cavelle relayed all of the circumstances surrounding his departure and the Holiday Train Fund—a complete non-event.

56. Grennan asked Cavelle if he still had and could send the email from Carter announcing his resignation, so she could show it to decision-makers at King County Metro Transit.

57. Cavelle immediately forwarded Carter's email announcing Cavelle's resignation. Cavelle then wrote to Grennan and stated, "I have never done anything to or mislead the people that work for me or the City of Chicago. I have given 20 years of dedicated service which included hours and days of volunteer work for the Holiday train and its employees." (*See* August 10, 2016 email chain attached as <u>Exhibit E</u>.)

58. Cavelle acknowledged that his initiatives at the CTA may have ruffled some feathers, "I cannot answer as to why hateful people do what they do and as stated in my interview I did not make everyone happy with the changes I knew had to be made," but insisted that he would always "be dedicated and an honest servant for the people I provide service for." (*<u>Id</u>*.)

59. Several hours later, Grennan wrote back to Cavelle and said, "George, This email is to confirm King County Metro has withdrawn its offer of employment." Grennan informed Cavelle that the following press release would issue internally at King County Metro Transit and solicited any changes he might have, "Unfortunately, we were not able

to secure George Cavelle as our next Vehicle Maintenance Manager, leaving us with the position vacant at the end of the month. To help aid the transition, we are commencing with an internal special duty recruitment while we retool our recruitment processes for the future." (*Id.*)

60.     Cavelle told Grennan how devastating this development was given he had accepted the offer and taken countless steps, including resigning from his current employment in order to accept the position at King County Metro Transit.

61.     Cavelle persisted and asked Grennan what was said that could have caused this reversal. Grennan told Cavelle that Carter himself called and advised the management team at King County Metro Transit that Cavelle had been terminated for stealing from the Holiday Train Fund. According to Grennan, Carter made no mention of Cavelle's resignation or the fact that Carter had sent around a well wishes email for Cavelle.

62.     Grennan indicated to Cavelle that is why she wanted to see the email, as it was completely inconsistent with the picture that Carter had painted for the management team at King County Metro Transit.

63.     Cavelle told Grennan the information was absolutely false and asked if there was anything further he could do or anyone he could speak to about the situation. Grennan told Cavelle that under the circumstances, and given what Carter said, King County Metro Transit could not move forward with his candidacy.

**COUNT I**
**(Tortious Interference with Business Expectancy/**
**Prospective Economic Advantage)**

64.     Plaintiff repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65.     Plaintiff had a reasonable expectation of entering into a valid business relationship with King County Metro Transit.

66.     Defendants knew of Plaintiff's expectancy when they reached out to multiple King County Metro Transit representatives on multiple occasions after King County issued its press release that Cavelle had been hired and would be replacing John Alley.

67.     Defendants purposefully and intentionally interfered with Plaintiff's legitimate expectancy by making false statements about Cavelle as identified above.

68.     Defendants' conduct prevented Plaintiff's legitimate expectancy from ripening into a valid business relationship.

69.     Plaintiff has been damaged in his loss of the King County Metro Transit job and damage to his reputation, resulting from Defendants' interference.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## COUNT II
### (Tortious Interference with Contract)

70.     Plaintiff repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

71.     King County Metro Transit made an offer of employment to Plaintiff and Plaintiff accepted that offer on August 3, 2016.

72.     Defendants became aware of Plaintiff's contract following King County Metro Transit's press release on August 5, 2016.

73.     Defendants intentionally induced a breach and termination of the contract between Plaintiff and King County Metro Transit by King County Metro Transit.

74.     The breach by King County Metro Transit was caused by Defendants' unlawful conduct and false statements surrounding Cavelle, his character, and his separation from CTA.

75.     Plaintiff has been damaged as a direct and proximate result of Defendants' interference.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## COUNT III
### Defamation *Per Se*

76.     Plaintiff repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

77.     On or around September 3 and 5, 2015, Defendants made the false statements contained in Ex. B to this First Amended Complaint to the former President of the CTA.

78.    On or around August 9, 2016, Defendants made false statements about Plaintiff to individuals at King County Metro Transit and Sound Transit accusing Plaintiff of criminal activity, improper relationships with female direct reports, telling King County Metro Transit officials that Cavelle could not reapply for employment with CTA, otherwise misleading King County and Sound Transit officials with respect to Cavelle's separation form CTA, and for those other false statements detailed above and incorporated herein.

79.    Defendants knew at the time they made the statements that they were false.

80.    The statements made by Defendants impute the commission of a criminal offense to Plaintiff.

81.    The statements made by Defendants impute an inability to perform or want of integrity in the discharge of the duties of Plaintiff's office or employment.

82.    The statements made by Defendants prejudice Plaintiff, or impute a lack of ability, in his trade, profession, and business.

