# EXHIBIT B

FIRM ID  40190

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION**

FILED
8/13/2018 4:12 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2016D003534

FILED DATE: 8/13/2018 4:12 PM    2016D003534

IN RE: THE MARRIAGE OF:   )
           )
JENNIFER M. CAVELLE,   )
n/k/a JENNIFER SAWKA   )
           )
  Petitioner,      )
           )
  and        )  Case No. 16 D 003534
           )
GEORGE R. CAVELLE,   )
           )
  Respondent.     )

**PETITION TO ENFORCE OR, ALTERNATIVELY,**
**TO MODIFY JUDGMENT**

   Pursuant to 750 ILCS 5/501, 750 ILCS 5/502(e); 750 ILCS 5/508(b) and 735 ILCS 5/2-1401, Jennifer Cavelle n/k/a Jennifer Sawka ("Jennifer") hereby petitions this honorable Court to enforce or, alternatively, to modify the Judgment for Dissolution of Marriage ("Judgment") entered in this matter on August 22, 2017. In support of this Petition, Jennifer states as follows:

<u>COUNT I</u>

<u>**Enforcement of the Judgment.**</u>

   1.  On August 22, 2017, this Court entered its Judgment for Dissolution of Marriage ("Judgment") which incorporated the parties' Marital Settlement Agreement ("MSA,") submitted herewith as Exhibit A.[1]

---

[1] The MSA, Exhibit A hereto, will be presented to this Court for its *in camera* review. The MSA and the Judgment are sometimes collectively referred to herein as "the Judgment."

FILED DATE: 8/13/2018 4:12 PM    2016D003534

2.      As set forth in the Paragraph 6.E. of the MSA, "Each party **represents and warrants** that as of the date of this Agreement, neither he nor she has an interest in any marital asset, excluding furniture, furnishings, jewelry and other personal items of property, all of which having been previously disclosed, (hereinafter collectively referred to as "Disclosed Personal Property"), **which is not specifically set forth and allocated** in the Agreement." (Emphasis added.) Despite this clear representation and warranty, Respondent George Cavelle ("George") intentionally failed to disclose a material asset which was not "specifically set forth and allocated" in the MSA. In fact, it was an asset which – prior to the entry of the Judgment – George himself valued at "in excess of $5 million."

3.      On July 24, 2017, George filed a tortious interference and defamation action seeking damages against his former employer, the Chicago Transit Authority, in the United States District Court for the Northern District of Illinois (collectively, "the Defamation Action").    That matter is entitled *George Cavelle v. Chicago Transit Authority, Dorval R. Carter, Jr., individually, John Doe 1 and John Doe 2*, Case No. 17 CV 05409, and it remains pending and unresolved. (*See* Ex. B.)  Among other things, the Defamation Action seeks damages in excess of $5,000,000.

4.      On information and belief, there are negotiations in process in the Defamation Action, pursuant to which George is expected to receive a substantial settlement payment.  Because this cause of action arose during the

FILED DATE: 8/13/2018 4:12 PM    2016D003534

marriage, and, in fact, was filed prior to the entry of the Judgment herein, it is a marital asset which George should have expressly disclosed to be allocated under the terms of the MSA. (*See, e.g., In re Marriage of Rivera*, 2016 IL App (1st Dist.) 160552, ¶¶ 38 to 40, 409 Ill. Dec. 103, 113, 67 N.E.3d 315, 325.)    The MSA, however, makes no reference whatsoever to the Defamation Action.

5.    At the time George filed the Defamation Action on July 24, 2017, he was still in the process of editing the MSA. In fact, George's attorney sent Jennifer's counsel an email three days *after* the Defamation Action was filed, explaining that George was still editing the MSA. (*See* Ex. C.)  And one week after he filed the Defamation Action – on July 31, 2017 – George himself sent an email to his counsel, Jennifer's counsel, and Jennifer, enclosing his edits to the Marital Settlement Agreement.  George identified the subject matter of that email as "GC Edits for MSA 07-31-17," and attached to that email "FNL MSA Signed 07.31.17 pdf." (*See* Ex. D.)[2]

6.    Significantly, while George continued to make edits to the MSA during the week after he filed the Defamation Action, he obviously could have and should have made one more edit, adding his pending "$5,000,000" Defamation Action to the assets being allocated under the MSA.  But George willfully and intentionally chose to conceal the Defamation Action from Jennifer.

7.    Paragraph 6.E. of the MSA directly addresses this situation. Where, as here, the failure to disclose is intentional and willful,  Jennifer is entitled

---

[2] The actual version of the MSA which was attached to George's July 31, 2017 email is available for this Court's review *in camera* if the Court so desires.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

to receive 75% of the value of the Defamation Action, based on the higher of its value at the time of distribution or at the time Judgment was entered. (*See* MSA, ¶ 6.E.(i).) If this Court were to determine that George's failure to disclose was inadvertent – notwithstanding George's deliberate concealment of this asset – Jennifer would still be entitled to receive 60% of the value of the Defamation Action, again based upon the higher of its value at the time of distribution or at the time the Judgment was entered. (*See* MSA, ¶ 6.E.(ii).)

8. This Court plainly has the right – indeed the obligation – to enforce these terms of the Judgment, Section 502(e) of the IMDMA makes clear that the "terms of the agreement set forth in the judgment are enforceable by all remedies available for enforcement of a judgment, including contempt, and are enforceable as contract terms." (750 ILCS 5/502(e).)