83.    The statements made by Defendant have caused Plaintiff damage is his business and profession, and specifically caused the loss of the job with King County Metro Transit.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## COUNT IV
## Defamation *Per Quod*

84. Plaintiff repeats and realleges paragraphs 1-63 as if fully set forth herein.

85. On or around September 3 and 5, 2015, Defendants made the false statements contained in Ex. B to this First Amended Complaint to the former President of the CTA.

86. On or around August 9, 2016, Defendants made false statements about Plaintiff to individuals at King County Metro Transit and Sound Transit accusing Plaintiff of criminal activity, improper relationships with female direct reports, telling King County Metro Transit officials that Cavelle could not reapply for employment with CTA, otherwise misleading King County and Sound Transit officials with respect to Cavelle's separation form CTA, and for those other false statements detailed above and incorporated herein.

87. Defendants knew at the time they made the statements that they were false.

88. The statements made by Defendants impute the commission of a criminal offense.

89. The statements made by Defendants impute an inability to perform or want of integrity in the discharge of the duties of Plaintiff's office or employment.

90. The statements made by Defendants prejudice Plaintiff, or impute a lack of ability, in his trade, profession, and business.

91. The statements made by Defendant have caused Plaintiff damage is his business and profession, and specifically caused the loss of the job with King County Metro Transit.

- 17 -

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## COUNT V
## False Light

92. Plaintiff repeats and realleges paragraphs 1-63 as if fully set forth herein.

93. On or around September 3 and 5, 2015, Defendants made the false statements contained in Ex. B to this First Amended Complaint to the former President of the CTA.

94. On or around August 9, 2016, Defendants made false statements about Plaintiff to individuals at King County Metro Transit and Sound Transit accusing Plaintiff of criminal activity, improper relationships with female direct reports, telling King County Metro Transit officials that Cavelle could not reapply for employment with CTA, otherwise misleading King County and Sound Transit officials with respect to Cavelle's separation form CTA, and for those other false statements detailed above and incorporated herein.

95. Defendants knew at the time they made the statements that they were false.

96. The statements made by Defendants impute the commission of a criminal offense.

97. The statements made by Defendants impute an inability to perform or want of integrity in the discharge of the duties of Plaintiff's office or employment.

98.     The statements made by Defendants prejudice Plaintiff, or impute a lack of ability, in his trade, profession, and business.

99.     The statements made by Defendant have caused Plaintiff damage is his business and profession, and specifically caused the loss of the job with King County Metro Transit.

100.    That statements made by Defendants are highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

101.    Defendants made the statements to Kruesi and the individuals in Seattle with reckless disregard as to their offensiveness, and even now cannot establish where Defendants gained the information published, nor whether it is true.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues and claims so triable under the Constitution of the United States of America, the Constitution of the State of Illinois, and and/or any applicable statute.

Dated: February 27, 2019

Respectfully submitted,

GEORGE CAVELLE

By:_____

Robert D. Sweeney
John J. Scharkey
Sweeney & Scharkey LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
Tel. (312) 384-0500

*Counsel for Plaintiff George Cavelle*

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues and claims so triable under the Constitution of the United States of America, the Constitution of the State of Illinois, and/or any applicable statute.

Dated: July 9, 2019

Respectfully submitted,

GEORGE CAVELLE

By:    /s/ Garrett H. Nye
       Robert D. Sweeney
       John J. Scharkey
       Garrett H. Nye
       Sweeney, Scharkey & Blanchard, LLC
       111 W. Washington St.
       Burnham Center
       Suite 1160
       Chicago, Illinois 60602
       Tel. (312) 384-0500

       *Counsel for Plaintiff George Cavelle*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing to be filed with the Clerk of Court using

the Court's ECF/CM filing system which will send notice of this filing to all parties of record.

Dated: July 9, 2019                    By: <u>    /s/ Garrett H. Nye                    </u>
                                       Garrett H. Nye
                                       Sweeney, Scharkey & Blanchard, LLC
                                       111 W. Washington St.
                                       Burnham Center
                                       Suite 1160
                                       Chicago, Illinois 60602
                                       Tel. (312) 384-0500

                                       *Counsel for Plaintiff George Cavelle*

EXHIBIT A

## SECURITY

cta

# LOOKOUT BULLETIN
# INFORMATION

Law Enforcement Use Only- Not for Media

# DISMISSED EMPLOYEE



**DATE:** Aug 28, 2015    **TIME:** 19:30 Hrs    **RD#:** Info. Only

**LOCATION:** CTA

THE ABOVE INDIVIDUAL IS A RECENTLY DISMISSED CTA EMPLOYEE. IF HE IS OBSERVED ON
CTA PROPERTY, CONTACT CTA SECURITY SERVICES AT (312) 681-2911. THIS IS FOR
INFORMATIONAL PURPOSES ONLY.