9. Jennifer therefore seeks to enforce the Judgment in accordance with its express terms. She further seeks her attorneys' fees and costs incurred in pursuing this Petition based upon George's intentional failure to disclose a material asset.

WHEREFORE, Jennifer Cavelle, n/k/a Jennifer Sawka, respectfully requests that this honorable Court:

A. Enforce the terms of the Judgment and award Jennifer the greater of 75% of the value of the Defamation Action at the time the Judgment was entered, or at the time of its distribution;

4

FILED DATE: 8/13/2018 4:12 PM    2016D003534

B.     Award Jennifer her attorneys' fees and costs incurred in seeking the relief sought in this Petition; and

C.     Award Jennifer such other and further relief as this Court deems just and proper.

## COUNT II

## Modification of the Judgment.

10.     Jennifer reasserts and realleges Paragraphs 1 through 9 above as Paragraph 10 of this Count II.

11.     Alternatively, pursuant to Section 1401 Jennifer seeks to modify Paragraph 6 of the MSA, incorporated into the Judgment, to expressly include the Defamation Action as an asset to be allocated between the parties.  Section 1401 allows a party to obtain relief from a judgment more than 30 days after its entry where, as here, there exists a meritorious defense or claim, and the party exercised "due diligence" both in pursing that defense or claim and in filing the Section 1401 motion.  (735 ILCS 5/2-1401.)  *See, e.g., Smith v. Airoom, Inc.,* 114 Ill.2d 209, 221, 499 N.E.2d 1381, 1386 (1986).

12.     Jennifer clearly has a meritorious claim.   A valuable marital asset was intentionally concealed from her, and the MSA expressly provides her with relief.  As set forth above, George was well aware of the existence of the Defamation Action as he continued to edit the MSA.  His intentional and deliberate failure to disclose this asset was solely intended to prevent Jennifer from receiving

FILED DATE: 8/13/2018 4:12 PM    2016D003534

her interest therein. Due to George's active concealment of this asset, Jennifer was unable to assert this claim notwithstanding any diligence on her part.

13.     Jennifer made an effort to resolve this matter amicably; however, those efforts were unsuccessful.    Accordingly, she has timely and diligently filed this Petition pursuant to Section 1401.    Further, in accordance with the statute, the Petition is supported by Jennifer's Verification as well as documents constituting an "other appropriate showing" as contemplated by Section 1401(b).   (735 ILCS 5/2-1401(b).)

14.     Section 1401 allows this Court to modify the MSA and expressly include the Defamation Action as an additional property item in Paragraph 6 to be distributed between the parties. Under these circumstances, this Court should do so.

15.     Further, based upon George's intentional concealment of this valuable asset, this Court should order George to pay Jennifer's attorneys' fees and costs incurred in presenting this Petition.

WHEREFORE, Jennifer Cavelle, n/k/a Jennifer Sawka, respectfully requests that this honorable Court:

A.     Modify the MSA to expressly include the Defamation Action as an asset to be allocated between the parties, in accordance with the terms of Paragraph 6.E.(i) of the MSA;

FILED DATE: 8/13/2018 4:12 PM    2016D003534

B.     Order that in accordance with the MSA, Jennifer shall be awarded 75% of the higher of the value of the Defamation Action at the time of the Judgment or at the time of its distribution pursuant to Paragraph 6.E.(i);

C.     Award Jennifer her attorneys' fees and costs incurred in pursuing this Petition; and

D.     Award Jennifer such other and further relief as this Court deems just and proper.

Respectfully submitted,

**JENNIFER CAVELLE**
**n/k/a JENNIFER SAWKA**

By: _____
        One of her attorneys

Frances H. Krasnow
Michael T. Held
**Harrison & Held, LLP**
333 W Wacker Dr. Suite 1700
Chicago, Illinois 60606
Telephone: (312) 332-1111
Facsimile: (312) 332-1150
**Firm ID 40190**
*Attorneys for Petitioner*

FILED DATE: 8/13/2018 4:12 PM   2016D003534

## VERIFICATION BY CERTIFICATION

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned, **JENNIFER CAVELLE n/k/a JENNIFER SAWKA**, certifies that the statements set forth in the foregoing **Petition to Enforce or, Alternatively, To Modify Judgment** are true and correct, except as to matters therein stated to be on information and belief, and to such matters she certifies as aforesaid that she verily believes the same to be true.

**JENNIFER CAVELLE,**
**n/k/a JENNIFER SAWKA**

8

FILED DATE: 8/13/2018 4:12 PM   2016D003534

## EXHIBIT A

**MSA (for in-camera review only)**

FILED DATE: 8/13/2018 4:12 PM   2016D003534

**EXHIBIT B**

FILED DATE: 8/13/2018 4:12 PM   2016D003534

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GEORGE CAVELLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:17-cv-_____ |
| v. | ) | |
| | ) | Jury Trial Demanded |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| DORVAL R. CARTER, JR., individually, | ) | |
| JOHN DOE 1, and JOHN DOE 2, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, George Cavelle ("Cavelle"), through his undersigned attorneys, for his complaint against Defendants, Chicago Transit Authority (the "CTA"), Dorval R. Carter, Jr. ("Carter"), John Doe 1, and John Doe 2, states as follows:

### Introduction

1.      This action arises out of the malicious and intentional conduct of the CTA, the CTA's president Dorval Carter, Jr. and at least two executives working under Carter at the CTA, who set out to ruin Cavelle's life and career prospects. During nearly 20 years of dedicated and faithful service to the CTA, Cavelle was a model employee who rose through the ranks from an entry-level worker responsible for rail car repairs and maintenance to become Chief Transit Operating Officer at the CTA. Despite his excellent track record and the myriad contributions he made to the CTA during his tenure, Cavelle's career came to an abrupt and unceremonious end in August 2015, almost immediately after Carter became President of the CTA. There was no legitimate basis for Cavelle's forced resignation. He was a political casualty of the new Carter regime.