**CONTACT PUBLIC TRANSPORTATION 24 Hr. HOTLINE 312-745-4443**
**NOTIFY JIM HIGGINS @ CELL: (773) 820-1019**

EXHIBIT B

| | |
|---|---|
| **From:** | Carter, Dorval [/O=CTA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DCARTER] |
| **Sent:** | 9/5/2015 6:42:33 PM |
| **To:** | kruesi@aol.com |
| **Subject:** | Re: Update |

Buford was the FBI guy who was made VP over transit operations with no experience. We let him go on Thursday. Cavelle was the guy who went from a Maintenace manager to head of Ops in like 18 months. Came to find out after he left that his entire personal life is falling apart seriously heavy drinking, possible drug use and recently separated from his wife. His friends are about to do an intervention to try to get him help. In any event I'm glad we got him out of CTA. I am looking deeper into what he was up to during his time at CTA. He has paid us back the $6100 apparently by borrowing money from his friends here at CTA. I am doing my due diligence on Robert and his time at MTA. Including talking to John Porcari who he worked for during his first stint at MTA. After talking with him this week I do believe he has toughened up since his previous stint here. We will see if anything comes up through the vetting. Things are starting to come together as I build a team that I can trust. Thanks again for the advice.

As an aside northerly island opened up this week. Lots of praise for RMD for shutting down Miegs and turning the airport into a park from both Rahm and Durbin! Unfortunately RMD was unable to attend the event.

Sent from my iPhone

On Sep 5, 2015, at 11:05 AM, "kruesi@aol.com" <kruesi@aol.com> wrote:

> Dorval,
> Is this Buford, the guy who came up from nowhere, or Cavelle, the supposed FBI guy?
> What's your follow-up for this guy? If you know that he took $6100, I'd bet two things: that's not all he took and you're not the only one who knows about it. Act accordingly.
> I liked Robert, although I thought he was weak, i.e.,he got run over by the Mooney crowd. If his experience has made him tougher, he'd be good for you. You definitely will want to find out the real story behind why he left Maryland.
> It is good that you're getting folks you can rely on in the key positions; that will ensure that you're the guy actually running the place, and that people will know it. That makes things easier all around.
> You definitely need to get some intellectual horsepower back in key spots, to reverse the dumbed-down management environment.
> Best,
> Frank

> -----Original Message-----
> From: Carter, Dorval <d2580carter@transitchicago.com>
> To: Frank Kruesi <kruesi@aol.com>
> Sent: Thu, Sep 3, 2015 7:20 am
> Subject: Update

> Frank,

> FYI. Had the head of operations resign on Friday. Found out today that
> he stole $6100 from the account that funds the holiday train! Definitely
> made
> the right move. Also moved the guy running Safety who had no transit
> background
> out of his position. Made Ron Ester acting and have interviewed the head of
> Safety at MARTA who used to work at CTA last week who is interested in
> comments
> by back and would be a good fit. I also interviewed Robert Smith for the head
> of

Ops position yesterday. He has left the position as head of Maryland MTA and is
interested in working for me. He knows CTA (you may recall he was our VP of Bus
Ops) and has developed significant experience in the industry since his time at
CTA.  He may be a good replacement . Things are starting to move.

Dorval

Sent from my iPhone

EXHIBIT C



**From:** **Buonanno Grennan, Nancy**  Nancy.BuonannoGrennan@kingcounty.gov
**Subject:** Re: Formal Offer
**Date:** August 3, 2016 at 2:38 PM
**To:** George Cavelle  georgecavelle@gmail.com

Whoohoo! Great news. We can recommend some realtors. We have the hope you can have some time to work a little bit with John Alley, our outgoing VM head. His last day is 8/31 but I am going to see if he will extend 1 more week. In any event, I will let you know- if we can get you here sooner, we would love that but can live with the first full week of September.

Yeah!

Sent from my iPhone

On Aug 3, 2016, at 11:31 AM, George Cavelle <georgecavelle@gmail.com> wrote:

> Nancy
>
> Thank you for the consideration...I guess the only other question I have is...Do you know any good Realtors?...Looks like I'm moving to Seattle. Very excited to be on the team. As far as a start date, I will have to give at least two weeks notice so that I can close out and or hand off the operations of my current employer to my replacement, since it is already August 3rd I will probably need until the first full week in September, that is as long as everything goes smoothly on my end, that would put me at starting the week of September 4th. Let me know if thats conducive to your timeline, obviously if you need me there sooner I will make the necessary arrangements to be there. Additionally if in fact my current employer is not in need of a full two weeks I can notify you as such and possibly start earlier. Again I feel honored to have been selected to be on the team and I can't wait to get started.
>
>
> On Aug 3, 2016, at 10:57 AM, Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov> wrote:
>
> Because of the way the salary schedule works, let's start you at Step 10 (your position progresses on the even number steps). The down side – you don't get a bump at 6 months but the plus side, you get that extra money from day 1. If that is a deal, we get you a letter confirming our offer and your acceptance at step 10! And, let us know the start date. People here are too excited for words, so this will be great news.
>
> **From:** George Cavelle [mailto:georgecavelle@gmail.com]
> **Sent:** Wednesday, August 03, 2016 7:47 AM
> **To:** Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov>
> **Subject:** Fwd: Formal Offer
>
> Nancy
>
> First and foremost, thank you for the honor of receiving this offer. I am very excited to join the team. However would it be possible to start me out at step nine then in six months raise me to the step 10 level for the top dollar amount that was mentioned in the original offer letter. Other than that everything else seems reasonable and again I appreciate all of your time and the opportunity to be a part of an incredible organization like King County.
>
>
>
> Begin forwarded message:
>
> **From:** "Eddy, Susan" <Susan.Eddy@kingcounty.gov>
> **Subject:** **Formal Offer**

**Date:** August 2, 2016 at 4:00:14 PM EDT
**To:** George Cavelle <<u>georgecavelle@gmail.com</u>>
**Cc:** "Buonanno Grennan, Nancy"
<<u>Nancy.BuonannoGrennan@kingcounty.gov</u>>

George,

Attached please find an electronic copy of your formal offer, if you have questions, please let us know.

susan eddy | sphr | shrm-scp
special projects manager II
department of transportation | transit division
ph: 206-477-6003| fx: 206-263-5202
<u>susan.eddy@kingcounty.gov</u>

EXHIBIT D

# GOVERNMENT*FLEET

MANAGING PUBLIC SECTOR VEHICLES & EQUIPMENT

## Alley to Retire From King County Metro

August 05, 2016

John Alley has announced he will retire from King County Metro Transit in Seattle, Wash., on Aug. 31, ending 50 years of service in the fleet industry. Alley is the transit agency's vehicle maintenance manager. George Cavelle, with Chicago Transit Authority, will be replacing Alley.



Vehicle Maintenance oversees nearly 1,500 transit coaches, 550 non-revenue support vehicles, seven maintenance operations bases, a component supply center, fleet procurement, fleet engineering and training, and data management. Vehicle Maintenance employs more than 750 professional staff and support personnel and has an annual operating budget of more than $135 million and an annual procurement budget of more than $130 million.

Alley previously served as deputy director of the City of San Diego, Calif., Fleet Services Division. In that position, he oversaw a fleet consolidation that included more than 4,000 vehicles. He also worked as the San Diego Police Department fleet administrator and has also worked with the Washington State Patrol and the Washington State Department of Transportation.

Alley's awards include the 2010 *Government Fleet Magazine* Public Sector Fleet Manager of the Year, NAFA's Larry Goill Award in 2009, and the San Diego Taxpayer Association's Golden Watchdog Award in 2009. He was recently inducted into *Government Fleet Magazine's* Public Fleet Hall of Fame.

Alley and his wife Betty plan to spend time with family and on hobbies.

Related: Sarasota County Fleet Manager to Retire

Copyright © 2016 Government Fleet. All Rights Reserved.

EXHIBIT E

From: **Buonanno Grennan, Nancy** Nancy.BuonannoGrennan@kingcounty.gov
Subject: RE: Email From Dorval Carter
Date: August 10, 2016 at 1:23 PM
To: George Cavelle georgecavelle@gmail.com



George,

This email is to confirm that King County Metro has withdrawn its offer of employment. To make this easiest, we will announce this to the organization as follows:

Unfortunately, we were not able to secure George Cavelle as our next Vehicle Maintenance Manager, leaving us with the position vacant at the end of the month. To help aid the transition, we are commencing with an internal special duty recruitment while we retool our recruitment processes for the future. Thanks to everyone who participated in the process.

Let me know if you have any changes you would like us to make to that.

Nancy


-----Original Message-----
From: George Cavelle [mailto:georgecavelle@gmail.com]
Sent: Wednesday, August 10, 2016 8:22 AM
To: Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov>
Subject: Email From Dorval Carter

Nancy


Please see attached as explained. Additionally let me be perfectly clear, I have never done anything to hurt or mislead the people that work for me or the City of Chicago. I have given 20 years of dedicated service which included hours and days of volunteer work for the Holiday train and its employees. I cannot answer as to why hateful people do what they do and as stated in my interview I did not make everyone happy with the changes I knew had to be made, that being said, all I can say is that I have, am and always will be a dedicated and an honest servant for the people I provide service and work for.