FILED DATE: 8/13/2018 4:12 PM   2016D003534

2.      Beyond forcing Cavelle's resignation at the CTA, Carter and his executives set out to interfere with and ultimately ruin Cavelle's reputation and ability to earn a living in the transit industry by publicizing falsehoods about his character and trustworthiness, his ability to meet the demands of his chosen profession, and the basis for his forced resignation at the CTA. In particular, in August 2016—a year after his resignation—Cavelle was offered and accepted a position with King County Metro Transit, the transit agency serving the Seattle area. Upon hearing the news of Cavelle's hiring, Carter, using his contacts and influence in the transit industry, sought out and informed high-ranking members of King County Metro Transit that Cavelle had been fired for stealing from the CTA—an intentionally and demonstrably false statement. Upon hearing from Carter and his executives, King County Metro Transit informed Cavelle that its offer of employment was being rescinded. Cavelle has been unable to secure any meaningful comparable employment since.

3.      As outlined more fully below, Defendants' conduct was intentional, malicious, and without justification. Cavelle seeks damages, including punitive damages, in excess of $5 million.

### The Parties, Jurisdiction, and Venue

4.      George Cavelle is a citizen of the State of Florida.

5.      The CTA is a municipal corporation organized under the laws of the State of Illinois with its principal place of business in Cook County, Illinois.

6.      Carter is the president of the CTA and a citizen of the State of Illinois.

7.      On information and belief, John Doe 1 and 2 are high-ranking executives at the CTA and citizens of the State of Illinois.

8.      This Court has original jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

9.      Venue is proper in this Court under 28 U.S.C. § 1391 because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred.

### Cavelle's Employment History with the CTA

10.     Cavelle began his career with the CTA over twenty years ago, in 1996, working in the Rail Maintenance Department maintaining rail cars and other vehicles and assisting with operations. Through hard work, dedication, and self-sacrifice, Cavelle ascended the ranks within the CTA, despite the turbulence and uncertainty of approximately six regime changes that inevitably followed the different political figures and administrations that ran and controlled the CTA.

11.     In 2015, Cavelle was promoted to Chief Transportation Operations Officer by then CTA president Forest Claypool ("Claypool"). Cavelle was promoted ahead of many more senior candidates who were connected to the CTA's former leadership before Claypool became president. Cavelle's promotion, although meritorious, did not please senior members who had worked either with or directly for Mr. Carter in his previous time at the CTA.

12.     The Claypool administration was known as a no-nonsense administration. Claypool launched various initiatives to clean up the CTA both operationally and fiscally. Numerous CTA employees who failed to show for work, violated safety standards or generally broke the rules were fired on Claypool's watch. In fact, between 2011 and 2014,

FILED DATE: 8/13/2018 4:12 PM   2016D003534

FILED DATE: 8/13/2018 4:12 PM   2016D003534

the Claypool administration dismissed approximately 900 CTA employees. Cavelle was heavily involved in this movement which was widely publicized in Chicago media.

13.     Cavelle's mandate from the Claypool administration was to bring efficiency, fiscal discipline, and budgetary restraint to CTA transit operations, a charge he took seriously and pursued vigorously. Cavelle's decisions and initiatives, though financially beneficial for the CTA, caused internal upheaval and abandoned many decades-old institutionalized inefficiencies that Cavelle identified within the CTA.

### Regime Change at the CTA and Cavelle's Forced Resignation

14.     In April of 2015, Claypool left the CTA to become Mayor Rahm Emanuel's Chief of Staff. Shortly thereafter, Carter was installed as Claypool's successor. Carter joined the CTA from the Department of Transportation in Washington D.C., although he had worked at the CTA for many years before he joined the Department of Transportation and was thus no stranger to the CTA or its internal politics.

15.     Upon his return to the CTA, Carter was not shy about reshuffling the ranks—demoting or promoting certain personnel as he saw fit—in order to insure that his administration was staffed with individuals that were loyal to him and spoke favorably of his management style and leadership experience.

16.     Cavelle did not fit Carter's bill and was an early political casualty of the Carter administration. Specifically, in August 2015, Carter's Chief of Staff, Sylvia Garcia ("Garcia"), and CTA counsel, Brad Jansen ("Jansen"), summoned Cavelle to Carter's office and informed him—without any prior notice and for no stated reason—that he was being removed from his position as Chief Transportation Operating Officer, effective immediately.

17.     Cavelle advised Garcia that he had been employed by the CTA for 19.5 years and that his separation before 20 years of service could have a significant, adverse impact on his pension benefits, which he had worked very hard to earn. In order to avoid that scenario, Cavelle advised that he was willing to work in a maintenance facility or take a demotion in order to stay affiliated with the CTA and to prove his value to the CTA. Cavelle stated that he was aware that this accommodation had been made for several other high-ranking personnel in the past and that he had knowledge of it because in some cases he was instructed to facilitate the accommodation.

18.     Garcia denied the request and advised Cavelle that his separation from the CTA needed to be finalized that day and that he needed to leave the CTA premises immediately. Cavelle was nonetheless advised that his departure from the CTA would be treated as a resignation.

19.     Recognizing the inequities of the situation, the CTA's Director of Security, James Keating ("Keating") said there was no need for Cavelle to be marched out of the building during work hours. Garcia was nevertheless adamant that Cavelle be walked out of the building to the point of aggressively debating the issue with Keating.

20.     In order to avoid publicly humiliating Cavelle, Keating offered to return with Cavelle the next day, a Saturday, to permit Cavelle to gather his personal effects and allow for a more reasonable and dignified departure.

21.     Garcia relented. The parties agreed that Cavelle would tender his resignation that day and return the following day in order to pack his personal effects and leave the building under security escort.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

FILED DATE: 8/13/2018 4:12 PM    2016D003534

22.    Shortly after Cavelle tendered his resignation, Carter immediately and publicly announced Cavelle's separation and thanked Cavelle for his years of service and dedication to the CTA. *See Carter Email Announcing Cavelle's Resignation attached hereto as Ex. A*

23.    The following day, Saturday, August 29, 2015, Cavelle returned to the CTA as promised with his assistant and Keating. They moved as much of Cavelle's personal files and effects, which had accumulated over 19 plus years, as they could into boxes and packed those boxes into Cavelle's car and his assistant's car, as there was too much for one vehicle. Cavelle inauspiciously departed the building saying goodbye only to Keating and his assistant.

24.    Cavelle did not make specific plans with his assistant to get his personal effects out of her car, but he informed her that he was going to a friend's house in Fox Lake to reflect on what had happened, clear his mind, and plan a path forward.

25.    Cavelle left for Fox Lake the following day.

### The Holiday Train Fund

26.    Several days after his resignation from the CTA, Cavelle received a call from his assistant on his cell phone. She advised him that "they" were looking for the Holiday Train Fund file but could not locate it.

27.    The Holiday Train Fund was an annual fundraiser run by the CTA employees to support a small charitable cause. Employees at the CTA typically collected a few thousand dollars in cash and checks. The fund was generally maintained in its own account, but due to a transition between banks was being kept in a file in Cavelle's office at the time of his resignation.

- 6 -

FILED DATE: 8/13/2018 4:12 PM    2016D003534

28.     Cavelle told his assistant where he believed the Holiday Train Fund file was located. She advised him that it was not in the file cabinet. Cavelle told her it could have been inadvertently removed while they were boxing his personal effects and loading them into their cars.

29.     Cavelle asked her to look in the materials in her car and he would do the same when he returned that weekend, as the boxes had been hurriedly stacked in his garage before he left for Fox Lake.

### The CTA Creates and Publishes a Wanted Poster

30.     Several days later, Cavelle's assistant called again and told Cavelle that the search for the Holiday Train Fund was becoming "more serious." Cavelle, in utter disbelief, said he would cut his trip short, return to Chicago that night, and see if the Holiday Train Fund was among the personal effects and files in the boxes stacked in his attic.

31.     What Cavelle did not know at the time—and only discovered in February 2017—was that by August 25, 2015, the CTA had created a fugitive-style "wanted" poster featuring a black and white photograph of Cavelle, and posted them all over CTA properties (the "Wanted Poster"). *Wanted Poster attached hereto as Ex. B.*

32.     The Wanted Poster states in large bold font at the top, "CTA SECURITY LOOKOUT BULLETIN," "Law Enforcement Use Only, Not for Media," and "DISMISSED EMPLOYEE." *Id.*

33.     The Wanted Poster includes a photograph of Cavelle and it states below the photo: "THE ABOVE INDIVIDUAL IS A RECENTLY DISMISSED CTA EMPLOYEE.

- 7 -

FILED DATE: 8/13/2018 4:12 PM   2016D003534

IF HE IS OBSERVED ON CTA PROPERTY, CONTACT CTA SECURITY SERVICES AT (312)***-****. THIS IS FOR INFORMATIONAL PURPOSES ONLY." *Id.*

34.     The poster says, in large capital letters on the bottom border, "CONTACT PUBLIC TRANSPORTATION 24 Hr. HOTLINE 312-745-4443.  NOTIFY JIM HIGGINS @ CELL (773) 820-1019." *Id.*

35.     Cavelle was advised that the posters were put up throughout the interior of the CTA building, outside the CTA building, and at various depots and other CTA facilities where Cavelle did not have regular contact.

36.     On information and belief, CTA does not create and post signage like this for employees unless there is a risk of violence or other potential criminal activity by the separated employee against staff or property.

37.     Nonetheless, on Thursday September 3, 2015 Cavelle and a friend dug through the boxes. They located the entire Holiday Train Fund file that evening. Cavelle notified Karen Siementz, Carter's General Counsel, that the file had been mistakenly removed but that everything was intact, including all records and ledgers, checks and cash, and that he would drop it off at the CTA the very next morning.

38.     As promised, Cavelle met Siementz and the general manager of Payroll, Linda Davis, the next morning on a loading dock at the CTA, as directed, and gave Siementz the Holiday Train Fund file.  Siementz thanked Cavelle and stated, "Thank you George, just hang in there everything will work out", after which both Ms. Siementz and Ms. Davis gave Mr. Cavelle a hug goodbye, and nothing further was said about the matter.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

## Cavelle Lands a Job with King County Metro Transit

39.    Over the course of the next several months, Cavelle set out to find new employment with transit agencies throughout the country. With the assistance of an employment placement firm he was introduced to the transit agency for the Seattle area, King County Metro Transit, located in the State of Washington.

40.    Cavelle was extensively vetted through multiple rounds of interviews and selection procedures, culminating in King County Metro Transit offering Cavelle the position as Vehicle Maintenance Manager, a position in which he would oversee 1,500 transit coaches, and 550 non-revenue support vehicles.

41.    Cavelle countered seeking better compensation. King County Metro Transit agreed to Cavelle's demand and offered Cavelle the position on August 3, 2016. In response to Cavelle accepting the position, the Deputy General Manager for King County, Nancy Grennan ("Grennan"), wrote to Cavelle and said, "Whoohoo! Great news. We can recommend some realtors.  We have the hope you can have some time to work a little bit with John Alley, our outgoing VM head . . . Yeah! . . . And let us know that start date. People here are too excited for words, so this will be great news." *August 3, 2016 email from N. Grennan to G. Cavelle, attached as Ex. C.*

42.    On August 5, 2016, King County issued a press release announcing that the Vehicle Maintenance Head, John Alley, was retiring and that Cavelle, formerly with the Chicago Transit Authority, was assuming Alley's position. *King County Metro Transit Press Release dated August 5, 2016, attached as Ex. D.*

- 9 -

FILED DATE: 8/13/2018 4:12 PM   2016D003534

43.     Over the next several days, Alley sent Cavelle multiple emails containing Alley's extensive analysis of the issues facing Cavelle as he on-boarded as new head of Vehicle Maintenance.

### Carter and His Cronies Contact King County Metro Transit and Interfere

44.     Within days of the King County press release, Carter learned that Cavelle had accepted King County Metro Transit's offer and would be moving to Seattle for the position. Using his influence and contacts in the transit industry, Carter contacted certain high-ranking officials at King County Metro Transit and informed them that Cavelle had been terminated from the CTA for stealing from the Holiday Train Fund.

45.     This is directly contradicted by Ex. A to this Complaint.

46.     Consequently, five days after the press release announcing Cavelle taking over for John Alley, Grennan informed Cavelle that King County was rescinding its offer of employment

47.     Cavelle was in disbelief. He had already started making plans to move out to Seattle and taking steps to transition and could not understand why in the course of seven days King County Metro Transit would completely reverse itself.

48.     Grennan pressed Cavelle why he actually left the CTA. Cavelle reiterated, as he had stated in his initial interview, that there was a change of leadership, and that the new president wanted his own administration and his own people in the C-Suite positions. Cavelle reiterated that he was told there was going to be a change of administration and he was allowed to resign.

49.     Grennan then asked Cavelle, "Are you sure you weren't fired for stealing from the Holiday Fund?" Cavelle met this inquiry with disbelief. He pointed out that it

FILED DATE: 8/13/2018 4:12 PM    2016D003534

was completely inaccurate and that he had an email from Carter announcing his resignation and congratulating him on his years of service. Cavelle relayed all of the circumstances surrounding his departure and the Holiday Train Fund—a complete non-event.

50.     Grennan asked Cavelle if he still had and could send the email from Carter announcing his resignation and if he could send it to her, so she could show it to decision-makers at King County Metro Transit.

51.     Cavelle immediately forwarded Carter's email announcing Cavelle's resignation. Cavelle then wrote to Grennan and stated, "I have never done anything to hurt or mislead the people that work for me or the City of Chicago. I have given 20 years of dedicated service which included hours and days of volunteer work for the Holiday train and its employees." *August 10, 2016 email chain attached as Ex. E.*

52.     Cavelle acknowledged that his initiatives at the CTA may have ruffled some feathers, "I cannot answer as to why hateful people do what they do and as stated in my interview I did not make everyone happy with the changes I knew had to be made," but insisted that he would always "be dedicated and an honest servant for the people I provide service for." *Id.*

53.     Several hours later, Grennan wrote back to Cavelle and said, "George, This email is to confirm King County Metro has withdrawn its offer of employment." Grennan informed Cavelle that the following press release would issue internally at King County Metro Transit and solicited any changes he might have, "Unfortunately, we were not able to secure George Cavelle as our next Vehicle Maintenance Manager, leaving us with the position vacant at the end of the month. To help aid the transition, we are commencing

FILED DATE: 8/13/2018 4:12 PM   2016D003534

with an internal special duty recruitment while we retool our recruitment processes for the future." *Id.*

54.     Cavelle told Grennan how devastating this development was given he had accepted the offer and taken countless steps, including resigning from his current employment in order to accept the position at King County Metro Transit.

55.     Cavelle persisted and asked Grennan what was said that could have caused this reversal. Grennan told Cavelle that Carter himself called and advised the management team at King County Metro Transit that Cavelle had been terminated for stealing from the Holiday Train Fund. According to Grennan, Carter made no mention of Cavelle's resignation or the fact that Carter had sent around a well wishes email for Cavelle. Grennan indicated to Cavelle that is why she wanted to see the email, as it was completely inconsistent with the picture that Carter had painted for the management team at King County Metro Transit.  Cavelle confirmed that it was Carter himself that called and Grennan affirmed her statement.

56.     Grennan also told Cavelle that two senior members of Carter's administration had called separately during the preceding days reiterating the same information to multiple people at King County Metro Transit.

57.     Cavelle told Grennan the information was absolutely false, and asked if there was anything further he could do or anyone he could speak to about the situation. Grennan told Cavelle that under the circumstances, and given what Carter and the other CTA representatives said, King County Metro Transit could not move forward with his candidacy.

FILED DATE: 8/13/2018 4:12 PM   2016D003534

## COUNT I
### (Tortious Interference with Business Expectancy/ Prospective Economic Advantage)

58. Plaintiff repeats and realleges paragraphs 1 through 57 as if fully set forth herein.

59. Plaintiff had a reasonable expectation of entering into a valid business relationship with King County Metro Transit.

60. Defendants knew of Plaintiff's expectancy when they reached out to multiple King County Metro Transit representatives on multiple occasions after King County issued its press release that Cavelle had been hired and would be replacing John Alley.

61. Defendants purposefully and intentionally interfered with Plaintiff's legitimate expectancy by falsely stating that Plaintiff was terminated for stealing from the Holiday Train Fund, and by saying Plaintiff was dismissed. Both statements are demonstrably false.

62. Defendants' conduct prevented Plaintiff's legitimate expectancy from ripening into a valid business relationship.

63. Plaintiff has been damaged in his loss of the King County Metro Transit job and damage to his reputation, resulting from Defendants' interference.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

## COUNT II
### (Tortious Interference with Contract)

64.     Plaintiff repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65.     King County Metro Transit made an offer of employment to Plaintiff and Plaintiff accepted that offer on August 3, 2016.

66.     Defendants became aware of Plaintiff's contract following King County Metro Transit's press release on August 5, 2016.

67.     Defendants intentionally induced a breach and termination of the contract between Plaintiff and King County Metro Transit by King County Metro Transit.

68.     The breach by King County Metro Transit was caused by Defendants' unlawful conduct and false statements surrounding Cavelle, his character, and his separation from CTA.

69.     Plaintiff has been damaged as a direct and proximate result of Defendants' interference.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

## COUNT III
### Defamation *Per Se*

70.     Plaintiff repeats and realleges paragraphs 1 through 69 as if fully set forth herein.

71.     Between August 5 and August 10, 2016, Defendants made knowingly and intentionally false statements about Plaintiff to individuals at King County Metro Transit accusing Plaintiff of criminal activity relative to the CTA's Holiday Train Fund, telling King County Metro Transit officials that Cavelle was terminated for taking funds from CTA, and for falsely stating that he was terminated instead of Cavelle resigning.

72.     Defendants knew at the time they made the statements that they were false.

73.     The statements made by Defendants impute the commission of a criminal offense to Plaintiff.

74.     The statements made by Defendants impute an inability to perform or want of integrity in the discharge of the duties of Plaintiff's office or employment.

75.     The statements made by Defendants prejudice Plaintiff, or impute a lack of ability, in his trade, profession, and business.

76.     The statements made by Defendant have caused Plaintiff damage is his business and profession, and specifically caused the loss of the job with King County Metro Transit.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all damages proven at trial, including punitive damages for Defendants' willful and

FILED DATE: 8/13/2018 4:12 PM    2016D003534

malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

## COUNT IV
### Defamation *Per Quod*

77.    Plaintiff repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78.    Between August 5 and August 10, 2016, Defendants made false statements about Plaintiff to individuals at King County Metro Transit accusing Plaintiff of criminal activity relative to the CTA's Holiday Train Fund, telling King County Metro Transit officials that Cavelle was terminated for taking funds from CTA, and for falsely stating that he was terminated instead of Cavelle resigning.

79.    Defendants knew at the time they made the statements that they were false.

80.    The statements made by Defendants impute the commission of a criminal offense.

81.    The statements made by Defendants impute an inability to perform or want of integrity in the discharge of the duties of Plaintiff's office or employment.

82.    The statements made by Defendants prejudice Plaintiff, or impute a lack of ability, in his trade, profession, and business.

83.    The statements made by Defendant have caused Plaintiff damage is his business and profession, and specifically caused the loss of the job with King County Metro Transit.

WHEREFORE, Plaintiff, George Cavelle, respectfully requests that this Court: (1) enter judgment in favor of Plaintiff and against Defendants, (2) award Plaintiff all

FILED DATE: 8/13/2018 4:12 PM   2016D003534

damages proven at trial, including punitive damages for Defendants' willful and malicious conduct, (3) award Plaintiff its costs and attorneys' fees, and (4) award Plaintiff all additional relief this Court deems fair and just.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable under the Constitution of the United States of America, the Constitution of the State of Illinois, and and/or any applicable statute.

Dated: July 24, 2017

Respectfully submitted,

GEORGE CAVELLE

By: /s/ Robert D. Sweeney

Robert D. Sweeney (6238209)
John J. Scharkey (6278387)
Sweeney & Scharkey LLC
111 West Washington Street
Burnham Center, Suite 1160
Chicago, Illinois 60602
Tel. (312) 384-0500

*Counsel for Plaintiff George Cavelle*

FILED DATE: 8/13/2018 4:12 PM   2016D003534

# EXHIBIT A

FILED DATE: 8/13/2018 4:12 PM    2016D003534

**From:** Carter, Dorval
**Sent:** Friday, August 28, 2015 4:21 PM
**To:** GMs&VPs
**Subject:** Executive staff announcement

Safety is my number one priority at CTA and in keeping with my focus to make our organization best in class, I am realigning our safety organization to better meet our needs as an agency.  Dwayne Lane will be our Vice President of Risk Management focusing on deploying our Safety Management System and Occupational Safety efforts.  Cary Hendrix will be our General Manager for Safety Management Systems and Frank Gresik will be our General Manager for Occupational Safety.  Both will continue to report directly to Dwayne.  On an interim basis, Ron Ester will serve as our VP for Transit Safety and Chief Safety Officer overseeing our operational safety efforts.  Ken Elam will be Acting General Manager for Rail Safety and Rovaughn Graham will be Acting General Manager for Bus Safety, both reporting directly to Ron.  While Ron is acting in this safety role, Bernard Jackson will become interim Director of the Control Center.  The Workers' Compensation team currently housed in Safety will be joining Kevin Rakkers' team in the General Counsel's Office to streamline and improve the effectiveness of our worker's compensation efforts.  Our compliance team of Jeff Hulbert and Nora Leerhsen will now report to Steve Wood.

Finally, George Cavelle has resigned to pursue other opportunities and I have asked Dave Kowalski to act on an interim basis as Chief Transit Operations Officer.  I want to thank George for his innovative thinking, dedication and 18 years of service to the CTA.

FILED DATE: 8/13/2018 4:12 PM   2016D003534

# EXHIBIT B

FILED DATE: 8/13/2018 4:12 PM    2016D003534



FILED DATE: 8/13/2018 4:12 PM    2016D003534

# EXHIBIT C

FILED DATE: 8/13/2018 4:12 PM   2016D003534



**From:** **Buonanno Grennan, Nancy** Nancy.BuonannoGrennan@kingcounty.gov
**Subject:** Re: Formal Offer
**Date:** August 3, 2016 at 2:38 PM
**To:** George Cavelle georgecavelle@gmail.com

Whoohoo! Great news. We can recommend some realtors. We have the hope you can have some time to work a little bit with John Alley, our outgoing VM head. His last day is 8/31 but I am going to see if he will extend 1 more week. In any event, I will let you know- if we can get you here sooner, we would love that but can live with the first full week of September.

Yeah!

Sent from my iPhone

On Aug 3, 2016, at 11:31 AM, George Cavelle <georgecavelle@gmail.com> wrote:

> Nancy
>
> Thank you for the consideration...I guess the only other question I have is...Do you know any good Realtors?...Looks like I'm moving to Seattle. Very excited to be on the team. As far as a start date. I will have to give at least two weeks notice so that I can close out and or hand off the operations of my current employer to my replacement, since it is already August 3rd I will probably need until the first full week in September, that is as long as everything goes smoothly on my end, that would put me at starting the week of September 4th. Let me know if thats conducive to your timeline, obviously if you need me there sooner I will make the necessary arrangements to be there. Additionally if in fact my current employer is not in need of a full two weeks I can notify you as such and possibly start earlier. Again I feel honored to have been selected to be on the team and I can't wait to get started.
>
> On Aug 3, 2016, at 10:57 AM, Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov> wrote:
>
>> Because of the way the salary schedule works, let's start you at Step 10 (your position progresses on the even number steps). The down side – you don't get a bump at 6 months but the plus side, you get that extra money from day 1. If that is a deal, we get you a letter confirming our offer and your acceptance at step 10! And, let us know the start date. People here are too excited for words, so this will be great news.
>>
>> **From:** George Cavelle [mailto:georgecavelle@gmail.com]
>> **Sent:** Wednesday, August 03, 2016 7:47 AM
>> **To:** Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov>
>> **Subject:** Fwd: Formal Offer
>>
>> Nancy
>>
>> First and foremost, thank you for the honor of receiving this offer. I am very excited to join the team. However would it be possible to start me out at step nine then in six months raise me to the step 10 level for the top dollar amount that was mentioned in the original offer letter. Other than that everything else seems reasonable and again I appreciate all of your time and the opportunity to be a part of an incredible organization like King County.
>>
>> Begin forwarded message:
>>
>> **From:** "Eddy, Susan" <Susan.Eddy@kingcounty.gov>
>> **Subject:** Formal Offer

**Date:** August 2, 2016 at 4:00:14 PM EDT
**To:** George Cavelle <georgecavelle@gmail.com>
**Cc:** "Buonanno Grennan, Nancy"
<Nancy.BuonannoGrennan@kingcounty.gov>

George,

Attached please find an electronic copy of your formal offer, if you have questions, please let us know.

susan eddy | sphr | shrm-scp
special projects manager II
department of transportation | transit division
ph: 206-477-6003| fx: 206-263-5202
susan.eddy@kingcounty.gov

FILED DATE: 8/13/2018 4:12 PM   2016D003534

FILED DATE: 8/13/2018 4:12 PM    2016D003534

# EXHIBIT D

FILED DATE: 8/13/2018 4:12 PM    2016D003534

# GOVERNMENT FLEET

MANAGING PUBLIC SECTOR VEHICLES & EQUIPMENT

## Alley to Retire From King County Metro

August 05, 2016

John Alley has announced he will retire from King County Metro Transit in Seattle, Wash., on Aug. 31, ending 50 years of service in the fleet industry. Alley is the transit agency's vehicle maintenance manager. George Cavelle, with Chicago Transit Authority, will be replacing Alley.



Vehicle Maintenance oversees nearly 1,500 transit coaches, 550 non-revenue support vehicles, seven maintenance operations bases, a component supply center, fleet procurement, fleet engineering and training, and data management. Vehicle Maintenance employs more than 750 professional staff and support personnel and has an annual operating budget of more than $135 million and an annual procurement budget of more than $130 million.

Alley previously served as deputy director of the City of San Diego, Calif., Fleet Services Division. In that position, he oversaw a fleet consolidation that included more than 4,000 vehicles. He also worked as the San Diego Police Department fleet administrator and has also worked with the Washington State Patrol and the Washington State Department of Transportation.

Alley's awards include the 2010 *Government Fleet Magazine* Public Sector Fleet Manager of the Year, NAFA's Larry Goill Award in 2009, and the San Diego Taxpayer Association's Golden Watchdog Award in 2009. He was recently inducted into *Government Fleet Magazine's* Public Fleet Hall of Fame.

Alley and his wife Betty plan to spend time with family and on hobbies.

Related: Sarasota County Fleet Manager to Retire

Copyright © 2016 Government Fleet. All Rights Reserved.

FILED DATE: 8/13/2018 4:12 PM    2016D003534

# EXHIBIT E



From: **Buonanno Grennan, Nancy** Nancy.BuonannoGrennan@kingcounty.gov
Subject: RE: Email From Dorval Carter
Date: August 10, 2016 at 1:23 PM
To: George Cavelle georgecavelle@gmail.com

George,

This email is to confirm that King County Metro has withdrawn its offer of employment.  To make this easiest, we will announce this to the organization as follows:

Unfortunately, we were not able to secure George Cavelle as our next Vehicle Maintenance Manager, leaving us with the position vacant at the end of the month.  To help aid the transition, we are commencing with an internal special duty recruitment while we retool our recruitment processes for the future.  Thanks to everyone who participated in the process.

Let me know if you have any changes you would like us to make to that.

Nancy


-----Original Message-----
From: George Cavelle [mailto:georgecavelle@gmail.com]
Sent: Wednesday, August 10, 2016 8:22 AM
To: Buonanno Grennan, Nancy <Nancy.BuonannoGrennan@kingcounty.gov>
Subject: Email From Dorval Carter

Nancy


Please see attached as explained. Additionally let me be perfectly clear, I have never done anything to hurt or mislead the people that work for me or the City of Chicago. I have given 20 years of dedicated service which included hours and days of volunteer work for the Holiday train and its employees. I cannot answer as to why hateful people do what they do and as stated in my interview I did not make everyone happy with the changes I knew had to be made, that being said, all I can say is that I have, am and always will be a dedicated and an honest servant for the people I provide service and work for.

FILED DATE: 8/13/2018 4:12 PM   2016D003534

FILED DATE: 8/13/2018 4:12 PM   2016D003534

**EXHIBIT C**

**Frances H. Krasnow**

FILED DATE: 8/13/2018 4:12 PM    2016D003534

**From:** Kristina Jarvis [mailto:kjarvis@jarvisfamilylaw.com]
**Sent:** Thursday, July 27, 2017 4:36 PM
**To:** Frances H. Krasnow
**Cc:** georgecavelle@gmail.com
**Subject:** MSA

George is making two handwritten changes and sending me the pages via scan and email. Your client can accept or reject the changes.

****Please note my new direct line telephone below****

Regards,

Kristina L. Jarvis

**Law Offices of Kristina L. Jarvis, P.C.**
111 West Washington Street
Suite 1160
Chicago, Illinois 60602
Direct: (312) 384-1287
Telefax: (312) 384-0600
E-Mail: kjarvis@jarvisfamilylaw.com

**CONFIDENTIAL E-MAIL**
This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving it in any manner. This communication does not form any contractual obligation on behalf of the sender or the Law Offices of Kristina L. Jarvis, P.C.

**CIRCULAR 230 NOTICE**
To ensure compliance with recently enacted U.S. Treasury Department regulations, we are now required to advise you that, unless otherwise indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters herein.

FILED DATE: 8/13/2018 4:12 PM   2016D003534

**EXHIBIT D**

**Frances H. Krasnow**

FILED DATE: 8/13/2018 4:12 PM    2016D003534

| | |
|---|---|
| **From:** | George Cavelle <jamin.gee@gmail.com> |
| **Sent:** | Monday, July 31, 2017 7:34 PM |
| **To:** | Frances H. Krasnow; Kristina Jarvis; Jennifer Cavelle |
| **Subject:** | GC Edits for MSA 07-31-17 |
| **Attachments:** | FNL MSA Signed 07-31-17.pdf |

Please see attached

1

FILED DATE: 8/13/2018 4:12 PM   2016D003534

## CERTIFICATE OF SERVICE

Kevin A. Salzstein, an attorney, hereby certifies that he caused a true and correct copy of **Petition to Enforce or, Alternatively, to Modify Judgment** to be served by Email and U.S. mail upon:

George Cavelle
1811 Renaissance Commons Blvd, Apt 2513
Boynton Beach, Florida 33426
Email: jamin.gee@gmail.com

With a courtesy copy to:

Kristina L. Jarvis
Law Offices of Kristina L. Jarvis, P.C.
111 W. Washington Street
Suite 1160
Email: kjarvis@jarvisfamilylaw.com

this 10th day of August, 2018.

**Kevin Salzstein**